# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

North Carolina Democratic Party,

                Plaintiff,

      v.

North Carolina State Board of Elections; Karen Brinson Bell, *in her official capacity as Executive Director of the North Carolina State Board of Elections*; Alan Hirsch, *in his official capacity as Chair of the North Carolina State Board of Elections*; Jeff Carmon, *in his official capacity as Secretary of the North Carolina State Board of Elections*; and Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, *in their official capacities as members of the North Carolina State Board of Elections*,

                Defendants.

Case No. 5:24-cv-699-M-KS

**FIRST AMENDED COMPLAINT**

      Plaintiff North Carolina Democratic Party, pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure, and complaining of defendants, alleges:

## INTRODUCTION

      1.      As the Supreme Court has explained, the right to vote "'is a fundamental matter in a free and democratic society,'" and a right that is "'preservative of other basic civil and political rights.'" *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964)). Indeed, the Court has said, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Accordingly, "[i]t has been repeatedly recognized that all qualified voters have a constitutionally

protected right to vote *and to have their votes counted*." *Reynolds*, 377 U.S. at 554 (citation omitted) (emphasis added).

2.      From September 20 to November 5, millions of eligible voters exercised that fundamental right to vote in North Carolina's 2024 general election. Some contests, including for associate justice of the North Carolina Supreme Court and certain state legislative seats, were extremely close. For example, with all counties having canvassed and twice re-counted their results, Allison Riggs, the Democratic nominee for associate justice (and the incumbent), received several hundred more votes than Jefferson Griffin, the Republican nominee.

3.      Griffin filed 307 election protests in counties across North Carolina, claiming that 60,000 voters' ballots should not be counted. The Republican candidates for three legislative seats—Frank Sossamon, Stacie McGinn, and Ashlee Adams (who has since conceded)—also filed protests.[1]

4.      On November 20, the North Carolina State Board of Elections ("NCSBE") issued an order (attached as Exhibit A) taking jurisdiction over three categories of protests (collectively, the "Protests"). Specifically, the NCSBE took jurisdiction over protests filed by Griffin, Sossamon, Adams, and McGinn alleging that ballots were unlawfully counted for one of the following reasons described by the NCSBE:

> a.  Ballots were cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States;
>
> b.  Ballots were cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a qualifying photo ID or ID Exception Form; and

---

[1] These protests are public records available on the North Carolina State Board of Elections website at https://dl.ncsbe.gov/?prefix=Legal/Nov%202024%20Protests. All URLs cited herein without a publication date were visited on December 30, 2024.

c.  Ballots were cast by registered voters whose voter-registration database records contain neither a driver's license number nor the last-four digits of a social security number.

Exhibit A ¶1.

5.  On December 13, following briefing and a hearing, the NCSBE issued a decision (attached as Exhibit B) dismissing the Protests on grounds based largely in federal law.  But Judge Griffin has continued to press the Protests in two ways.

6.  *First*, he petitioned for an extraordinary writ of prohibition in the North Carolina Supreme Court, asking that court to prohibit the NCSBE from counting the challenged ballots.  Because that petition sought declaratory rulings under various provisions of federal law, it was removed to federal court.  Notice of Removal (ECF 1), *Griffin v. NCSBE*, No. 24-cv-00724 (E.D.N.C. Dec. 19, 2024).

7.  *Second*, Judge Griffin filed three petitions (one per category of Protest) for judicial review of the NCSBE's decision in the Wake County Superior Court; those petitions have also been removed to federal court as a single action.  Notice of Removal (ECF 1), *Griffin v. NCSBE*, No. 24-cv-00731 (E.D.N.C. Dec. 20, 2024).

8.  Despite the removals, further state proceedings remain possible, as this Court has ordered the NCSBE to show cause as to why the former matter should not be remanded to the North Carolina Supreme Court.  *See* Text Order, No. 24-cv-00724 (E.D.N.C. Dec. 26, 2024).

9.  The NCSBE has not yet certified the state supreme court election for Justice Riggs but has represented that, absent a stay, the certificate of election will issue on or after January 7, 2025.  *See* Notice of Removal (ECF 1) at 4, No. 24-cv-00724.  The same certification date applies to the winning legislative candidates.

10.  While protests have historically been used to challenge individual voter eligibility based on *individualized* evidence (e.g., evidence that a voter has been convicted of a felony, or

moved to another jurisdiction and registered to vote there), each of the three categories pressed by the protestors presents a *systematic* challenge. Two of the three, moreover, rest on legal theories advanced unsuccessfully before the election by the North Carolina Republican Party ("NCRP") and the Republican National Committee ("RNC").

11.     Because they involve systematic challenges, the Protests—though framed in state-law terms—implicate multiple provisions of federal law in ways that the traditional use of the protest process does not. As systematic challenges to voter eligibility raised after the election, for example, the first and third categories of protest contravene the National Voter Registration Act ("NVRA"), which prohibits what is in essence retroactive post-election voter-roll maintenance. *See* Exhibit B at 26-27. Constitutional due process also prohibits the relief the protesters seek, both because the protesting candidates failed to provide affected voters adequate notice (as required to ensure they have an opportunity to be heard), *see id.* at 11-14, and because changing the rules for eligibility or voting after an election imposes an undue burden on the right to vote, even if the state provides notice and a chance to be heard after the election is over, *see id.* at 23-25. The first two categories of Protests also involve ballots cast by military and overseas citizens pursuant to the protections provided by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), as implemented by the North Carolina Uniform Military and Overseas Voting Act ("UMOVA"). *See id.* at 29-32, 37-39. The third category, meanwhile, is grounded in a state statutory provision that expressly incorporates the federal Help America Vote Act ("HAVA")—which prohibits (and certainly does not authorize) refusing to count a ballot on the ground that the voter's registration records do not contain a driver's license number or the last four digits of a social security number. *See id.* at 18.

12.     Put simply, the Protests demand that North Carolina violate federal laws safeguarding North Carolinians' fundamental right to have their votes counted.  In light of that demand, and given the state proceedings Judge Griffin has initiated, this Court should issue a declaratory judgment regarding the application of federal law to the Protests.  In particular, the NCDP requests a declaratory judgment that federal law prohibits throwing out votes after an election on the basis of the mass, systematic challenges lodged by the Protests.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction under 28 U.S.C. §1331, as this action arises under federal statutes—the NVRA and HAVA—and the U.S. Constitution.  This Court also has subject-matter jurisdiction under 28 U.S.C. §1343(a) and 42 U.S.C. §1983, as plaintiff seeks equitable and declaratory relief to protect the right to vote.

14.     This Court has personal jurisdiction over the North Carolina State Board of Elections, which is a state agency of (and located in) North Carolina.

15.     This Court has personal jurisdiction over NCSBE Executive Director Karen Brinson Bell, NCSBE Chair Alan Hirsch, Secretary Jeff Carmon, and NCSBE members Stacy Eggers IV, Kevin N. Lewis, Siobhan O'Duffy Millen, as they are each sued in their official capacities as appointed officials in North Carolina.  Each also works and resides in North Carolina.  *See infra* ¶¶22-27.

16.     Venue in this Court is proper under 28 U.S.C. §1391(b).  The NCSBE and its members reside in this district, and the NCSBE assumed jurisdiction over the Protests giving rise to the complaint.  Furthermore, a substantial portion of the federal-law violations outlined in this complaint have occurred or will occur in this district, because many of the voters whose ballots

are challenged by the Protests reside within this district, cast their ballots within this district, and had their ballots duly counted by their respective county boards of elections within this district.

17.     This Court has authority to grant declaratory (and injunctive) relief under 28 U.S.C. §§2201-2202.  The Court also has authority to enter a declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65.

## PARTIES

### A.     Plaintiff

18.     The North Carolina Democratic Party ("NCDP") is a state committee, as that term is defined by 52 U.S.C. §30101.  The NCDP's purpose is to elect Democratic candidates to public office throughout North Carolina, including the Democratic nominees for associate justice of the North Carolina Supreme Court and the state legislative seats at issue here.  To accomplish that purpose, the NCDP supports Democratic candidates in national, state, and local elections through fundraising and organizing efforts; protects the legal rights of voters; and ensures that all voters can cast ballots and have their votes counted in North Carolina.  The NCDP has members and other constituents throughout North Carolina, including many voters who regularly support and vote for candidates affiliated with the Democratic Party (and did so in this election), such as Justice Riggs and the Democratic candidates for the relevant legislative seats: Representative Terrence Everitt, Bryan Cohn, and Woodson Bradley.

19.     There are over 2.4 million registered members of the Democratic Party in North Carolina.  *See Voter Registration Statistics*, NCSBE.[2]  Members of the NCDP, and other individuals who voted for Justice Riggs and/or one of the Democratic nominees for the relevant legislative seats, will have their votes thrown out if the Protests are ultimately sustained on

---

[2] https://vt.ncsbe.gov/RegStat/Results/?date=12%2F21%2F2024.

appeal or if Judge Griffin's petition for a writ of prohibition is successful. As a representative of those voters, the NCDP can obtain relief on their behalf without their individual participation. The NCDP thus brings the claims below on behalf of its members as well as other individuals who voted for Justice Riggs and/or its legislative nominees and will be harmed by the Protests.

20. The Protests, and Judge Griffin's continued efforts to have votes tossed out, also directly harm the NCDP as an organization, and hence it also has standing to sue on its own behalf. The NCDP has expended significant funds and resources on voter outreach and mobilization efforts in the 2024 general election. Forcing the NCDP to protect its members by defending against these Protests has diverted and will continue to divert the NCDP's funds from its core voter-counseling, policy advocacy, and other business by requiring significant additional expenditures on voter outreach and mobilization in the future to ensure disenfranchised voters are able to both cast their ballots and have their votes counted in future elections. Any erroneous denial of Democratic voters' right to have their ballots counted further injures the NCDP by undermining the NCDP's ability to succeed in getting Democrats elected.

**B. Defendants**

21. The North Carolina State Board of Elections is the state agency with "general supervision over the primaries and elections in the State." N.C. Gen. Stat. §163-22. It is thus "the state agency charged with the administration of the elections process and campaign finance disclosure and compliance." *About NCSBE*.[3] The NCSBE "works in conjunction with county boards of elections" throughout North Carolina "to ensure that elections are conducted lawfully and fairly." N.C. Gen. Stat. §163-182.12; *see also id.* §163-182.11. That work includes

---

[3] https://www.ncsbe.gov/about.

regulating and addressing protests filed with the county boards of elections. *Id.* §163-182.12.

The NCSBE is located in Raleigh, North Carolina. *About NCSBE*, *supra* n.3.

22.    Karen Brinson Bell is NCSBE's executive director, and thus North Carolina's

"Chief State Election Official," N.C. Gen. Stat. §163-82.2.  In that role, she is tasked with

"administering elections," "overseeing 100 county boards of elections," and "ensuring voting for

more than 7 million voters." *About NCSBE*, *supra* n.3.  She is sued in her official capacity.

23.    Alan Hirsch is NCSBE's chair.  He resides in Chapel Hill, North Carolina, and is

sued in his official capacity.

24.    Jeff Carmon is NCSBE's secretary.  He resides in Snow Hill, North Carolina, and

is sued in his official capacity.

25.    Stacy Eggers IV is an NCSBE member.  He resides in Boone, North Carolina, and

is sued in his official capacity.

26.    Kevin N. Lewis is an NCSBE member.  He resides in Rocky Mount, North

Carolina, and is sued in his official capacity.

27.    Siobhan O'Duffy Millen is an NCSBE member.  She resides in Raleigh, North

Carolina, and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.    The NCRP's Previous Attempts To Systematically Purge Voters From The Rolls

28.    In North Carolina, "[e]very person born in the United States and every person

who has been naturalized," is "18 years of age," and meets certain qualifications "shall be

entitled to vote at any election."  N.C. Const. art. VI, §1.  To the extent a private party believes

that a person is not eligible to vote, the party must challenge the person's eligibility: (1) well

before the election (at least 25 days), N.C. Gen. Stat. §163-85; (2) when the challenged voter

casts a ballot in person on election day, *id.* §163-87; or (3) by 5 pm on the business day after the deadline for receipt of absentee ballots, if the challenged voter cast such a ballot, *id.* §163-89. The challenger must come forward with affirmative, individualized proof that the voter is ineligible to cast a ballot at the relevant time, and the voter must be afforded notice and an opportunity to be heard when challenged. *See id.* §§163-86, 163-88, 163-89.

29.     During the 2024 general election, none of the Republican candidates' campaigns (i.e., the campaigns of Griffin, Adams, Sossamon, and McGinn) availed itself of these procedures, nor did the NCRP. Instead, the NCRP, along with the RNC, filed several lawsuits to disenfranchise specified categories of voters en masse.

30.     For example, in August 2024, the NCRP and RNC asked a North Carolina superior court to purge up to 225,000 registered North Carolinians from the voter rolls or force them to cast provisional ballots that are presumptively not counted, even though these voters filled out the state's voter-registration form, had their eligibility to vote verified by election officials, and had brought or would bring identification to the polls when they voted (as state and federal law require). The lawsuit claimed that these 225,000 voters *might* be ineligible because they (1) allegedly registered using an NCSBE registration form that supposedly did not make clear that voters with a North Carolina driver's license or social security number must provide one of those numbers on the form, as required by the federal Help America Vote Act, 52 U.S.C. §21083(a)(5)(A), which is incorporated into state law, N.C. Gen. Stat. §§63-82.11(c), 163-82.4(a)(11), and (2) allegedly did not provide this information. Because the case hinged on the interpretation of HAVA and the NVRA, it was removed to federal court in this district. The district court dismissed the statutory claim based on its interpretation of HAVA, and the Fourth Circuit rejected the plaintiffs' attempt to remand the constitutional claim to state court. *See*

*Republican National Committee v. North Carolina State Board of Elections*, 120 F.4th 390, 393 (4th Cir. 2024). The NCRP and RNC did not appeal the dismissal of their statutory claim; litigation over their constitutional claim continues in federal court. *See* Case No. 24-cv-547 (E.D.N.C.).

31. Two months after filing the lawsuit just discussed, the NCRP and RNC brought a case seeking to disenfranchise specified categories of overseas voters, including military servicemembers and their families, who cast ballots pursuant to (1) UOCAVA—which safeguards the rights of military and overseas voters in federal elections—and (2) UMOVA, a state law that incorporates and expands upon UOCAVA's protections for elections for state office. The NCRP and RNC claimed that U.S. citizens born overseas who have not lived in the United States but whose parents were eligible North Carolina voters before moving abroad are not eligible to vote, despite a state law granting them that right, N.C. Gen. Stat. §163-258.2(1)(e), and further claimed that all overseas voters should be required to provide identification proving residency under state law. The NCRP and RNC declined to pursue injunctive relief in state court regarding the latter claim. They did seek a preliminary injunction as to the former claim, but their request was denied, as was their request for extraordinary relief from the North Carolina Court of Appeals. They also sought extraordinary relief from the North Carolina Supreme Court, a request which remains pending. *See Kivett v. North Carolina State Board of Elections*, Case No. 281P24 (N.C. Nov. 1, 2024).

32. In each of these cases, the courts appropriately exercised judicial restraint, refusing to alter the rules of the ongoing 2024 general election in a manner that would disenfranchise voters.

**B.     Republican Candidates' Post-Election Protests**

33.     Voting in the 2024 general election commenced on September 20, 2024, with the distribution of military and overseas ballots.  Absentee ballots were distributed beginning on September 24, and election day was November 5.

34.     One closely contested race was for associate justice of the North Carolina Supreme Court.  That court comprises a chief justice and six associate justices.  Each of the seven members serves an eight-year term.  Governor Roy Cooper appointed Justice Riggs to fill the vacancy in seat #6 in September 2023.  In March 2024, following primary elections, she was nominated by the NCDP to stand for re-election.  The NCRP nominated Judge Griffin to challenge Justice Riggs.

35.     Several state legislative races in North Carolina were also closely contested in the 2024 general election, including those for Senate Districts 18 and 42 and House District 32.

36.     North Carolina's county boards of elections canvassed the 2024 general election results on November 15 and 18.  Pursuant to that canvass, Justice Riggs won re-election by several hundred votes; the Democratic nominees for Senate District 18 (Everitt), Senate District 42 (Bradley), and House District 32 (Cohn) also won their elections, each by a margin of a few hundred votes.

37.     Dissatisfied with the results of the canvass, Griffin, along with the Republican candidates for Senate District 18 (Adams), Senate District 42 (McGinn), and House District 32 (Sossamon) filed a slew of election protests.  In North Carolina, "[a] protest concerning the conduct of an election may be filed with the county board of elections by any registered voter who was eligible to vote in the election or by any person who was a candidate for nomination or election in the election," and it must concern "the manner in which votes were counted and results tabulated" or "some other irregularity."  N.C. Gen. Stat. §§163-182.9(a), (b)(2).  A protest

must be dismissed where there is "not substantial evidence of any violation [of the election law], irregularity, or misconduct sufficient to cast doubt on the results of the election." *Id.* §§163-182.10(d)(2). Historically, protests have been used to challenge tabulation accuracy or individual voter eligibility, such as where voters have died, been convicted of felonies, voted twice, or where their votes were improperly excluded.[4]

38.    Griffin filed 307 election protests in counties across North Carolina, claiming that 60,000 voters' ballots should not be counted, and the legislative candidates filed several similar protests. Some of these protests raised factual, record-based challenges, such as (again) that county boards of elections unlawfully counted votes by voters who had died or been convicted of felonies. But others used the protest process to raise systematic legal challenges to the eligibility of groups of voters and the validity of their votes based on the same or similar legal theories the NCRP and RNC have pushed in litigation.

39.    On November 20, 2024, the NCSBE issued an order specifying how the protests would be considered. *See* Exhibit A. Under that order, the NCSBE took jurisdiction over protests filed with county boards of elections by Griffin, Sossamon, Adams, and McGinn that "allege that ballots were unlawfully counted for one of [three] reasons." *Id.* ¶1. The NCSBE described those reasons, which mirror the legal theories advanced in the lawsuits discussed above, as:

    a.    Ballots were cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States;

---

[4] Danielle Battaglia, *Protests, Appeals and Recounts Continue to Delay NC Supreme Court Election Results*, News & Observer (Dec. 9, 2020), https://www.newsobserver.com/news/politics-government/election/article247668465.html; *NC Board Of Elections Orders Counties To Dismiss Protests From McCrory Campaign*, WBTV (Nov. 29, 2016), https://www.wbtv.com/story/33813583/nc-board-of-elections-orders-counties-to-dismiss-protests-from-mccrory-campaign/.

b. Ballots were cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form; and

c. Ballots were cast by registered voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number.

*Id.* Examples from each of the three categories—the three that are at issue here—are attached as Exhibits C, D, and E respectively.[5]  The county boards of elections retained jurisdiction over all other protests, including individualized challenges to voter eligibility.  Exhibit A ¶4.

40.     Voters targeted by the first category have been assured for over thirteen years that (contrary to the protestors' claim) they are eligible to vote because a state statute—which the NCRP and RNC have (unsuccessfully) challenged in court—grants them that right.  *See* N.C. Gen. Stat. §163-258.2(1)(e).  That statute is consistent with established state law construing voter residence and domicile.  *See Thayer v. Thayer*, 187 N.C. 573, 574 (1924); N.C. Const. art. VI, §2(2).

41.     Similarly, both NCSBE guidance and North Carolina law informed voters targeted by the second category that (contrary to the protestors' claim) they did not have to submit photo identification along with their absentee ballots.  The NCSBE has stated that "neither federal nor state law requires" such voters to "provide ID when returning their ballot."  Exhibit D at 1, 8.  And state law provides that unless they request a regular absentee ballot, UMOVA voters are given ballots "specifically prepared or distributed for" their use.  N.C. Gen. Stat. §163-258.2.  Only a declaration, and no photo identification, must accompany such ballots.  *Id*. §163-258.17(b).  Even if photo identification were required, moreover, state law provides that "[i]f a [UMOVA] voter's mistake or omission in the completion of" a ballot "does not prevent

---

[5] While these examples are protests filed by Judge Griffin, the protests filed by the legislative candidates within each category are identical or nearly identical.  *See supra* ¶3 & n.1.

determining whether a covered voter is eligible to vote, the mistake or omission does not invalidate" the ballot. *Id.* §163-258.17(a).

42.    Likewise, voters targeted by the third category of Protests registered using state-provided registration forms—which the RNC and NCRP have argued did not "clearly indicate that" a registrant was "required to list her driver's license number or the last four digits of her social security number," *Republican National Committee*, 120 F.4th at 399—and were then allowed to vote, which means their registrations were accepted and eligibility confirmed by election officials. *See* N.C. Gen. Stat. §§163-82.1(a), 183-82.6, 183-82.7.

43.    In an apparent effort to comply with state requirements that protesters provide notice of protests to affected voters, the NCRP mailed postcards to broad categories of voters. *See* Exhibit F (Offerman affidavit) ¶¶10-20.  For example, the NCRP claims to have mailed postcards to every person who cast a ballot in the November 2024 general election, who registered after January 1, 2004, and whose registration-database records do not contain a driver's license number or the last four digits of a social security number.  *See* Exhibit E at 11. The postcards, however, contain minimal or misleading information.  For example, they do not indicate which candidate has filed the protest or even which race is at issue.  *See* Exhibit F at 5. Nor do they indicate which of the hundreds of protests concern the recipient.  Rather, the postcards merely state that "your vote *may* be affected by one or more protests filed in relation to the 2024 General Election" and instruct voters to "scan [a] QR code to view the protest filings" and "check under the county in which you cast a ballot to see what protest *may* relate to you." *Id.* (emphases added).  As the NCSBE noted, the QR code leads to a page linking to hundreds of protests, not all organized by county.  *See* Exhibit B at 9.  And within each individual protest filing, names of affected voters appear only in non-alphabetized printouts of spreadsheets.  *Id.*

At least some of the postcards, moreover, are addressed to the challenged voter "or current resident." *See* Exhibit G.[6]  And while the postcards note that "more information on when your County Board of Elections will hold a hearing on this matter" is available at a link found via the QR code, *id.*, following that link merely directs voters to a dropdown list of counties, and selecting a county leads to a link to the landing page for that county's board of elections—not to information on hearing dates.  Finally, nothing on the postcard indicates that voters will have any opportunity to be heard at a hearing or otherwise.  *See id.*

## CLAIMS FOR RELIEF

### Count I: Violation of the National Voter Registration Act,
### 52 U.S.C. §§20507(c)(2)(A), 20507(b)(1) – Systematic Removal of Voters

44.     Plaintiff realleges all preceding paragraphs as if fully set forth herein.

45.     With exceptions not relevant here, federal law requires each state to (1) maintain a single authoritative list of voters registered in the state, and (2) conduct "list maintenance" to remove ineligible individuals from the rolls.  52 U.S.C. §21083(a).  Under the NVRA, voters may be removed from the rolls at their request or because of a change in residence, a criminal conviction, mental incapacity, or death.  *Id.* §20507(a)(3), (4).  North Carolina law provides for removal from the voter rolls for largely the same reasons.  *See* N.C. Gen. Stat. §163-82.1(c).

46.     At the same time, the NVRA sharply limits states' ability to deem voters ineligible shortly before or after any federal election.  Section 8 of the NVRA provides that:

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

---

[6] Exhibit G is extracted from an image of an as-sent postcard published by the Southern Coalition for Social Justice.  *See* Southern Coalition for Social Justice (@scsjofficial), Instagram (Dec. 4, 2024), https://www.instagram.com/scsjofficial/p/DDKzasev_dz/?img_index=1.

52 U.S.C. §20507(c)(2)(A).  North Carolina law requires that systematic efforts to remove ineligible voters from the rolls, for the purposes of both federal and state elections, comply with the NVRA.  N.C. Gen. Stat. §163-82.14(a); *see also* Exhibit B at 26-27.

47.    In a prior case, another federal district court in North Carolina held that North Carolina county boards of elections violated 52 U.S.C. §20507(c)(2)(A) when voters were systematically removed from the rolls within 90 days of a federal election based on challenges stemming from mailings to those voters being returned as undeliverable.  *See North Carolina State Conference of NAACP v. Bipartisan Board of Elections and Ethics Enforcement*, 2018 WL 3748172, at *5-10 (M.D.N.C. Aug. 7, 2018).  The court enjoined North Carolina officials from continuing to do so "without individualized inquiry as to the circumstances of each voter in the 90 days preceding a federal election." *Id.* at *12.  It further enjoined officials from "holding hearings or taking any other action(s) to process challenges" designed to facilitate systematic removal. *Id.*[7]

48.    The NVRA thus prohibits North Carolina from discarding votes based on the systematic challenges contained in the first and third categories of Protests, which dispute voters' status on the voter rolls.  For the 2024 general election, the deadline for systematic list maintenance to be completed was August 7, 2024.  After that date, voters could not be legally deemed ineligible for systematic, rather than individualized, reasons.  But the Protests do not raise individualized challenges against any of the registered voters whose votes they seek to

---

[7] In accordance with the NVRA and the court's order, the NCSBE promulgated Numbered Memo 2018-07, which reiterates that within 90 days of a federal election, county boards may not remove a voter from the rolls based on a voter challenge brought without an individualized inquiry as to the circumstances of each voter, meaning reliable first-hand evidence specific to the voters challenged.  Generic evidence that conveys no information about each challenged voter's specific circumstances is not sufficient.

cancel.  Rather, by endeavoring to throw away the already-cast votes of large swaths of voters based on generic legal challenges, the Protests (and the appeal and petition that continue to advance them), in essence, call for retroactive post-election voter-roll maintenance.  That is barred by the NVRA.

49.    Although split into separate county-specific packages, the Protests (and related lawsuits) amount to requests for the kind of systematic, non-individualized bulk removal of voters that the NVRA bars and which the RNC and NCRP failed to obtain through pre-election litigation.  For example, Protests in the first category each follow the same template, seeking retroactively to disenfranchise *all* voters who have never "resided in the United States," whom they identify by attaching a chart listing the names and residential addresses of such suspected voters in the county.  *See, e.g.*, Exhibit C at 16.  But a voter is "domiciled" in North Carolina— and thereby satisfies North Carolina's residency requirement—even if he has never lived in North Carolina, so long as he was born to North Carolina residents and never established a new domicile.  *Thayer*, 187 N.C. at 574; *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

50.    Similarly, the third category of Protests targets voters who purportedly did not provide their driver's license number or the last four digits of their social security number on their voter registration forms.  But many of these voters—i.e., those who omitted this information while registering by mail—were required by HAVA and its state analog to present a valid photo identification or other identifying document the first time they voted.  *See* 52 U.S.C. §21083(b); N.C. Gen. Sat. §163-166.12(a).  The NVRA's requirement of individualized eligibility determinations ensures that each voter targeted for disenfranchisement is in fact

ineligible to vote.  By contrast, sweeping protests that target voters en masse, like the ones here, are forbidden after the 90-day mark.

51.     Lastly, the NVRA requires that any "State program or activity" to de-register voters be "uniform, nondiscriminatory, and in compliance with" the Voting Rights Act.  52 U.S.C. §20507(b)(1).  That requirement is violated when a method for purging voters is over-inclusive, "identif[ying] many properly registered citizens as potential noncitizens."  *United States v. Florida*, 870 F.Supp.2d 1346, 1350 (N.D. Fla. 2012).

52.     Protests in the third category, which seek to discard ballots "cast by registered voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number," Exhibit A ¶1(c), are undoubtedly over-inclusive. Even if it were lawful to discard ballots of voters whose NCSBE-provided registration forms were accepted despite not providing the information required by HAVA, HAVA does not require every voter to provide a driver's license number or the last four digits of their social security number.  Rather, "[i]f an applicant for voter registration … has not been issued a current and valid driver's license or a social security number," then "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes."  52 U.S.C. §21083(a)(5)(A)(ii).  And neither any protest nor the NCRP-RNC lawsuit on this issue contains *any* allegation that the NCSBE failed to assign an identifying number to any—let alone all—of the applicants who did not provide such information when registering with the prior form. Indeed, the NCRP conceded in litigation that the voters targeted for removal on this basis are only "*potentially* ineligible."  *See* Complaint ¶94, *Republican National Committee v. North Carolina State Board of Elections*, No. 24-cv-26995-910 (N.C. Super. Ct. Aug. 23, 2024) (emphasis added).

53.     The NCSBE's order dismissing the Protests confirms this reasoning.  It concluded that Protests in the third category "derive[] from federal law" (HAVA), "and the complained-of issue has been remedied consistent with federal law" through the federal-court litigation described above.  *See* Exhibit B at 17; *supra* ¶30.  It further explained that this Court "has determined that no further remedy would be permissible for the current election."  Exhibit B at 20 (citing Order (ECF 73) at 4, *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-547 (Nov. 22, 2024)).  The NCSBE also concluded that both state and federal law allow individuals who did not provide an identification number to register and vote, *see* 52 U.S.C. §21083(a)(5)(ii), and that the Protests failed adequately to allege any cause to believe the targeted voters registered without providing the relevant identification numbers.  Exhibit B at 17, 25-26.  Finally, the NCSBE concluded that the federal 90-day bar, as codified in the NVRA and incorporated into HAVA, prohibits discarding ballots targeted by the third category of Protests.  *Id*. at 26-27.

54.     Absent this Court's adjudication, the Protests (and the litigation that seeks to advance them) present an ongoing risk of mass disenfranchisement of thousands of NCDP members, in contravention of the NVRA.  The Court should therefore enter a declaratory judgment that the NVRA prohibits throwing out votes after an election on the basis of the systematic challenges raised by the first and third categories of Protests (and reiterated in Judge Griffin's subsequent litigation).[8]

---

[8] Because the election has already occurred, the NCDP was not required to provide notice of this NVRA violation to North Carolina's chief election official before suing; notice is required only where violations are occurring or will occur "more than 30 days before the date of an election for Federal office," 52 U.S.C. §20510(b)(3).

**Count II: Violation of the Fourteenth Amendment to the United States Constitution –
Procedural Due Process**

55.     Plaintiff realleges all preceding paragraphs as if fully set forth herein.

56.     Due process prohibits states from depriving "any person of life, liberty, or
property without due process of law."  U.S. Const. amend. XIV, §1.  A state thus may not deny a
constitutionally protected liberty interest without adequate procedural protections.

57.     Although sustaining the Protests would be unconstitutional even if a procedural-
due-process claim were assessed under the *Anderson-Burdick* framework, *see infra* Count III,
"[m]ultiple district courts … have considered procedural due process challenges to election
regulations under ordinary procedural due process principles," i.e., the factors outlined in the
next paragraph.  *Arizona Democratic Party v. Hobbs*, 485 F.Supp.3d 1073, 1093 (D. Ariz. 2020)
(collecting cases); *see also Democracy North Carolina v. North Carolina State Board of
Elections*, 476 F.Supp.3d 158, 228-229 (M.D.N.C. 2020) (applying those factors for a
procedural-due-process claim against a North Carolina law governing absentee ballots).  To
succeed on a procedural-due-process claim, a plaintiff must show: "(1) a cognizable liberty
interest or property interest; (2) the deprivation of that interest by some form of state action; and
(3) that the procedures employed were constitutionally inadequate."  *Kendall v. Balcerzak*, 650
F.3d 515, 528 (4th Cir. 2011) (quotation marks omitted).  On the last element, procedures are
typically inadequate if they do not provide "notice and an opportunity to be heard."  *Wolf v.
Fauquier County Board of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009); *see also Fuentes v.
Shevin*, 407 U.S. 67, 81 (1972).

58.     To assess the adequacy of procedural protections, courts examine three factors:
(1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous
deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

59.     Procedural due process prohibits discarding votes on the basis of the Protests because the Protests fail to provide affected voters adequate notice or an opportunity to be heard before they are deprived of their fundamental right to have their votes counted.

60.     All three groups of voters that the Protests target registered via an NCSBE form, which required them to swear under oath that they were eligible voters, had their eligibility verified by election officials, were registered to vote by county boards of elections, cast their ballots in accordance with the provided instructions, and had their ballots accepted and counted. As explained, North Carolina passed a statute codifying the right to vote in the state for citizens born overseas who have not lived in the United States but whose parents were eligible North Carolina voters before moving abroad. *See* N.C. Gen. Stat. §163-258.2(1)(e). Likewise, a state statutory provision informs overseas voters that no photo identification need accompany their ballot, *id*. §163-258.17(b)—a message NCSBE has reinforced, Exhibit D at 1, 8. And North Carolina provided the registration form that voters who are targeted by the third category completed, processed their registrations, added them to the voter rolls, allowed them to vote, and accepted and counted their ballots. It does not comport with procedural due process for any of these voters to be told only now—after the election—that through no fault of their own their votes will not count after all, absent notice and opportunity to provide whatever information or ID the Protests assert was missing.

61.     Affected voters have not been given adequate notice and an opportunity to provide the allegedly missing information. The postcards sent by the NCRP are insufficient.

They do not inform voters which candidate has filed a protest, which of the hundreds of protests filed by various candidates affects the recipient, or even which race is at issue. Nor do the postcards disclose that the recipient has been named in a protest; they merely state that "your vote *may* be affected by one or more protests filed in relation to the 2024 General Election" and instruct voters to "scan [a] QR code to view the protest filings" and "check under the county in which you cast a ballot to see what protest *may* relate to you." Exhibit F at 5 (emphases added). Indeed, the postcards do not even indicate that the person who reads it may be affected by any protest, because at least some were addressed to a named voter "or current resident." *See* Exhibit G. The NCRP's use of such an "exceptional address format" (39 C.F.R. §111.1(a)(2)(ii)) ensured that the mail would not be forwarded to the named voter or returned undeliverable if the voter had moved. *See* U.S. Postal Service, *Domestic Mail Manual*, Part 602 (Addressing), §§3.1.3, 3.4.1.[9] As a result, the voter might never receive even this paltry "notice."

62. Providing access to information only through a QR code—the postcards do not contain a web address—is not reasonably calculated to provide notice to many voters, particularly those without access to or familiarity with the latest technology, who are disproportionately likely to be older or of lower socioeconomic status. The postcards also do not indicate that affected voters will have any opportunity to be heard before their votes are discarded. While the postcards note that "more information on when your County Board of Elections will hold a hearing on this matter" is available at a link found via the QR code, *see* Exhibit F at 5, following that link directs voters to a dropdown list of counties, and selecting a county leads to a link to the landing page for that county's board of elections rather than to information on hearing dates. In any event, the postcards do not indicate that the recipient may

---

[9] Available at https://pe.usps.com/text/dmm300/welcome.htm.

be able to speak at that hearing. And they certainly do not suggest that affected voters will have the opportunity to provide whatever information or identification the Protests assert was missing.

63. Application of the three *Mathews* factors confirms that procedural due process prohibits discarding votes on the basis of the Protests.

64. *First*, the private interest at stake is extremely strong. "No right is more precious in a free country than that of having a voice in the election of those who make the laws." *Wesberry*, 376 U.S. at 17, *quoted in North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016). But the Protests threaten the right to vote, which encompasses voters' right both to "cast their ballots" *and* to "have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941).

65. *Second*, disenfranchising voters based on the claims made in the Protests poses a serious risk of error. With the possible exception of those concerning overseas voters who have never lived in North Carolina, the Protests do not allege that any of the targeted voters are actually ineligible to vote. As explained, neither the Protests nor the prior litigation over HAVA requirements allege that any of the targeted voters were, in fact, ineligible. Likewise, the Protests concerning ballots cast by military or overseas citizens that were not accompanied by a photocopy of a photo ID or ID exception form do not allege that voters who did not include a photo ID—because they were never instructed to do so—are ineligible to vote. *See* Exhibit D. Even if some of these voters were not eligible, additional procedures would reduce the risk of any inaccurate determinations, because voters who are in fact eligible would be able to demonstrate their eligibility. *See Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145-146 (4th Cir. 2018).

66.     *Third*, there is no risk of unreasonable burden on the government, because state law already establishes a system for providing notice and an opportunity to be heard:  North Carolina's challenge process involves voters receiving *meaningful* notice and a hearing before being de-registered based on a challenge from another voter.  *See* N.C. Gen. Stat. §§163-85, 163-86.  There is no reason such a process could not work here.

67.     In a recent case involving baseless allegations of voting by non-U.S. citizens, the chief justice of the Arizona Supreme Court rejected an attempt (similar to the Protests) to deny nearly 100,000 voters the ability to vote in state and local elections because they supposedly had not provided documentary proof of U.S. citizenship when they registered.  *See Richer v. Fontes*, 2024 Ariz. LEXIS 263, at *8 (Ariz. Sept. 20, 2024) (Timmer, C.J.).  The chief justice was "unwilling" to "disenfranchise voters en masse" when doing so "is not authorized by state law and would violate principles of due process."  *Id.*  That was "particularly true" given that (1) it was a "state administrative failure" that led to voters being registered without the requisite proof of citizenship, and (2) there was "so little time remaining before the beginning of the 2024 General Election."  *Id.* at *7.  The same conclusion is warranted here.

68.     In dismissing the Protests, the NCSBE ruled that—in addition to violating state requirements—the Protests violated federal due process for substantially the reasons described above.  Exhibit B at 6.  In particular, the NCSBE concluded, the postcards did not inform voters which contested races the protest pertained to, that "a legal proceeding has been filed against them," how to "follow the QR code," or "engage in a needle-in-a-haystack effort to locate what has been alleged about them and by whom," as well as "how and whether they can respond."  *Id.* at 13.  This, the NCSBE ruled, violated voters' federal due-process rights because it was "substantially less likely to give the voters notice than any other customary alternatives."  *Id.*

69.    Absent this Court's adjudication, the Protests (and the litigation that seeks to advance them) present an ongoing risk of mass disenfranchisement of thousands of NCDP members, in violation of the constitutional guarantee of procedural due process. The Court should therefore enter a declaratory judgment that procedural due process prohibits discarding votes after an election on the basis of systematic challenges, including the particular challenges raised by the Protests.

### Count III: Violation of the First and Fourteenth Amendments to the United States Constitution – Undue Burden on the Fundamental Right To Vote

70.    Plaintiff realleges all preceding paragraphs as if fully set forth herein.

71.    State laws that burden the right to vote violate the First and Fourteenth Amendments to the U.S. Constitution unless relevant and legitimate state interests of sufficient weight justify the burden or burdens. *See Anderson v. Celebrezze*, 460 U.S. 780, 788-790 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The more severely a law burdens the right to vote, the more strictly it must be scrutinized. Hence, "election laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'" *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (quoting *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)); *see also Burdick*, 504 U.S. at 434.

72.    Under settled Fourth Circuit law, discarding ballots voters cast in good-faith reliance on a state's own assurances violates the dictates of federal due process. *Hendon v. North Carolina State Board of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citing *Griffin v. Burns*, 570 F.2d 1065, 1075-1076 (1st Cir. 1978)). In *Griffin v. Burns*, the First Circuit held that a state violated due process when its supreme court invalidated absentee ballots already cast on

the ground that absentee ballots in party primaries were never constitutionally or statutorily authorized—despite the issuance of such ballots in party primaries being a longstanding practice. 570 F.2d at 1066-1067. Federal courts may identify and remedy such federal violations, moreover, even when state proceedings remain pending. *See Marks v. Stinson*, 19 F.3d 873, 884 (3d Cir. 1994).

73. Discarding votes on the basis of the systematic challenges raised in the Protests would impose severe burdens on North Carolinians' right to vote so as to make the election fundamentally unfair, with no sufficient justification.

74. Declining to count a voter's vote due to a procedural "error" that was affirmatively induced by the state—such as not including a driver's license number on a registration form or a photocopy of a photo ID with an overseas mail-in ballot—severely burdens the right to vote, even if the state provides notice and a hearing after the election is over. So does declining to count a vote of an overseas voter who, for thirteen years, was informed by state law that she could vote despite never having lived in North Carolina, no matter if some process is provided. The state cannot simply change the rules after an election and claim it is lawful because it gave voters notice and a chance to be heard. For instance, North Carolina could not now decide that it is only going to count the votes of those who voted in person (rather than by absentee ballot), even if it gave all voters notice and a hearing.

75. No sufficiently weighty state interest justifies discarding votes on the basis of the Protests. North Carolina has no interest in—and, in fact, has a strong interest against—retroactively disenfranchising voters who registered and voted in reliance on its own statutes and instructions.

76.     Citing *Hendon* and *Griffin*, the NCSBE ruled that all three categories of Protests would, if granted, violate "the federal constitution's guarantee of substantive due process." Exhibit B at 32 (discussing first category of Protests); *see also id.* at 29 (second category), 25-26 (third category).  "[R]egardless of whether state law permits" the Protests "to proceed," the NCSBE concluded, "the federal constitution does not."  *Id.* at 25.

77.     Absent this Court's adjudication, the Protests (and the litigation that seeks to advance them) present an ongoing risk of mass disenfranchisement of thousands of NCDP members, in violation of the First and Fourteenth Amendments.  The Court should therefore enter a declaratory judgment that the First and Fourteenth Amendments prohibit discarding votes after an election on the basis of systematic challenges, including the particular challenges raised by the Protests.

### Count IV: Violation of the Help America Vote Act, 52 U.S.C. §52 U.S.C. §21083(a) – Removal of Eligible Voters

78.     Plaintiff realleges all preceding paragraphs as if fully set forth herein.

79.     HAVA commands that states maintain their voter lists "in a manner that ensures that[] … only voters who are not registered or who are not eligible to vote are removed."  52 U.S.C. §21083(a)(2)(B)(ii).

80.     This provision of HAVA prohibits North Carolina from effectively conducting retroactive post-election voter-list maintenance by discarding votes based on the systematic challenge contained in the third category of Protests, which targets voters whose registration database records do not include a driver's license or social security number.  As explained, these voters completed NCSBE-provided registration forms and were deemed eligible to vote.  And the Protests do not even allege that any of these voters were, in fact, ineligible.  *See supra* ¶52. Defects in voter-registration *forms* do not render a voter ineligible.  Recognizing as much, North

Carolina law does not allow challenges on the basis of defects in registration forms, instead permitting challenges only on limited statutory grounds that go to actual eligibility or a defect in a ballot. *See* N.C. Gen. Stat. §§163-85, 163-90.3.

81.     Absent this Court's adjudication, the Protests (and the litigation that seeks to advance them) present an ongoing risk of mass disenfranchisement of thousands of NCDP members, in contravention of HAVA. The Court should therefore enter a declaratory judgment that HAVA prohibits discarding votes after an election on the basis of the systematic challenge presented in the third category of Protests.

## PRAYER FOR RELIEF

WHEREFORE, the NCDP requests entry of a judgment:

a.  Declaring that federal law—specifically, the NVRA, the First and Fourteenth Amendments, and HAVA—prohibits discarding votes after an election on the basis of the challenges lodged by the Protests.

b.  Directing defendants, their agents, successors in office, and all persons acting in concert with any of the foregoing to take any necessary and appropriate action to ensure that state, county, and local authorities who administer North Carolina's elections and post-election protests comply with this Court's orders;

c.  Awarding plaintiffs such other and further relief as the Court deems just and proper.

December 31, 2024

Respectfully submitted,

/s/ Shana L. Fulton

SETH P. WAXMAN[*]
DANIEL S. VOLCHOK[*]
CHRISTOPHER E. BABBITT[*]
JANE E. KESSNER[*]
NITISHA BARONIA[*]
ANN E. HIMES[*]
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
jane.kessner@wilmerhale.com
annie.himes@wilmerhale.com

SHANA L. FULTON
N.C. Bar No. 27836
WILLIAM A. ROBERTSON
N.C. Bar No. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON,
   HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

[*] Local Rule 83.1(e) special appearance