## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | |
|---|---|
| North Carolina Democratic Party, <br><br>         Plaintiff, <br><br>    v. <br><br> North Carolina State Board of Elections; Karen Brinson Bell, *in her official capacity as Executive Director of the North Carolina State Board of Elections*; Alan Hirsch, *in his official capacity as Chair of the North Carolina State Board of Elections*; Jeff Carmon, *in his official capacity as Secretary of the North Carolina State Board of Elections*; and Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, *in their official capacities as members of the North Carolina State Board of Elections*, <br><br>         Defendants. | Case No. 5:24-cv-699-M-KS <br><br><br><br> **SECOND AMENDED COMPLAINT** |

Plaintiff North Carolina Democratic Party, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, and with the written consent of Defendants North Carolina State Board of Elections, Karen Brinson Bell, Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, alleges as follows:

### INTRODUCTION

1.   As the Supreme Court has explained, the right to vote "'is a fundamental matter in a free and democratic society,'" and a right that is "'preservative of other basic civil and political rights.'" *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964)). Indeed, the Court has said, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Accordingly,

"[i]t has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote and to have their votes counted." *Reynolds*, 377 U.S. at 554 (citation omitted).

2.    Last year, from September 20 through November 5, millions of eligible voters exercised that fundamental right to vote in North Carolina's 2024 general election. Some contests, including for associate justice of the North Carolina Supreme Court and certain state legislative seats, were extremely close. For example, with all counties having canvassed and twice re-counted their results, Allison Riggs, the Democratic nominee for associate justice (and the incumbent), received several hundred more votes than North Carolina Court of Appeals Judge Jefferson Griffin, the Republican nominee.

3.    Judge Griffin responded to his loss by filing 307 election protests, claiming that the ballots of thousands of voters—including around 1400 military or overseas voters from Guilford County—should not be counted. He later amended those protests (after the deadline for filing a protest had passed) to target approximately 3800 additional military or overseas voters from a select group of heavily Democratic counties. The Republican candidates for three legislative seats who also very narrowly lost filed similar protests, but they have since conceded.[1]

4.    On November 20, the North Carolina State Board of Elections ("NCSBE" or "Board") issued an order (attached as Exhibit A) taking jurisdiction over three categories of protests (collectively, the "Protests"). Specifically, the NCSBE took jurisdiction over protests filed by Judge Griffin (and the three legislative candidates) alleging that ballots were unlawfully counted for one of the following reasons described by the NCSBE:

---

[1] These protests are public records available on the North Carolina State Board of Elections website at https://dl.ncsbe.gov/?prefix=Legal/Nov%202024%20Protests. All URLs cited herein without a publication date were visited on April 14, 2025.

2

<ol type="a">
<li>Ballots were cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States;</li>

<li>Ballots were cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a qualifying photo ID or ID Exception Form; and</li>

<li>Ballots were cast by registered voters whose voter-registration database records contain neither a driver's license number nor the last-four digits of a social security number.</li>
</ol>

Ex.A ¶1.

5.  On December 13, following briefing and a hearing, the NCSBE issued a decision (attached as Exhibit B) dismissing the Protests on largely federal-law grounds. But Judge Griffin continued to press the Protests, in two ways.

6.  *First*, he petitioned for an extraordinary writ of prohibition in the North Carolina Supreme Court, asking that court to prohibit the NCSBE from counting the challenged ballots. *Griffin v. NCSBE (Griffin I)*, 2025 WL 263400 (N.C. Dec. 18, 2024). Because that petition sought declaratory rulings under various provisions of federal law, it was removed to federal court, after which this Court remanded it to state court. *See Griffin v. NCSBE*, No. 5:24-cv-724 at 1-2 (E.D.N.C. Jan. 6, 2025).

7.  *Second*, Judge Griffin filed three petitions for judicial review (one per category of Protest) in the Wake County Superior Court. *See Griffin v. NCSBE*, Nos. 24CV040622-910, 24CV040619-910, and 24CV040620-910 (Wake Cnty. Sup. Ct. Dec. 20, 2024) (collectively, *Griffin II*). Those petitions were also removed to federal court as a single action. Notice of Removal (ECF 1), *Griffin v. NCSBE*, No. 24-cv-731 (E.D.N.C. Dec. 20, 2024). This Court remanded on the same grounds on which it remanded *Griffin I. Griffin*, No. 5:24-cv-731 (E.D.N.C. Jan. 6, 2025).

8. Following this Court's remand of *Griffin I*, the North Carolina Supreme Court dismissed that case as procedurally improper but stayed certification of the Riggs-Griffin election "until the Superior Court of Wake County has ruled on" Judge Griffin's appeals of the NCSBE's Order in the *Griffin II* set of cases "and any appeals from its rulings have been exhausted." *Griffin I*, 2025 WL 263400, at *2 (N.C. Jan. 22, 2025).

9. On appeal from this Court's remand order, the Fourth Circuit ruled that the North Carolina Supreme Court's dismissal of *Griffin I* mooted any federal questions raised in Judge Griffin's petition for a writ of prohibition, leaving the state court's stay of certification in place. *Griffin v. NCSBE*, No. 25-1018 at 7 (4th Cir. Feb. 4, 2025) (per curiam). The court of appeals also held that the Board had properly removed *Griffin II*, seeing "no error" in this Court's determination that the Board was entitled to a federal forum to adjudicate whether Judge Griffin's demands would require the NCSBE to violate civil rights law. *Id.* at 9. The Fourth Circuit nevertheless affirmed this Court's order remanding *Griffin II* to state court but ordered this Court to retain jurisdiction until final resolution in state court, including any appeals, so as to ensure federal resolution of the "federal constitutional issues." *Id.*

10. Judge Griffin thus proceeded in his three *Griffin II* appeals against the NCSBE and Justice Riggs in the Wake County Superior Court—where the defendants reserved their right to a federal forum to adjudicate the federal issues raised, *see, e.g.*, State Board Notice (D.E. 21), *Griffin II* (Wake Cnty. Sup. Ct. Feb. 6, 2025) (citing *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964)).

11. The superior court dismissed all three of Judge Griffin's appeals from the NCSBE's denial of his protests, but a three-judge panel of the North Carolina Court of Appeals reversed. *Griffin II*, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) (per curiam). As to the military and

4

overseas voters who had not shown proof of prior in-state residence, the panel instructed the NCSBE "to direct the county boards to identify the votes" they cast "and remove them from the final count of the 2024 election for Supreme Court Seat 6," without offering those voters any ability to cure their ballots. *Id.* at *15. As to (1) the military and overseas voters who did not provide photo identification with their ballots (because state regulations provided such identification was not required) and (2) voters who had not provided either their driver's license number or the last four digits of their social security number when they registered to vote (again because they were not told they had to), the panel ruled they were "not qualified" to vote and ordered the NCSBE to "omit from the final count the votes of those voters who fail to timely" provide the relevant identification within 15 days. *Id.* at *14-15. The decision did not clarify whether it applied to certain voters added to the Protests after the deadline for filing challenges had passed. Dissenting, Judge Hampson noted that "on the Record before" the court, Judge Griffin had "yet to identify a *single* voter—among the tens of thousands [he] challenges in this appeal— who was, in fact, ineligible to vote in the 2024 General Election under the statutes, rules, and regulations in place in November 2024 governing that election." *Griffin II*, 2025 WL 1021724, at *15 (emphasis added).

12.     Justice Riggs and the NCSBE each filed a petition for discretionary review with the North Carolina Supreme Court. *See* Docs. 3, 6, *Griffin II*, No. 320P24-3 (N.C. Apr. 6, 2025). That court granted review only in part. It denied review as to the overseas voters who had registered in reliance on their parents' state residence, leaving in place the court of appeals' order that the NCSBE discard those votes without providing those voters notice or an opportunity to cure. *Griffin II*, No. 320P24-3, at 3 (N.C. Apr. 11, 2025). The North Carolina Supreme Court also largely denied review as to the second category (military and overseas voters who did not provide

photo identification with their ballots), agreeing that their ballots should be discarded absent cure but "expand[ing] the period to cure deficiencies" set by the court of appeals "from fifteen business days to thirty calendar days after the mailing of notice." *Id.* at 6. The North Carolina Supreme Court reversed the court of appeals as to the third category of voters (those whose registration records did not list a drivers' license or social security number), largely on the ground that "mistakes made by negligent election officials in registering citizens who are otherwise eligible to vote" could not "negate the vote of an otherwise lawful voter." *Id.* Like the court of appeals, the North Carolina Supreme Court did not clarify whether its decision applied to the additional 3,832 voters whom Judge Griffin had challenged after the challenge deadline had passed. Justice Riggs did not participate in the decision, having recused herself from all proceedings in the state supreme court involving Judge Griffin's attempts to overturn her election victory. *See id.*

13. As a result of the North Carolina Supreme Court's decision, absent federal courts' intervention, voters in the first category—overseas citizens who voted in reliance on a state statute indicating that North Carolinians living abroad who inherited their residence from their parents were eligible to vote—will have their votes for Associate Justice on the North Carolina Supreme Court discarded. And voters in the second category—active-duty military personnel and other North Carolinians living abroad who did not provide a photocopy of their photo identification with their ballots, in reliance on state law providing that they were "not required to submit a photocopy of acceptable photo identification," 8 N.C. Admin. Code 17.0109(d)—will have their votes for Associate Justice discarded unless they are able to provide the NCSBE with a copy of their identification within thirty calendar days from notice being mailed (a daunting prospect considering, among other things, the inevitable delays with international mail).

6

14.     As detailed below, the NCSBE has not yet begun the notification and cure process but has published the names and residential addresses of more than 60,000 voters targeted by Griffin and explained on its website that the Protests may have named certain voters in error.

15.     The two categories of Protests the North Carolina Supreme Court sustained under state law violate multiple provisions of federal law.  For example, the Constitution's Due Process Clause prohibits discarding votes based on the Protests:  Changing the rules for eligibility or voting after an election imposes an undue burden on the right to vote even if the state provides notice and a chance to be heard after the election is over, and the retroactive discarding of ballots in this manner violates voters' right to procedural due process (including their right to adequate notice and an opportunity to be heard).  Selectively discarding votes or subjecting voters to a cure process by county, moreover, rather than applying uniform rules statewide, violates the Constitution's Equal Protection Clause.  Finally, the first protest category contravenes the National Voter Registration Act ("NVRA"), which prohibits what is in essence retroactive post-election voter-roll maintenance.

16.     Put simply, by discarding votes of military and overseas citizens based on the Protests—even after the woefully insufficient cure process the NCSBE has been instructed to undertake—North Carolina will violate federal laws safeguarding North Carolinians' fundamental right to have their votes counted.  This Court should therefore issue a declaratory judgment that federal law prohibits throwing out votes after an election based on the systematic challenges lodged by the first two categories of Protests—even accounting for the cure process the state courts have ordered—and enjoin defendants from doing so.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction under 28 U.S.C. §1331, as this action arises under a federal statute and the U.S. Constitution.  This Court also has subject-matter jurisdiction under 28 U.S.C. §1343(a) and 42 U.S.C. §1983, as plaintiff seeks equitable and declaratory relief to protect the right to vote.

18.     This Court has personal jurisdiction over the North Carolina State Board of Elections, which is a state agency of (and located in) North Carolina.

19.     This Court has personal jurisdiction over NCSBE Executive Director Karen Brinson Bell, NCSBE Chair Alan Hirsch, Secretary Jeff Carmon, and NCSBE members Stacy Eggers IV, Kevin N. Lewis, Siobhan O'Duffy Millen, as they are each sued in their official capacities as appointed officials in North Carolina.  Each also works and resides in North Carolina. *See infra* ¶¶26-31.

20.     Venue in this Court is proper under 28 U.S.C. §1391(b).  The NCSBE and its members reside in this district, and the NCSBE assumed jurisdiction over the Protests giving rise to the complaint.

21.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§2201-2202.  The Court also has authority to enter a declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65.

## PARTIES

### A.     Plaintiff

22.     The North Carolina Democratic Party ("NCDP") is a state committee, as that term is defined by 52 U.S.C. §30101.  The NCDP's purpose is to elect Democratic candidates to public office throughout North Carolina, including Democratic nominees for associate justice of the North Carolina Supreme Court.  To accomplish that purpose, the NCDP supports Democratic

8

candidates in national, state, and local elections through fundraising and organizing efforts; protects the legal rights of voters; and ensures that all voters can cast ballots and have their votes counted in North Carolina. The NCDP has members and other constituents throughout North Carolina, including many voters who regularly support and vote for candidates affiliated with the Democratic Party (and did so in the 2024 general election), such as Justice Riggs.

23. There are more than 2.4 million registered members of the Democratic Party in North Carolina. *See Voter Registration Statistics*, NCSBE.[2] Under the state courts' rulings, members of the NCDP, and other individuals who voted for Justice Riggs, will have their votes thrown out unless federal courts intervene. As a representative of those voters, the NCDP can obtain relief on their behalf without their individual participation. The NCDP thus brings the claims below on behalf of its members as well as other individuals who voted for Justice Riggs and now risk having their votes discarded.

24. Sustaining the Protests would also directly harm the NCDP as an organization, and hence it also has standing to sue on its own behalf. The NCDP has expended significant funds and resources on voter outreach and mobilization efforts in the 2024 general election. Forcing the NCDP to protect its members by defending against these Protests—and now by mobilizing some of them to provide the requested identification within a compressed time period several months after the election—has diverted and will continue to divert the NCDP's funds from its core voter-counseling, policy advocacy, and other business by requiring significant additional expenditures on voter outreach and mobilization in the future to ensure disenfranchised voters are able to both cast their ballots and have their votes counted in future elections. Any erroneous denial of

---

[2] https://vt.ncsbe.gov/RegStat/Results/?date=12%2F21%2F2024.

Democratic voters' right to have their ballots counted further injures the NCDP by undermining the NCDP's ability to succeed in getting Democrats elected.

**B.      Defendants**

25.      The North Carolina State Board of Elections is the state agency with "general supervision over the primaries and elections in the State." N.C. Gen. Stat. §163-22. It is thus "the state agency charged with the administration of the elections process and campaign finance disclosure and compliance." *About NCSBE*.[3] The NCSBE "works in conjunction with county boards of elections" throughout North Carolina "to ensure that elections are conducted lawfully and fairly." N.C. Gen. Stat. §163-182.12; *see also id.* §163-182.11. That work includes regulating and addressing protests filed with the county boards of elections. *Id.* §163-182.12. The NCSBE is located in Raleigh, North Carolina. *About NCSBE*, *supra* n.3.

26.      Karen Brinson Bell is NCSBE's executive director, and thus North Carolina's "Chief State Election Official," N.C. Gen. Stat. §163-82.2. In that role, she is tasked with "administering elections," "overseeing 100 county boards of elections," and "ensuring voting for more than 7 million voters." *About NCSBE*, *supra* n.3. She is sued in her official capacity.

27.      Alan Hirsch is NCSBE's chair. He resides in Chapel Hill, North Carolina, and is sued in his official capacity.

28.      Jeff Carmon is NCSBE's secretary. He resides in Snow Hill, North Carolina, and is sued in his official capacity.

29.      Stacy Eggers IV is an NCSBE member. He resides in Boone, North Carolina, and is sued in his official capacity.

---

[3] https://www.ncsbe.gov/about.

30.     Kevin N. Lewis is an NCSBE member.  He resides in Rocky Mount, North Carolina, and is sued in his official capacity.

31.     Siobhan O'Duffy Millen is an NCSBE member.  She resides in Raleigh, North Carolina, and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.     The NCRP's Previous Attempts To Systematically Purge Voters From The Rolls

32.     In North Carolina, "[e]very person born in the United States and every person who has been naturalized," is "18 years of age," and meets certain qualifications "shall be entitled to vote at any election."  N.C. Const. art. VI, §1.  To the extent a private party believes that a person is not eligible to vote, the party must challenge the person's eligibility: (1) at least 25 days before an election, N.C. Gen. Stat. §163-85; (2) when the challenged voter casts a ballot in person on election day, *id.* §163-87; or (3) by 5 pm on the business day after the deadline for receipt of absentee ballots, if the challenged voter cast such a ballot, *id.* §163-89.  The challenger must come forward with individualized proof that the voter is ineligible to cast a ballot at the relevant time, and the voter must be afforded notice and an opportunity to be heard when challenged.  *See id.* §§163-86, 163-88, 163-89.

33.     During the 2024 general election, Griffin's campaign did not avail itself of these procedures, nor did the North Carolina Republican Party ("NCRP").  Instead, the NCRP, along with the Republican National Committee ("RNC"), filed several lawsuits to disenfranchise specified categories of voters en masse.

34.     For example, in August 2024, the NCRP and RNC asked the North Carolina superior court to purge up to 225,000 registered North Carolinians from the rolls or force them to cast provisional ballots (which are presumptively not counted), even though these voters filled out

the state's voter-registration form, had their eligibility to vote verified by election officials, and had brought or would bring identification to the polls when they voted (as state and federal law require). The lawsuit claimed that these 225,000 voters *might* be ineligible on the same ground as Judge Griffin's third protest category (a ground the North Carolina Supreme Court has now dismissed). The case was removed to federal court, which dismissed the statutory claim, and the Fourth Circuit rejected the plaintiffs' attempt to remand the constitutional claim to state court. *Republican National Committee v. North Carolina State Board of Elections*, 120 F.4th 390, 393 (4th Cir. 2024). The NCRP and RNC did not appeal the dismissal of their statutory claim; litigation over their constitutional claim continues in this Court, Case No. 24-cv-547 (E.D.N.C.).

35.    Two months after filing the lawsuit just discussed, the NCRP and RNC brought a case seeking to disenfranchise specified categories of overseas voters, including military servicemembers and their families, who cast ballots pursuant to (1) The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)—which safeguards the rights of military and overseas voters in federal elections, *see* 52 U.S.C. §§20301 *et seq.*—and (2) North Carolina's Uniform Military and Overseas Voters Act (UMOVA), which incorporates and expands upon UOCAVA's protections for elections for state office, N.C. Gen. Stat. §§163-258.1 *et seq*. The NCRP and RNC claimed that U.S. citizens born overseas who have not lived in the United States but whose parents were eligible North Carolina voters before moving abroad are not eligible to vote, despite a state law granting them that right, *see* N.C. Gen. Stat. §163-258.2(1)(e), and further claimed that all overseas voters should be required to provide identification proving residency under state law. The NCRP and RNC declined to pursue injunctive relief in state court regarding the latter claim. They did seek a preliminary injunction as to the former claim but their request was denied, as was their request for extraordinary relief from the North Carolina Court of Appeals. They also sought

extraordinary relief from the North Carolina Supreme Court, a request that remains pending.  *See*

*Kivett v. North Carolina State Board of Elections*, Case No. 281P24 (N.C. Nov. 1, 2024).

36.     In each of these cases, the courts appropriately refused to alter the rules of the

ongoing 2024 general election in a manner that would disenfranchise voters who followed the rules

then in effect.

**B.     Republican Candidates' Post-Election Protests**

37.     Voting in the 2024 general election commenced on September 20, 2024, with the

distribution of military and overseas ballots.  Absentee ballots were distributed beginning on

September 24, and election day was November 5.

38.     One closely contested race was for associate justice of the North Carolina Supreme

Court.  That court comprises a chief justice and six associate justices.  Each of the seven members

serves an eight-year term.  Governor Roy Cooper appointed Justice Riggs to fill the vacancy in

seat #6 in September 2023.  In March 2024, following primary elections, she was nominated by

the NCDP to stand for re-election.  The NCRP nominated Judge Griffin.

39.     North Carolina's county boards of elections canvassed the 2024 general election

results on November 15 and 18.  Pursuant to that canvass, Justice Riggs won re-election by several

hundred votes.

40.     Dissatisfied with that result, Judge Griffin (along with three Republican candidates

for legislative seats, who have since conceded) filed a slew of election protests.  In North Carolina,

"[a] protest concerning the conduct of an election may be filed with the county board of elections

by any registered voter who was eligible to vote in the election or by any person who was a

candidate for nomination or election in the election," and it must concern "the manner in which

votes were counted and results tabulated" or "some other irregularity."  N.C. Gen. Stat. §§163-

182.9(a), (b)(2).  A protest must be dismissed where there is "not substantial evidence of any

13

violation [of the election law], irregularity, or misconduct sufficient to cast doubt on the results of the election." *Id.* §§163-182.10(d)(2). Historically, protests have been used to challenge tabulation accuracy or individual voter eligibility, such as where voters have died, been convicted of felonies, voted twice, or where their votes were improperly excluded.[4]

41. Judge Griffin filed 307 election protests in counties across North Carolina, claiming that more than 60,000 voters' ballots should not be counted. Some of these protests raised factual, record-based challenges, such as (again) that county boards of elections unlawfully counted votes by voters who had died or been convicted of felonies. But others used the protest process to raise systematic legal challenges to the eligibility of groups of voters and the validity of their votes based on the same or similar legal theories the NCRP and RNC have pushed in litigation.

42. The NCSBE took jurisdiction over protests filed with county boards of elections by Judge Griffin (along with three legislative candidates) "alleg[ing] that ballots were unlawfully counted for one of [three] reasons." Ex.A ¶1. The NCSBE described those reasons, which mirror the legal theories advanced in the lawsuits discussed above, as:

   a. Ballots were cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States;

   b. Ballots were cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form; and

   c. Ballots were cast by registered voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number.

---

[4] Battaglia, *Protests, Appeals and Recounts Continue to Delay NC Supreme Court Election Results*, News & Observer (Dec. 9, 2020), https://www.newsobserver.com/news/politics-government/election/article247668465.html; *NC Board Of Elections Orders Counties To Dismiss Protests From McCrory Campaign*, WBTV (Nov. 29, 2016), https://www.wbtv.com/story/33813583/nc-board-of-elections-orders-counties-to-dismiss-protests-from-mccrory-campaign/.

*Id.* Examples from the first two categories—which are at issue here—are attached as Exhibits C and D, respectively. The county boards of elections retained jurisdiction over all other protests, including individualized challenges to voter eligibility. *Id.* ¶4.

43. After the deadline for filing protests passed, Judge Griffin targeted thousands of additional military and overseas voters who fell into the second category. *See* Ex.B at 3. Specifically, as reflected in data published by the NCSBE, Judge Griffin expanded his original challenge from approximately 1,394 such voters (all in Guilford County) to include approximately 3,694 additional voters across three new counties; he also expanded his challenge to voters in the first category (which targeted approximately 267 voters) to target approximately 138 additional voters. *See* Ex.G (*Information for Voters Challenged in Election Protest: Statement Updated on April 9 with FAQ for Affected Voters*), https://tinyurl.com/ycx5duz4. As of April 9, the Protests, as adjusted, collectively challenged 5,493 voters in the first and second categories. Judge Griffin also attempted to challenge voters in two additional counties, but did not make the names of those voters part of the judicial record. *See Griffin II*, No. 320P24-3, at 12 (Earls, J., concurring in part and dissenting in part). Such additional protests are not listed in these totals, which draw from the NCSBE's published data.[5]

44. Voters targeted by the first category have been assured for over thirteen years that (contrary to Judge Griffin's claim) they are eligible to vote because a state statute—which the NCRP and RNC have (unsuccessfully) challenged in court—grants them that right. *See* N.C. Gen. Stat. §163-258.2(1)(e).

---

[5] A copy of the NCSBE's published list of voters Judge Griffin originally challenged as falling in the first category is attached as Exhibit H, and the NCSBE's list of Judge Griffin's late additions to that first category is attached as Exhibit I. The NCSBE's list of all Protests lodged in the second category (including the late-added names of voters from Buncombe, Durham, and Forsyth counties) is attached as Exhibit J.

45.     Similarly, both NCSBE guidance and North Carolina law informed voters targeted by the second category that (contrary to Judge Griffin's claim) they did not have to submit photo identification along with their absentee ballots.  The NCSBE has stated that "neither federal nor state law requires" such voters to "provide ID when returning their ballot."  Ex.D (sample protest for lack of photo identification) at 1, 8.  And state law provides that unless they request a regular absentee ballot, UMOVA voters are given ballots "specifically prepared or distributed for" their use.  N.C. Gen. Stat. §163-258.2.  Only a declaration, not photo identification, must accompany such ballots.  *Id*. §163-258.17(b).  At the time these ballots were cast, the voters were "not required to submit a photocopy of acceptable photo identification."  8 N.C. Admin. Code 17.0109(d).

46.     In an apparent effort to comply with state requirements that protesters provide notice of protests to affected voters, the NCRP mailed postcards to broad categories of voters.  *See* Ex.E (Offerman affidavit) ¶¶10-20.  But at least some of the postcards were addressed to a named voter "or current resident," *see* Ex.F (sample postcard), which ensured that the mail would not be forwarded to the named voter or returned undeliverable if the voter had moved.  *See* U.S. Postal Service, *Domestic Mail Manual*, Part 602 (Addressing), §§3.1.3, 3.4.1.[6]  The postcards, further, contained minimal and/or misleading information.  For example, they did not indicate which candidate filed a protest or even which race was at issue.  *See* Ex.F (sample postcard) at 5.  Nor did they indicate which of the hundreds of protests concern the recipient.  Rather, the postcards merely stated that "your vote *may* be affected by one or more protests filed in relation to the 2024 General Election" and instructed voters to "scan [a] QR code to view the protest filings" and "check under the county in which you cast a ballot to see what protest *may* relate to you."  *Id.* (emphases added).  As the NCSBE noted, the QR code led to a page linking to hundreds of protests,

---

[6] Available at https://pe.usps.com/text/dmm300/welcome.htm.

not all organized by county. *See* Ex.B at 9. And within each individual protest filing, names of affected voters appeared only in non-alphabetized printouts of spreadsheets. *Id.* At least some of the postcards, moreover, were addressed to the challenged voter "or current resident." *See* Ex.F. And while the postcards noted that "more information on when your County Board of Elections will hold a hearing on this matter" was available at a link found via the QR code, *id.*, following that link merely directed voters to a dropdown list of counties, and selecting a county led to a link to the landing page for that county's board of elections—not to information on hearing dates. Finally, nothing on the postcard indicated that voters would have any opportunity to be heard at a hearing or otherwise. *See id.*

### C. Expected Implementation Of The North Carolina Supreme Court's Decision

47. Before the North Carolina Supreme Court issued its final decision, the NCSBE published on its website a statement that the North Carolina Court of Appeals decision "may require the county boards of elections to contact voters whose voter registration forms did not include a driver's license number or last four digits of a Social Security number (and didn't check the box indicating they lacked these numbers), and to allow those voters to provide that information to their county board of elections, to ensure their votes for the supreme court contest count in the 2024 general election. The decision may also require the county boards … to contact military and overseas-citizen voters who used absentee ballots to provide a copy of their photo identification[.]" Ex.G. As of the filing of this amended complaint, the NCSBE had not updated that guidance to reflect the intervening decision by the North Carolina Supreme Court.

48. The NCSBE has published on its website the full names and residential addresses of all voters the Protests targeted. *See* Ex.G. But the "Frequently Asked Questions" section of the NCSBE's statement notes "that it is unclear whether the Court of Appeals decision would apply

to any voters added to the protest after the protest deadline," including the nearly 4,000 voters "identified by the protestor after the deadline to file a protest."  Ex.G.

49.     The NCSBE has yet to publish detailed instructions by which targeted voters are to be notified of whether and how they must prevent their votes from being discarded.  It has stated instead that "[i]f the court's decision does go into effect, the State Board of Elections will provide instructions to affected voters on how to comply with the court's decision."  Ex.G.  And it has informed voters that they are "welcome to submit" photo identification.  *Id.*

## CLAIMS FOR RELIEF

### Count I: Violation of the First and Fourteenth Amendments to the United States Constitution – Undue Burden on the Fundamental Right To Vote

50.     Plaintiff realleges all preceding paragraphs as if fully set forth herein.

51.     State laws that burden the right to vote violate the First and Fourteenth Amendments to the U.S. Constitution unless relevant and legitimate state interests of sufficient weight justify the burden or burdens.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788-790 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  The more severely a law burdens the right to vote, the more strictly it must be scrutinized.  Hence, "election laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'" *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (quoting *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)); *see also Burdick*, 504 U.S. at 434.

52.     Citing federal case law, the NCSBE ruled that each of the three categories of Protests would, if granted, violate "the federal constitution's guarantee of substantive due process." Ex.B at 32 (discussing first category of Protests); *see also id.* at 29 (second category), 25-26 (third

category). "[R]egardless of whether state law permits" the Protests "to proceed," the NCSBE concluded, "the federal constitution does not." *Id.* at 25.

53. That conclusion was correct. Under settled Fourth Circuit law, discarding ballots voters cast in good-faith reliance on a state's own assurances violates federal due process. *Hendon v. North Carolina State Board of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citing *Griffin v. Burns*, 570 F.2d 1065, 1075-1076 (1st Cir. 1978)). Federal courts may identify and remedy such federal violations, moreover, even when state proceedings remain pending. *See Marks v. Stinson*, 19 F.3d 873, 884 (3d Cir. 1994). In *Griffin v. Burns*, for example, the First Circuit held that a state violated due process when its supreme court invalidated absentee ballots already cast on the ground that absentee ballots in party primaries were never constitutionally or statutorily authorized— despite the issuance of such ballots in party primaries being a longstanding practice. 570 F.2d at 1066-1067.

54. Discarding votes based on the systematic challenges raised in the Protests would impose such severe burdens on North Carolinians' right to vote as to make the election fundamentally unfair, with no sufficient justification.

55. That some voters in the second category—military and overseas voters who did not provide photo identification with their ballots—may be afforded the chance to provide such identification before their votes are discarded does not alter the undue-burden analysis; simply being subjected to this process is itself an undue burden. Declining to count a vote due to an administrative "error" that was affirmatively induced by the state—such as not including a photocopy of a photo ID with an overseas mail-in ballot—severely burdens the right to vote, even if the state provides notice and an opportunity to be heard after the election is over. So does declining to count a vote of an overseas voter who, for thirteen years, was informed by state law

19

that she could vote in reliance on her parents' North Carolina residence, no matter if some process is provided. The state cannot simply change the rules after an election and claim it is lawful because it gave voters notice and a chance to be heard (which the North Carolina Supreme Court is not even allowing for the first category of protests). That is no more lawful than if North Carolina, for example, decided now that it would count the votes only of those who voted in person (rather than by absentee ballot), even if it gave all voters notice and a hearing before implementing that after-the-fact switch.

56. The Supreme Court's cases cautioning federal courts against enjoining or otherwise altering state election laws shortly before an election reinforce the burden that would be imposed by changing election rules at this juncture. As the Court explained in *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase," *id.* at 4-5. "That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S.Ct. 879, 880-881 (2022) (Kavanaugh, J., concurring in grant of stay applications). Here, the election rules are being changed more than five months *after* the election, far later than the *Purcell* principle would kick in to prevent eve-of-election changes. The Fourth Circuit has recognized the burden this imposes, noting that "[c]ourts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for *pre*-election adjudication when possible. They have reasoned that failure to require pre-election adjudication would 'permit, if not encourage, parties who could raise a claim to lay by and gamble

upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action.'" *Hendon*, 710 F.2d at 182 (quotation marks and citations omitted). Seeking to undo the ballot results in a court action is exactly what Judge Griffin has done here.

57. No sufficiently weighty state interest justifies changing the rules that govern the election after voters have cast their votes, whether those changes result in the wholesale discarding of votes or require certain voters to re-establish their identity. The military and overseas voters that the first two categories of Protests target all had their eligibility verified by election officials, were registered to vote by county boards of elections, cast their ballots in accordance with the provided instructions, and had their ballots accepted and counted. As explained, a North Carolina statute provides the right to vote in the state to citizens born overseas who have not lived in the United States but whose parents were eligible North Carolina voters before moving abroad. *See* N.C. Gen. Stat. §163-258.2(1)(e). Likewise, a state statutory provision informs overseas voters that no photo identification need accompany their ballot, *id.* §163-258.17(b)—a message NCSBE has reinforced, Ex.D at 1, 8.

58. North Carolina has no interest in—and in fact a strong interest against—retroactively disenfranchising voters who registered and voted in reliance on its own statutes and instructions. Indeed, that state's highest court itself explained that under its own "longstanding precedent, mistakes made by negligent election officials ... 'will not deprive [voters] of [their] right to vote or render [their] vote[s] void after [they have] been cast.'" *Griffin II*, No. 320P24-3, at 5 (N.C. Apr. 11, 2025) (quoting *Overton v. Mayor & City Commissioners of City of Hendersonville*, 253 N.C. 306, 116 S.E.2d 808, 815 (1960)). Likewise, in a case last year involving baseless allegations of voting by non-U.S. citizens, the chief justice of the Arizona Supreme Court rejected an attempt (similar to the Protests) to deny nearly 100,000 voters the ability to vote in

state and local elections because they supposedly had not provided documentary proof of U.S. citizenship when they registered (as required under Arizona law). *See Richer v. Fontes*, 2024 Ariz. LEXIS 263, at *8 (Ariz. Sept. 20, 2024) (Timmer, C.J.). The chief justice was "unwilling" to "disenfranchise voters en masse" when doing so "is not authorized by state law and would violate principles of due process." *Id.* That was "particularly true" given that (1) it was a "state administrative failure" that led to voters being registered without the requisite proof of citizenship, and (2) there was "so little time remaining before the beginning of the 2024 General Election." *Id.* at *7. The same conclusion is warranted here.

59. Unless enjoined, defendants will violate the First and Fourteenth Amendments by unduly burdening voters and/or discarding votes based on the systematic challenges raised by the first and second categories of Protests, effecting the mass disenfranchisement of NCDP members.

**Count II: Violation of the Fourteenth Amendment to the United States Constitution – Procedural Due Process**

60. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

61. Due process prohibits states from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, §1. A state thus may not deny a constitutionally protected liberty interest without adequate procedural protections.

62. Although sustaining the Protests would be unconstitutional even if a procedural-due-process claim were assessed under the *Anderson-Burdick* framework discussed in count I, "[m]ultiple district courts … have considered procedural due process challenges to election regulations under ordinary procedural due process principles," i.e., the factors outlined in the next paragraph. *Arizona Democratic Party v. Hobbs*, 485 F.Supp.3d 1073, 1093 (D. Ariz. 2020) (collecting cases); *see also Democracy North Carolina v. North Carolina State Board of Elections*, 476 F.Supp.3d 158, 228-229 (M.D.N.C. 2020) (applying those factors for a procedural-due-

process claim against a North Carolina law governing absentee ballots).  To succeed on a procedural-due-process claim, a plaintiff must show: "(1) a cognizable liberty interest or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate."  *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (quotation marks omitted).

63.     To assess the adequacy of procedural protections, courts examine three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

64.     Application of the three *Mathews* factors confirms that procedural due process prohibits discarding votes on the basis of the Protests.

65.     *First*, the private interest at stake is extremely strong.  "No right is more precious in a free country than that of having a voice in the election of those who make the laws."  *Wesberry*, 376 U.S. at 17, *quoted in North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016).  The Protests threaten the right to vote, which encompasses voters' right both to "cast their ballots" and to "have them counted."  *United States v. Classic*, 313 U.S. 299, 315 (1941).

66.     *Second*, disenfranchising voters based on the claims made in the Protests poses a serious risk of erroneously disenfranchising eligible and qualified voters.

67.     With respect to the voters in the second category of protests (overseas voters who did not include photo ID), the NCSBE has no evidence, and Judge Griffin has not claimed, that

any of the targeted voters is not who they claimed to be. *See* Ex.D. And each and every one of these military and overseas voters was required to sign a declaration under penalty of perjury attesting to their eligibility to vote and their identity when they cast their military-overseas ballots. But under the North Carolina Supreme Court's decision, these voters will lose their right to cast a vote that will be counted (even if they are in fact eligible to vote) unless all the stars happen to align. In particular, such voters will have to (1) actually receive a "mail[ing]" of "notice to cure" that the Board sends them (likely through international mail), *Griffin v. NCSBE*, No. 320P24-3, at 5, which will require not only that the Board have the correct mailing information but also that the voter not be traveling, in the hospital, in a combat zone where mail deliveries are often especially delayed, or otherwise indisposed during the narrow cure period; (2) have on hand the necessary proof of eligibility the Board is demanding (or be able to procure it very quickly despite in many cases being out of the country and despite such documents often taking time to obtain); (3) be in a position to copy that identification or fill out an exception form; and (4) are able to successfully return that information to the Board (again, likely through international mail)—all in just 30 days. The lack of any way to appeal a denial (or even be informed of the grounds for denial) further heightens the risk of erroneous determinations.

68. The risk of erroneous disenfranchisement is even higher for the hundreds of voters who will receive *no* notice from the state before their ballots are discarded, i.e., the overseas voters who lack a North Carolina residence and who the North Carolina appellate court held need not even be notified that their votes will be discarded, let alone afforded any opportunity to challenge the determination that they were properly named in that Protest, *Griffin*, 2025 WL 1021724, at *15. These voters are entitled to notice and an opportunity to be heard, to ensure that they were not placed on the list of targeted voters in error. The lack of notice or

opportunity to be heard leaves no doubt that the risk of erroneous deprivation is high, as binding precedent establishes that procedures are typically inadequate if they do not provide "notice and an opportunity to be heard," *Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009); *see also Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972).

69.     *Third* and finally, the government has no valid interest either in disenfranchising eligible voters or in unfairly changing the rules after an election in order to do so. And requiring additional or substitute process would not unreasonably burden the government, because state law already establishes a system for providing notice and an opportunity to be heard: North Carolina's ordinary challenge and protest processes guarantee voters *meaningful* notice and an individualized hearing at which a voter whose eligibility or identification is challenged has an opportunity to attest that she is qualified to vote or to cast a valid vote *before* her ballot is counted. *See* N.C. Gen. Stat. §§163-85 to 163-88. Alternatively, the individualized process available pre-election could be used post-election. While that may be costly, the costs cannot be viewed as overly burdensome, since state law provides for such hearings pre-election. At minimum, it would not unduly burden the state to allow voters more than 30 days to provide photo identification, to employ aggressive notice procedures carefully calculated to actually reach overseas voters (rather than simply mailing notice to the address on record), and to make it easy for voters to provide identification—such as by allowing pictures of identification to be submitted online or deploying state agents to help voters who may not have the necessary documents on hand procure them.

70.     Balancing the three factors makes clear that the cure process is inadequate: A crucial right is at stake, the chances of erroneous denial of that right via the cure process is extremely high, and the burden on the state for a process that would reduce those chances is

minimal and in any event warrants relatively little weight in the analysis. The balance thus tips sharply in favor of a due-process violation.

71.     Unless enjoined, defendants will violate the constitutional guarantee of procedural due process by subjecting voters to an inadequate "cure" process and potentially discarding votes based on the systematic challenges raised by the first and second categories of Protests without adequate process—save where a voter manages to provide the requested identification within 30 days of when the request is mailed (five months after the election)—effecting the mass disenfranchisement of NCDP members.

**Count III: Violation of the Fourteenth Amendment to the United States Constitution – Equal Protection**

72.     Plaintiff realleges all preceding paragraphs as if fully set forth herein.

73.     The Equal Protection Clause of the Fourteenth Amendment prohibits North Carolina from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1.

74.     This provision provides citizens "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). And "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000) (per curiam).

75.     As explained in the paragraphs that follow, voters the Protests targeted are now "at risk of being disenfranchised while similarly-situated voters are not, simply because of the county in which they reside, when they cast their ballot, or their physical location." *Griffin*, 2025 WL 1021724, at *40 (Hampson, J., dissenting). This violates the Equal Protection Clause, as does

subjecting voters to the discriminatory "cure" process the NCSBE will soon undertake absent this Court's intervention.

76. Judge Griffin's Protests targeted only voters in certain counties, and only for his race against Justice Riggs. For example, his challenge to military and overseas voters who did not provide a photo identification was limited to ballots cast in Guilford County. *See Griffin*, 2025 WL 1021724, at *40 (Hampson, J., dissenting). He expanded that challenge to name military and overseas voters in Buncombe, Durham, and Forsyth counties—but did so only after the protest deadline passed. *See* Ex.J. Discarding the votes of residents of one county (or select counties) in one race, but not ballots cast by voters in others that suffered from the same asserted defects, constitutes "arbitrary and disparate treatment" that "value[s] one person's voter over that of another." *Bush*, 531 U.S. at 104-105. So does automatically discarding the votes of voters in the first category simply because of where they live.

77. The 30-day "cure" process only exacerbates this problem. Requiring voters from targeted counties to complete additional steps in order to have their votes counted—steps not required of any other voters in the 2024 North Carolina Supreme Court election or in any other race—violates the Equal Protection Clause. Moreover, the "cure" process disparately affects certain voters (e.g., overseas voters in remote locations, or those who have since died or moved, or who are traveling) who may not receive notice of or have the opportunity to cure their votes in the limited time provided.

78. Unless enjoined, defendants will violate the constitutional guarantee of equal protection by discriminatorily discarding votes based on the systematic challenges raised by the first and second categories of Protests, effecting the mass disenfranchisement of NCDP members.

**Count IV: Violation of the National Voter Registration Act,
52 U.S.C. §§20507(c)(2)(A), 20507(b)(1) – Systematic Removal of Voters**

79. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

80. With exceptions not relevant here, the NVRA requires each state to (1) maintain a single authoritative list of voters registered in the state, and (2) conduct "list maintenance" to remove ineligible individuals from the rolls. 52 U.S.C. §21083(a). Voters may be removed from the rolls at their request or because of a change in residence, a criminal conviction, mental incapacity, or death. *Id.* §20507(a)(3), (4). North Carolina law provides for removal from the voter rolls for largely the same reasons. *See* N.C. Gen. Stat. §163-82.1(c).

81. At the same time, the NVRA sharply limits states' ability to deem voters ineligible shortly before or after any federal election. Section 8 provides that:

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

52 U.S.C. §20507(c)(2)(A). North Carolina law requires that systematic efforts to remove ineligible voters from the rolls, for the purposes of both federal and state elections, comply with the NVRA. N.C. Gen. Stat. §163-82.14(a); *see also* Ex.B at 26-27.

82. In 2018, another federal judge in this state held that North Carolina county boards of elections violated 52 U.S.C. §20507(c)(2)(A) when voters were systematically removed from the rolls within 90 days of a federal election based on challenges stemming from mailings to those voters being returned as undeliverable. *See North Carolina State Conference of NAACP v. Bipartisan Board of Elections and Ethics Enforcement*, 2018 WL 3748172, at *5-10 (M.D.N.C. Aug. 7, 2018). The judge enjoined North Carolina officials both from continuing to do so "without individualized inquiry as to the circumstances of each voter in the 90 days preceding a federal

28

election" and from "holding hearings or taking any other action(s) to process challenges" designed to facilitate systematic removal. *Id.* at *12.[7]

83. Consistent with this precedent—and with the plain statutory text—the NVRA prohibits North Carolina from discarding votes based on the systematic challenges contained in the first category of Protests, which dispute overseas voters' status on the voter rolls because they did not themselves live in North Carolina. For the 2024 general election, the deadline for systematic list maintenance to be completed was August 7, 2024. After that date, voters could not be legally deemed ineligible for systematic, rather than individualized, reasons. But the Protests do not raise individualized challenges against any of the registered voters whose votes they seek to cancel. Rather, by preparing to throw away the already-cast votes of groups of voters based on a generic legal challenge, North Carolina endeavors to engage in retroactive post-election voter-roll maintenance. That is barred by the NVRA.

84. Although split into separate county-specific packages, Protests in the first category amount to requests for the kind of systematic, non-individualized bulk removal of voters that the NVRA bars and that the RNC and NCRP failed to obtain through pre-election litigation. Protests in the first category each follow the same template, seeking retroactively to disenfranchise voters who marked on their ballot or ballot request form that they have "never lived in the United States," identified in a chart listing the names and residential addresses of such suspected voters in the county. *See, e.g.*, Ex.C at 16. But a voter is "domiciled" in North Carolina—and thereby satisfies

---

[7] In accordance with the NVRA and the court's order, the NCSBE promulgated Numbered Memo 2018-07, which reiterates that within 90 days of a federal election, county boards may not remove a voter from the rolls based on a voter challenge brought without an individualized inquiry as to the circumstances of each voter, meaning reliable first-hand evidence specific to the voters challenged. Generic evidence that conveys no information about each challenged voter's specific circumstances is not sufficient.

North Carolina's residency requirement—even if he has never lived in North Carolina, so long as he was born to North Carolina residents and never established a new domicile. *Thayer v. Thayer*, 187 N.C. 573, 122 S.E. 307, 308 (1924); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

85.    Unless enjoined, defendants will violate NVRA by discarding votes based on the systematic challenges raised by the first category of Protests well after the election, effecting the systematic disenfranchisement of NCDP members.[8]

**PRAYER FOR RELIEF**

WHEREFORE, the NCDP requests entry of a judgment:

a.  Declaring that federal law—specifically, the First and Fourteenth Amendments and the NVRA—prohibits discarding votes after an election on the basis of the challenges lodged by the first and second categories of Protests, or subjecting those voters to a post-election "cure" process specific to them.

b.  Preliminarily and permanently enjoining defendants, their agents, successors in office, and all persons acting in concert with them from (1) requiring targeted voters in the second category to "cure" their purportedly defective ballots in order to have their voters counted, (2) not counting votes by targeted voters based on the Protests, or (3) certifying the election insofar as the results are altered as a result of the Protests.

c.  Directing defendants, their agents, successors in office, and all persons acting in concert with any of the foregoing to take any necessary and appropriate action to ensure that state, county, and local authorities who administer North Carolina's elections and post-election protests comply with this Court's orders;

d.  Awarding plaintiffs such other and further relief as the Court deems just and proper.

---

[8] Because the election has already occurred, the NCDP was not required to provide notice of this NVRA violation to North Carolina's chief election official before suing; notice is required only where violations are occurring or will occur "more than 30 days before the date of an election for Federal office," 52 U.S.C. §20510(b)(3).

Case 5:24-cv-00699-M-KS    Document 35    Filed 04/14/25    Page 30 of 32

April 14, 2025

Respectfully submitted,

/s/ Shana L. Fulton

SETH P. WAXMAN[*]
DANIEL S. VOLCHOK[*]
CHRISTOPHER E. BABBITT[*]
JANE E. KESSNER[*]
NITISHA BARONIA[*]
ANN E. HIMES[*]
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
jane.kessner@wilmerhale.com
annie.himes@wilmerhale.com

SHANA L. FULTON
N.C. Bar No. 27836
WILLIAM A. ROBERTSON
N.C. Bar No. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON,
   HUMPHREY & LEONARD, LLP
150 Fayetteville Street, Suite 1700
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

[*] Local Rule 83.1(e) special appearance

**CERTIFICATE OF SERVICE**

On this 14th day of April, 2025, I electronically filed the foregoing document using the

court's CM/ECF system.

/s/ Shana L. Fulton
Shana L. Fulton