**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

North Carolina Democratic Party,

                  Plaintiff,

      v.

North Carolina State Board of Elections;
Karen Brinson Bell, *in her official capacity as
Executive Director of the North Carolina State
Board of Elections*; Alan Hirsch, *in his official
capacity as Chair of the North Carolina State
Board of Elections*; Jeff Carmon, *in his official
capacity as Secretary of the North Carolina
State Board of Elections*; and Stacy Eggers IV,
Kevin N. Lewis, and Siobhan O'Duffy Millen,
*in their official capacities as members of the
North Carolina State Board of Elections*,

                  Defendants.

Case No. 5:24-cv-699-M-KS

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ..........................................................................................................1
BACKGROUND ..........................................................................................................2

    A.    The North Carolina Republican Party's Previous Attempts To
Systematically Purge Voters From The Rolls..........................................................2
    B.    Republican Candidates' Post-Election Protests...............................................4
    C.    The NCSBE's Dismissal Of The Protests And Related Lawsuits ..........................6

LEGAL STANDARD.....................................................................................................9
ARGUMENT................................................................................................................10

I.    NCDP Is Likely To Succeed On The Merits .................................................10

    A.    The Post-Election Measures The North Carolina Courts Adopted Violate
The U.S. Constitution By Imposing An Undue Burden On Voters'
Fundamental Right To Vote, Depriving Them Of Due Process, And
Denying Them Equal Protection..........................................................................10

        1.    Undue Burden .........................................................................................10
        2.    Procedural Due Process ..........................................................................15
        3.    Equal Protection......................................................................................19

    B.    Discarding Ballots Violates The National Voter Registration Act......................21

II.    The Remaining Factors Favor An Injunction .................................................22

    A.    NCDP Will Suffer Irreparable Harm Absent Relief .........................................22
    B.    The Equities And Public Interest Favor An Injunction ........................................24

CONCLUSION.............................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)..........................................................................................................11

*Arcia v. Florida Secretary of State*,
    772 F.3d 1335 (11th Cir. 2014) ......................................................................................22

*Arizona Democratic Party v. Hobbs*,
    485 F.Supp.3d 1073 (D. Ariz. 2020) ...............................................................................16

*Bennett v. Yoshina*,
    140 F.3d 1218 (9th Cir. 1998) .........................................................................................12

*Burdick v. Takushi*,
    504 U.S. 428 (1992).........................................................................................................11

*Bush v. Gore*,
    531 U.S. 98 (2000) (per curiam)..............................................................................20, 21

*Democracy North Carolina v. North Carolina State Board of Elections*,
    476 F.Supp.3d 158 (M.D.N.C. 2020) ..............................................................................16

*Dunn v. Blumstein*,
    405 U.S. 330 (1972)...................................................................................................19, 20

*Elrod v. Burns*,
    427 U.S. 347 (1976).........................................................................................................23

*England v. Louisiana State Board of Medical Examiners*,
    375 U.S. 411 (1964)...........................................................................................................7

*Fuentes v. Shevin*,
    407 U.S. 67 (1972)............................................................................................................18

*Griffin v. Burns*,
    570 F.2d 1065 (1st Cir. 1978)....................................................................................11, 12

*Griffin v. North Carolina State Board of Elections,*
    No. 25-1018 (4th Cir. Feb. 4, 2025) (per curiam)............................................................7

*Griffin v. North Carolina State Board of Elections*,
    No. 5:24-cv-724 (E.D.N.C.)........................................................................................6, 10

*Griffin v. North Carolina State Board of Elections*,
    No. 5:24-cv-731 (E.D.N.C. Jan. 6, 2025) .........................................................................6

*Griffin v. North Carolina State Board of Elections*,
    No. 5:24-cv-731 (E.D.N.C. Apr. 12, 2025) ................................................................1

*Griffin v. North Carolina State Board of Elections*,
    No. 2025 WL 263400 (N.C. Jan 22, 2025) ...........................................................7

*Griffin v. North Carolina State Board of Elections*,
    No. 320P24 (N.C.) ................................................................................................6

*Griffin v. North Carolina State Board of Elections*,
    No. 320P24-3 (N.C. Apr. 11, 2025) ................................................................8, 14

*Griffin v. North Carolina State Board of Elections*,
    2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) ...............................4, 7, 8, 15, 18, 20

*Griffin v. North Carolina State Board of Elections*,
    No. 24CV040619-910 (Wake Cnty. Sup. Ct.) ..................................................6, 7

*Griffin v. North Carolina State Board of Elections*,
    No. 24CV040620-910 (Wake Cnty. Sup. Ct.) ......................................................6

*Griffin v. North Carolina State Board of Elections*,
    No. 24CV040622-910 (Wake Cnty. Sup. Ct.) ......................................................6

*Harper v. Virginia State Board of Elections*,
    383 U.S. 663 (1966) ......................................................................................10, 16

*Hendon v. North Carolina State Board of Elections*,
    710 F.2d 177 (4th Cir. 1983) ...................................................................11, 12, 15

*James v. Bartlett*,
    359 N.C. 260 (2005) ...........................................................................................15

*Kendall v. Balcerzak*,
    650 F.3d 515 (4th Cir. 2011) ...............................................................................16

*Kivett v. North Carolina State Board of Elections*,
    No. 281P24 (N.C.) ...............................................................................................4

*Kivett v. North Carolina State Board of Elections*,
    No. 24CV031557-910 (N.C. Sup. Ct. Oct. 21, 2024) ...........................................4

*Kivett v. North Carolina State Board of Elections*,
    No. P24-735 (N.C. Ct. App. Oct. 29, 2024) .........................................................4

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...............................................................................23

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)..........................................................................................16

*McLaughlin v. North Carolina Board of Elections,*
    65 F.3d 1215 (4th Cir. 1995) ..........................................................................11

*Merrill v. Milligan,*
    142 S.Ct. 879 (2022)........................................................................................13

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................................24

*North Carolina State Conference of NAACP v. Bipartisan Board of Elections and
    Ethics Enforcement,* 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) .................22

*North Carolina State Conference of NAACP v. Cooper,*
    430 F.Supp.3d 15 (M.D.N.C. 2019) ...............................................................24

*North Carolina State Conference of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ..........................................................................16

*Obama for America v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ..........................................................................24

*Overton v. Mayor & City Commissioners of City of Hendersonville,*
    255 N.C. 306 (1960) .......................................................................................14

*Pisano v. Strach,*
    743 F.3d 927 (4th Cir. 2014) ....................................................................11, 13

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) (per curiam)..................................................................13, 24

*Republican National Committee v. North Carolina State Board of Elections,*
    120 F.4th 390 (4th Cir. 2024) ....................................................................3, 21

*Reynolds v. Sims,*
    377 U.S. 533 (1964)...................................................................................10, 24

*Richer v. Fontes,*
    2024 Ariz. LEXIS 263 (Ariz. Sept. 20, 2024) ...............................................14

*United States v. Classic,*
    313 U.S. 299 (1941)........................................................................................16

*United States Department of Labor v. Wolf Run Mining Co.,*
    452 F.3d 275 (4th Cir. 2006) ..........................................................................10

iv

*Vitkus v. Blinken*,
    79 F.4th 352 (4th Cir. 2023) ........................................................9

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008)...................................................................10

*Wolf v. Fauquier County Board of Supervisors*,
    555 F.3d 311 (4th Cir. 2009) ....................................................18

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. Const.
    amend I.............................................................................1, 10, 15
    amend XIV ................................................................1, 10, 15, 19

N.C. Const. art. VI, §1 .......................................................................2

2 U.S.C. §20302 .................................................................................4

52 U.S.C. §20507 .............................................................................21

N.C. Gen. Stat.
    §163-85 ..............................................................................2, 18
    §163-86 ..............................................................................3, 18
    §163-87 ..............................................................................2, 18
    §163-88 ..............................................................................3, 18
    §163-166 ................................................................................17
    §163-89 ................................................................................2, 3
    §163-258.1 ...............................................................................4
    §163-258.2 ............................................................................5, 6
    §163-258.4 ..............................................................................17
    §163-258.13 ............................................................................17

8 N.C. Admin. Code 17.0109(d).........................................................6

## COURT FILINGS

Brief of Secure Families Initiative and Certain Members of Count Every Hero, An
    Unincorporated Association, In Support of Dismissing the "FPCA"
    Election Protests
    *Griffin v. North Carolina State Board of Elections*,
    No. 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 3, 2025)............................................25

Complaint,
    *Kivett v. North Carolina State Board of Elections*,
    No. 24CV031557-910 (N.C. Sup. Ct. Oct. 21, 2024).........................................................3

v

State Board's Opposition to Petition for Judicial Review
    *Griffin v. North Carolina State Board of Elections*,
    No. 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 3, 2025) ....................................6, 7, 17

State Board's Notice
    *Griffin v. North Carolina State Board of Elections*,
    No. 24CV040619-910 (Wake Cnty. Sup. Ct. Feb. 6, 2025) ....................................6, 7, 17

## OTHER AUTHORITIES

Anderson, Bryan, *Longtime NC Voters At Risk of Supreme Court Ballots Wrongly
    Getting Tossed*, Anderson Alerts (Apr. 13, 2025),
    https://andersonalerts.substack.com/p/supco-election-protest-issues ...............................18

Blake, Aaron, *The Gravity of a GOP Election Challenge in N.C.: 'Invites
    Incredible Mischief'*, Wash. Post (Jan. 8, 2025) ...............................................................26

Bonner, Lynn, *A Republican-Led Group Is Running Ads in NC Opposing the
    GOP Attempt to Throw out Ballots*, NC Newsline (Jan. 24, 2025),
    https://tinyurl.com/47kkmmfw ........................................................................................25

Holder, Eric H., Jr., *The Courts Must Stop This Judge From Stealing an Election*,
    N.Y. Times (Feb. 6, 2025) .........................................................................................25, 26

Clark, Doug Bock, *A North Carolina Supreme Court Candidate's Bid to Overturn
    His Loss Is Based on Theory Election Deniers Deemed Extreme*,
    ProPublica (Dec. 23, 2024), https://www.propublica.org/article/jefferson-
    griffin-north-carolina-supreme-court-challenge-election-integrity-network ...................26

Clark, Doug Bock, *They Followed North Carolina Election Rules When They
    Cast Their Ballots. Now Their Votes Could Be Tossed Anyway.*,
    ProPublica (Jan. 27, 2025), https://perma.cc/AL7J-JCLK ..............................................25

Letter to Judge Jefferson Griffin, (Mar. 18, 2025), https://tinyurl.com/4xpk7ar7........................25

## INTRODUCTION

North Carolina Supreme Court Justice Allison Riggs won re-election five months ago, a victory confirmed through multiple recounts. Her opponent, North Carolina Court of Appeals Judge Jefferson Griffin, and the Republican Party have litigated ever since in an effort to overturn the will of the people, demanding that the state alter the rules after the election in order to discard the votes of thousands of registered military servicepeople and other overseas citizens whom the state assured were properly registered to vote. Such after-the-fact mass disenfranchisement would brazenly violate federal law—particularly since it is strategically targeted only at selected groups of voters (voters whom the Republicans assume will skew Democratic), sparing other similarly situated voters. But because of the state courts' recent rulings on *state* law, that widespread violation of federal law will occur, at least, for nearly 300 voters who have been offered no opportunity to cure their ballots, and for approximately 1,400 additional voters unless each of those additional overseas voters proves within 30 days of the date a notice is mailed to them that they are indeed eligible to vote. And if the state decides to include additional ballots challenged after the protest deadline, the violation could occur for a total of nearly *5,500* voters. This Court should temporarily restrain and preliminarily enjoin state election officials from subjecting any of these voters to an unlawful "cure" process while the Court adjudicates the federal issues.

Both a temporary restraining order and a preliminary injunction are warranted, even though the Court has already preliminarily enjoined the North Carolina State Board of Elections (NCSBE or Board) from certifying the election results. *Griffin v. NCSBE* 5:24-cv-731 (Apr. 12, 2025). To begin with, the plaintiff—the North Carolina Democratic Party (NCDP)—will likely succeed on its claims that the First and Fourteenth Amendments and the National Voter Registration Act prohibit subjecting select classes of voters to the post-election cure process authorized by the North

Carolina Supreme Court under state law and/or discarding their votes on the grounds Judge Griffin urges.  Without an injunction, moreover, NCDP will be irreparably harmed, with its members disenfranchised and some forced to undergo an unduly burdensome and selectively targeted (i.e., discriminatory) "cure" process several months after the election.  By contrast, neither Judge Griffin nor the NCSBE would suffer any cognizable harm from a temporary stay while the federal issues are resolved.  Finally, the public has a strong interest in ensuring elections are fair and honest, which means not changing the rules after the fact in order to disenfranchise tens of thousands of people who followed the rules in place during the election.

The Court should temporarily restrain and preliminarily enjoin the NCSBE from carrying out any "cure" process, discarding any votes, or (consistent with the Court's April 12 order cited above) certifying the election for Judge Griffin, so that federal courts can determine whether doing so violates federal law before the irreparable harm is inflicted.

## BACKGROUND

### A. The North Carolina Republican Party's Previous Attempts To Systematically Purge Voters From The Rolls

Under North Carolina law, "[e]very person born in the United States and every person who has been naturalized," is "18 years of age," and meets certain qualifications "shall be entitled to vote at any election."  N.C. Const. art. VI, §1.  If a private party believes that a person seeking to vote is not eligible to do so, the party must challenge the person's eligibility: (1) at least 25 days before the election, N.C. Gen. Stat. §163-85; (2) when the person casts a ballot in person on election day, *id.* §163-87; or (3) by 5:00 pm on the business day after the deadline for receipt of absentee ballots, if the person cast such a ballot, *id.* §163-89.  The challenger must come forward with affirmative, individualized proof that the person is ineligible to cast a ballot at the relevant

time, and the person must be afforded notice and an opportunity to be heard when challenged. *See id.* §§163-86, 163-88, 163-89.

Judge Griffin's campaign did not avail itself of these procedures during the 2024 general election, nor did the North Carolina Republican Party (NCRP). Instead, the NCRP, along with the Republican National Committee (RNC), filed several lawsuits to disenfranchise specified categories of voters en masse.

For example, in August 2024, the NCRP and RNC asked a state judge to purge up to 225,000 registered North Carolinians from the voter rolls or else force them to cast provisional ballots—which under state law are presumptively not counted—even though these voters filled out the state's voter-registration form, had their eligibility to vote verified by election officials, and brought or would bring identification to the polls when they voted (as state and federal law require). The lawsuit claimed that these 225,000 voters *might* be ineligible, on a ground that Judge Griffin raised after the election but that the North Carolina Supreme Court has now rejected. That case was removed to this Court, which dismissed the plaintiffs' statutory claim based on its interpretation of HAVA (the NCRP and RNC did not appeal), and which is now adjudicating the plaintiffs' constitutional claim, following the Fourth Circuit's rejection of plaintiffs' attempt to remand that claim to state court. *See RNC v. NCSBE*, 120 F.4th 390, 393 (4th Cir. 2024).

Two months after filing that lawsuit, the NCRP and RNC sued to disenfranchise certain overseas voters (including military servicemembers and their families) who cast ballots pursuant to (1) the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)—which safeguards the rights of military and overseas voters in federal elections—and (2) the North Carolina Uniform Military and Overseas Voting Act (UMOVA), which incorporates and expands on UOCAVA's protections for elections for state office. *See* Complaint, *Kivett v. NCSBE*, No. 24CV031557-910

(N.C. Sup. Ct. Oct. 2, 2024) (citing 2 U.S.C. §20302 (UOCAVA); N.C. Gen. Stat. §§163-258.1 *et seq*. (UMOVA)). Specifically, the NCRP and RNC claimed (*Kivett* Compl. ¶¶6-7) that U.S. citizens born overseas who have not lived in the United States but whose parents were eligible North Carolina voters before moving abroad are ineligible to vote, despite a state law granting them that right, *see* N.C. Gen. Stat. §163-258.2(1)(e). They further claimed (*Kivett* Compl. ¶8) that all overseas voters should be required to provide identification proving residency under state law. The NCRP and RNC declined to pursue injunctive relief in state court regarding the latter claim, and their request for a preliminary injunction as to the former claim was denied by the trial court, *see Kivett v. NCSBE*, No. 24CV031557-910 (N.C. Sup. Ct. Oct. 21, 2024), as was their request for extraordinary relief from the North Carolina Court of Appeals, *see Kivett v. NCSBE*, No. P24-735 (N.C. Ct. App. Oct. 29, 2024). Their request for extraordinary relief from the North Carolina Supreme Court remains pending. *See Kivett v. NCSBE*, No. 281P24 (N.C. Nov. 1, 2024).

### B. Republican Candidates' Post-Election Protests

When North Carolina's county boards of elections canvassed the 2024 general election results, Justice Riggs was determined to have won re-election as associate justice of the North Carolina Supreme Court, defeating Judge Griffin. *Griffin v. NCSBE*, 2025 WL 1021724, at *1 (N.C. Ct. App. Apr. 4, 2025).

Dissatisfied with the choice the voters of North Carolina had made, Judge Griffin filed 307 election protests claiming that the ballots of thousands of voters should not be counted—including the ballots of nearly 300 overseas voters who inherited their residence from their parents, and the ballots of approximately 1,400 military and overseas voters in a single county (Guilford) who did not include photo identification with their ballots. After the deadline for filing protests had passed, he amended his protests to target a total of nearly *5,500* military or overseas voters. *See* Ex.3

(Lawson Decl.) ¶10. (The Republican candidates for three legislative seats who also narrowly lost filed similar protests, but they have all since conceded.) Some of the 307 protests raised factual, record-based challenges to individual voter eligibility, such as that county boards of elections unlawfully counted votes by voters who had died or been convicted of felonies. But others used the protest process to raise systematic legal challenges to the eligibility of groups of voters and the validity of their votes.

The NCSBE took jurisdiction over three categories of protests (collectively, "Protests"). Specifically, the Board took jurisdiction over protests alleging that ballots were unlawfully counted for one of the following reasons, which mirror the legal theories advanced in the GOP lawsuits discussed above:

 a. Ballots were cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States;

 b. Ballots were cast by military or overseas citizens under Article 21A of Chapter 163 [of the North Carolina General Statutes], when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form; and

 c. Ballots were cast by registered voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number.

Ex.A. to Second Amended Complaint (Complaint) (D.E. 35) ¶1.

Voters targeted by the first category have been assured for over thirteen years that they are eligible to vote, because a state statute—North Carolina General Statutes §163-258.2(1)(e), which the NCRP and RNC have unsuccessfully challenged in court—grants them that right. Similarly, both NCSBE guidance and North Carolina law informed voters targeted by the second category that they did not have to submit photo identification along with their absentee ballots. In particular, the Board has stated that "neither federal nor state law requires" such voters to "provide ID when

returning their ballot." Complaint Ex.D at 1, 8. Moreover, effective August 1, 2023, the Board promulgated a temporary regulation (since made permanent) stating that voters casting military-overseas ballots are "not required to submit a photocopy of acceptable photo identification." 8 N.C. Admin. Code 17.0109(d). And state law provides that UMOVA voters (unless they request a regular absentee ballot) are given ballots "specifically prepared or distributed for" their use, N.C. Gen. Stat. §163-258.2, which must be accompanied only by a declaration, not photo identification, *id*. §163-258.17(b).

### C.    The NCSBE's Dismissal Of The Protests And Related Lawsuits

After briefing and a hearing, the NCSBE dismissed the Protests based largely on federal law. Complaint Ex.B. The dismissal was consistent with the complaint NCDP had previously filed in this Court (on December 6, 2024; amended on December 31) seeking a declaratory judgment that federal law prohibits throwing out votes after an election based on the challenges lodged by the Protests. (D.E. 1). But Judge Griffin continued to press the Protests. He first petitioned for an extraordinary writ of prohibition from the North Carolina Supreme Court, asking that court to prohibit the Board from counting the challenged ballots. *Griffin v. NCSBE*, No. 320P24 (N.C. Dec. 18, 2024) (*Griffin I*). He later petitioned the Superior Court of Wake County to review the Board's dismissal of the Protests. *Griffin v. NCSBE*, Nos. 24CV040622-910, 24CV040619-910, and 24CV040620-910 (Wake Cnty. Sup. Ct. Dec. 20, 2024) (collectively, *Griffin II*). Because both petitions implicated various provisions of federal law, the Board removed them to federal court, but this Court remanded. *See Griffin v. NCSBE*, No. 5:24-cv-724 at 1-2 (E.D.N.C. Jan. 6, 2025); *Griffin v. NCSBE*, No. 5:24-cv-731 (E.D.N.C. Jan. 6, 2025). The North Carolina Supreme Court subsequently dismissed *Griffin I* as procedurally improper but stayed

6

certification of the election until *Griffin II* and any appeals were resolved. *Griffin I*, 2025 WL 263400, at *1 (N.C. Jan. 22, 2025).

On appeal from this Court's remand order, the Fourth Circuit ruled that the North Carolina Supreme Court's dismissal order in *Griffin I* mooted any federal questions raised in Judge Griffin's petition for a writ of prohibition, leaving the state court's stay of certification in place. *Griffin v. NCSBE*, No. 25-1018 at 7 (4th Cir. Feb. 4, 2025) (per curiam). The court of appeals also held that the Board had properly removed *Griffin II*, seeing "no error" in this Court's determination that the Board was entitled to a federal forum to adjudicate whether Judge Griffin's demands would require the NCSBE to violate civil rights law. *Id.* at 9. The Fourth Circuit nevertheless remanded *Griffin II* to state court but ordered this Court to retain jurisdiction until final resolution in state court (including any appeals) so as to ensure federal resolution of the "federal constitutional issues" at stake. *Id.* Judge Griffin then proceeded against the NCSBE and Justice Riggs in state court, where the defendants reserved their right to a federal forum to adjudicate the federal issues raised. *See, e.g.*, State Board's Notice (D.E. 28), *Griffin*, No. 24CV040619-910 (Wake Cnty. Sup. Ct. Feb. 6, 2025) (citing *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964)).

After the North Carolina Superior Court dismissed all three of Judge Griffin's appeals from the NCSBE's denial of his protests, a divided three-judge panel of the North Carolina Court of Appeals reversed. *Griffin*, 2025 WL 1021724, at *10. As to the military and overseas voters who had not shown proof of prior in-state residence, the panel held that those voters should all be disenfranchised, instructing the NCSBE "to direct the county boards to identify" the ballots those voters cast "and remove them from the final count of the 2024 election for Supreme Court Seat 6," without offering those voters *any* ability to cure their ballots. *Id.* at *15. The panel further deemed military and overseas voters who did not provide photo identification with their ballots (because

the state promulgated a regulation that they did not have to) and voters who had not provided certain identification numbers when they registered to vote (again because county boards did not tell them they had to) "not qualified" to vote. *Id.* at *14. It thus ordered the NCSBE to "omit from the final count the votes of those voters who fail to timely" provide the relevant identification within 15 business days of being mailed notice of the defect. *Id.* *15. The decision did not clarify whether it applies to the nearly 4,000 voters added to the Protests after the deadline for filing challenges had passed.

Dissenting, Judge Hampson noted that "on the Record before" the court, Judge Griffin had "yet to identify a *single* voter—among the tens of thousands [he] challenges in this appeal—who was, in fact, ineligible to vote in the 2024 General Election under the statutes, rules, and regulations in place in November 2024 governing that election." *Griffin*, 2025 WL 1021724, at *17 (Hampson, J., dissenting).

The state proceedings in the *Griffin* cases have now concluded: On April 11, the North Carolina Supreme Court denied review as to the overseas voters who had registered in reliance on their parents' state residence, leaving in place the Court of Appeals' order that the NCSBE discard all those voters' ballots without any notice or an opportunity to cure. *Griffin v. NCSBE*, No. 320P24-3, at 3 (N.C. Apr. 11, 2025). The court also largely denied review as to the second category (overseas voters who did not provide photo identification with their ballots because they were not told to), agreeing that their ballots should be discarded absent cure but "expand[ing] the period to cure deficiencies" set by the Court of Appeals "from fifteen business days to thirty calendar days after the mailing of notice." *Id.* at 6. The state high court reversed the Court of Appeals as to the third category of voters (those whose registration records did not list a drivers' license or social security number), largely on the ground that "mistakes made by negligent election

officials in registering citizens who are otherwise eligible to vote" could not "negate the vote of an otherwise lawful voter." *Id.* Like the Court of Appeals, the North Carolina Supreme Court did not clarify whether its decision applied to the nearly 4,000 additional military or overseas voters Judge Griffin had added to his Protests after the relevant deadline. As a result, absent this Court's intervention, the NCSBE will soon retroactively discard hundreds of votes cast by one set of registered voters and implement an unlawful cure process as to over a thousand voters (and possibly many more) in the other set—even though both sets of voters followed the state's registration and voting guidelines.

Although it has informed voters that they are "welcome to submit" an updated voter registration form or photo identification, the NCSBE has yet to publish detailed instructions by which targeted voters are to be notified of whether and how they must defend their votes from being discarded. Complaint Ex.G (*Information for Voters Challenged in Election Protest: Statement Updated on April 9 with FAQ for Affected Voters*, https://tinyurl.com/ycx5duz4). But as of April 12, the "Frequently Asked Questions" section of the NCSBE's statement noted "that it is unclear whether the Court of Appeals decision would apply to any voters added to the protest after the protest deadline," including the approximately 4,000 voters from three counties "identified by the protestor after the deadline to file a protest." *Id.*

## LEGAL STANDARD

A preliminary injunction should issue when (1) the plaintiff is likely to succeed on the merits, (2) the plaintiff is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in the plaintiff's favor, and (4) an injunction is in the public interest. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). The standard for a temporary restraining order is the

same. *See United States Department of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006).

## ARGUMENT

I. NCDP IS LIKELY TO SUCCEED ON THE MERITS

NCDP will likely prevail on its claims that the U.S. Constitution and the NVRA prohibit subjecting targeted classes of voters to a post-election "cure" process as authorized by the North Carolina Supreme Court under state law and/or discarding votes based on Griffin's remaining post-election challenges to votes cast by military and overseas citizens.

**A.** **The Post-Election Measures The North Carolina Courts Adopted Violate The U.S. Constitution By Imposing An Undue Burden On Voters' Fundamental Right To Vote, Depriving Them Of Due Process, And Denying Them Equal Protection**

As this Court has explained, "state regulation of state and local elections remains subject to federal constitutional constraints." Order (D.E. 50) at 7 n.4, *Griffin*, No. 5:24-cv-724 (E.D.N.C. Jan. 6, 2025) (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008)). And federal law recognizes that the right to vote "'is a fundamental matter in a free and democratic society,'" a right "'preservative of other basic civil and political rights.'" *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964)). Deprivation of that right here, through the imposition of post-election "cure" measures and/or retroactive discounting of ballots pursuant to post-election rule changes, would unduly burden the right to vote, violate procedural due process, and deny targeted voters equal protection of the laws.

### 1. *Undue Burden*

State laws that burden the right to vote violate the First and Fourteenth Amendments unless relevant and legitimate state interests of sufficient weight justify the burden or burdens. *See*

*Anderson v. Celebrezze*, 460 U.S. 780, 788-790 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The more severely a law burdens the right to vote, the more strictly it must be scrutinized. Hence, "election laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'" *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (quoting *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)); *see also Burdick*, 504 U.S. at 434.

Discarding ballots that voters cast in good-faith reliance on a state's own assurances unduly burdens the right to vote. For example, in a case the Fourth Circuit has described as reflecting "settled" law (*see Hendon v. NCSBE*, 710 F.2d 177, 182 (4th Cir. 1983)) the First Circuit held that a state's retroactive discarding of ballots cast by voters who "were doing no more than following the instructions of the officials charged with running the election" amounted "to a fraud upon the absent voters," *Griffin v. Burns*, 570 F.2d 1065, 1074-1075 (1st Cir. 1978). The Fourth Circuit in *Hendon* also recognized the burden that post-election litigation imposes more generally, noting that "[c]ourts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible. They have reasoned that failure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." 710 F.2d at 182 (citations and quotation marks omitted).

Other courts' caselaw is to the same effect. For instance, in the case cited by *Hendon*, *Griffin v. Burns*, the First Circuit held that Rhode Island imposed an undue burden when its supreme court invalidated absentee ballots already cast on the ground that such ballots were never

constitutionally or statutorily authorized for party primaries—despite the issuance of such ballots in party primaries being a longstanding practice, *see id.* at 1066-1067. As the First Circuit recognized, when the state reneges on its promise that voters' ballots will count, due process is violated because the right "involves the appearance of fairness as well as actual fairness." *Id.* at 1079. And in *Bennett v. Yoshina*, 140 F.3d 1218, 1226-1227 (9th Cir. 1998), the Ninth Circuit explained that a substantive due process violation occurs in the election context if "two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures."

The principles these cases articulate apply fully here. For starters, "undo[ing] the ballot results in a court action," *Hendon*, 710 F.2d at 182, is *exactly* what Judge Griffin seeks. Likewise, declining to count the timely cast ballots of registered North Carolinians due to an administrative "error" that was affirmatively induced by the state—such as not including a photocopy of a photo ID with an overseas mail-in ballot—severely burdens the right to vote. So does not counting the vote of an overseas voter who, for thirteen years, was informed by state law that she could vote in reliance on her parents' North Carolina residence. The state cannot change the rules *after* an election in order to deny the fundamental right to cast a ballot that will be counted to those who followed the rules in place before and during the election. North Carolina surely could not now decide, for example, that it is only going to count the votes of those who voted by absentee ballot rather than in person (or vice-versa).

That some voters at issue here may have a chance to prevent their votes from being discarded (by providing identification) does not alter the undue-burden analysis. Being *subjected* to such a verification process five months after votes have been cast and counted is itself a "severe

burden on ballot access," *Pisano*, 743 F.3d at 933, particularly because it is no ordinary "cure" procedure (a term that suggests a voter did something wrong). It is a demand that voters who were *told* that they were eligible to vote and that they could cast their ballots in a particular way (i.e., from overseas via a state-created system that did not allow for—let alone require—them to submit identifying documentation), nonetheless prove (or re-prove) their identity to the state in order for their votes in one particular election to *actually* be counted.

The Supreme Court's cases cautioning federal courts against enjoining or otherwise altering state election laws shortly before an election confirms the undue burden that would be imposed by changing election rules at this juncture. As the Court recognized in *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase," *id.* at 4-5. "That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S.Ct. 879, 880-881 (2022) (Kavanaugh, J., concurring in grant of stay applications). Here, the election rules are being changed more than five months *after* the election, far later than the *Purcell* principle would kick in to prevent eve-of-election changes.

No sufficiently weighty state interest justifies changing the rules that govern the election after voters have cast their votes, whether those changes result in the wholesale discarding of votes or require certain voters to provide identification. North Carolina has no interest in—and in fact has a strong interest against—inflicting the significant harm that would flow from retroactively disenfranchising voters who registered and voted in reliance on its own statutes and instructions.

As one voter put it in an affidavit filed in the state-court litigation, "[i]f my ballot is retroactively discarded under Judge Griffin's protest, I will feel stripped of my citizenship and completely betrayed." Ex.9 at 2.

Common sense confirms that conclusion, as it is fundamentally unfair to deny people who followed the rules in place before and during an election their fundamental right to cast a ballot that will be counted by changing the rules after the election. Indeed, the North Carolina Supreme Court itself explained: "Under [that] Court's longstanding precedent, mistakes made by negligent election officials … 'will not deprive [voters] of [their] right to vote or render [their] vote[s] void after [they have] been cast.'" *Griffin*, No. 320P24-3, at 5 (quoting *Overton v. Mayor & City Commissioners of City of Hendersonville*, 255 N.C. 306, 315 (1960)). That conclusion is further confirmed by a recent case involving allegations of voting by non-U.S. citizens, in which the chief justice of the Arizona Supreme Court rejected an attempt (similar to the Protests) to deny nearly 100,000 voters the ability to vote in state and local elections because they supposedly had not provided documentary proof of U.S. citizenship when they registered. *See Richer v. Fontes*, 2024 Ariz. LEXIS 263, at *8 (Ariz. Sept. 20, 2024) (Timmer, C.J.). The chief justice was "unwilling" to "disenfranchise voters en masse" when doing so "is not authorized by state law and would violate principles of due process." *Id.* That was "particularly true" given that (1) it was a "state administrative failure" that led to voters being registered without the requisite proof of citizenship,

and (2) there was "so little time remaining before the beginning of the 2024 General Election." *Id.* at *7. The same conclusion is warranted here.[1]

The Board recognized that the relief Judge Griffin seeks would offend federal law: Citing *Hendon* and *Griffin*, it ruled that the Protests would, if granted, violate "the federal constitution's guarantee of substantive due process." Complaint Ex.B at 32 (discussing first category of Protests); *see also id.* at 29 (second category). "[R]egardless of whether state law permits" the Protests "to proceed," the Board concluded, "the federal constitution does not." *Id.* at 25. The Board was correct—but absent preliminary relief from this Court, the state may unduly burden the voting rights of potentially thousands of NCDP members, in violation of the First and Fourteenth Amendments. Such conduct should be enjoined.

### 2. Procedural Due Process

Even if it were ever permissible to retroactively change the rules after an election in order to discard the ballots of voters who complied with the rules in place before and during the election, it is not permissible here. That is because voters have not been provided adequate process before losing their right to cast a ballot that will be counted. That is an independent constitutional violation.

Section 1 of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property without due process of law." To establish a procedural-due-process violation, a plaintiff must show both that state action deprived her of "a cognizable liberty or property

---

[1] At Judge Griffin's behest, the state courts repeatedly relied upon *James v. Bartlett*, 359 N.C. 260 (2005) to justify the categorical, retroactive disenfranchisement of voters in this case. *See, e.g.*, *Griffin*, 2025 WL 1021724, at *4. However, almost immediately after *James* was decided, the North Carolina General Assembly overturned the legal ruling in *James* that the provisional ballots at issue could not be counted. Ex.11 at 4. The General Assembly also rejected the argument that *James* permits retroactive disenfranchisement of voters who followed the instructions of the State Board when casting their ballots, explaining that such an interpretation would violate substantive due process and federal law. *Id.* at 7-12.

15

interest"—here, the undeniable interest in exercising one's constitutionally protected right to cast a ballot that will be counted, *see Harper*, 383 U.S. at 667—and that "the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (quotation marks omitted). To assess the adequacy of procedural protections, courts examine (1) "the private interest that will be affected"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

"Multiple district courts" have applied the *Mathews* factors in "consider[ing] procedural due process challenges to election regulations." *Arizona Democratic Party v. Hobbs*, 485 F.Supp.3d 1073, 1093 (D. Ariz. 2020) (collecting cases), *vacated on other grounds*, 18 F.4th 1179 (9th Cir. Dec. 8, 2021). One court in this circuit, for example, did so with a procedural-due-process challenge to a North Carolina law governing absentee ballots. *See Democracy North Carolina v. NCSBE*, 476 F.Supp.3d 158, 228-229 (M.D.N.C. 2020). Applying the factors here confirms that procedural due process prohibits discarding votes based on the Protests.

*First*, the private interest at stake is extremely strong. "No right is more precious in a free country than that of having a voice in the election of those who make the laws." *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016) (citation omitted). The Protests threaten that right, which encompasses voters' right both to "cast their ballots" *and* to "have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941).

*Second*, disenfranchising voters based on the Protests poses a serious risk of erroneous deprivations of the right to vote. With respect to the voters in the second category of protests

(overseas voters who did not include photo ID), the NCSBE has no evidence, and Judge Griffin has not claimed, that even a single one of the targeted voters is not who they claimed to be. *See* N.C. Gen. Stat. §163-166.16(g) (explaining the purpose of photo identification); State Board's Opposition to Petition for Judicial Review 43, *Griffin*, No. 24CV040620-910 (Wake County Sup. Ct. Feb. 3, 2025); Complaint Ex.D. And each and every one of these military and overseas voters was required to sign a declaration under penalty of perjury attesting to their eligibility to vote and their identity when they cast their military-overseas ballots. *See* N.C. Gen. Stat. §§163-258.4(e), 163-258.13. Yet under the North Carolina Supreme Court's decision, these voters will lose their right to cast a vote that will be counted (even if they are in fact eligible to vote) unless all the stars happen to align. In particular, such voters will have to (1) actually receive a mailing the Board sends them (likely through international mail), which will require not only that the Board have the correct mailing information but also that the voter not be traveling, in the hospital, in a combat zone where mail deliveries are often especially delayed, or otherwise indisposed during the narrow cure period; (2) have on hand the necessary proof of eligibility the Board is demanding (or be able to procure it very quickly despite in many cases being out of the country); (3) be in a position to copy that information or fill out an exception form; and (4) be able to successfully return that information to the Board (again, likely through international mail)—all in just 30 days. *See* Lawson Decl. ¶21. And even if all necessary steps happen, the lack of any way to appeal a denial (or even be informed of the grounds for denial) further heightens the risk of erroneous determinations.

That risk is even higher for the hundreds of voters who will receive *no* notice from the state before their ballots are discarded, i.e., the overseas voters who lack a North Carolina residence and who the North Carolina appellate court held need not even be notified that their votes will be

17

Case 5:24-cv-00699-M-KS    Document 37    Filed 04/14/25    Page 24 of 35

discarded, let alone afforded any opportunity to challenge the determination that they were properly named in that Protest, *Griffin*, 2025 WL 1021724, at \*15. These voters need such notice and an opportunity to be heard in order to ensure that they were not placed on the list in error; indeed there are already reports suggesting such errors. *See* Bryan Anderson, *Longtime NC Voters At Risk of Supreme Court Ballots Wrongly Getting Tossed*, Anderson Alerts (Apr. 13, 2025), https://andersonalerts.substack.com/p/supco-election-protest-issues (reporting that retired UNC-Greensboro professor who has lived in Guilford County for decades was labeled as a "never resident" by Judge Griffin's protests); Lawson Decl. Ex.A. The lack of notice or opportunity to be heard leaves no doubt that the risk of erroneous deprivation is high, as binding precedent establishes that procedures are typically inadequate if they do not provide "notice and an opportunity to be heard," *Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009); *see also Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972).

*Third*, the government has no valid interest either in disenfranchising eligible voters or in unfairly changing the rules after an election in order to do so. And requiring additional or substitute process would not unreasonably burden the government, because state law already establishes a system for providing notice and an opportunity to be heard: North Carolina's ordinary challenge and protest processes guarantee voters *meaningful* notice and an individualized hearing at which a voter whose eligibility or identification is challenged has an opportunity to attest that she is qualified to vote or to cast a valid vote *before* her ballot is counted. *See* N.C. Gen. Stat. §§163-85 to 163-88. There is no reason such a process could not have worked here, and voters should not have to undergo a constitutionally inadequate process because Judge Griffin failed to challenge these voters before the results were canvassed. Alternatively, the individualized process available pre-election could be used post-election. While that may be costly, the costs cannot be viewed as

overly burdensome, since state law provides for such hearings pre-election. In any event, costs cannot control the analysis; surely if, for example, Republican candidates protested every Democratic voter's ballot, the strong interest in avoiding a partisan voter purge would justify additional processes to ensure no mistakes are made. For the same reason, the fact that individualized hearings may extend the process is not dispositive. The scale of the threatened disenfranchisement heightens the need for more process, even if the costs—in money and time— would be significant. At minimum, it would not unduly burden the state to allow voters more than 30 days to provide photo identification, to employ aggressive notice procedures carefully calculated to actually reach overseas voters (rather than simply mailing notice to the address on record), and to make it easy for voters to provide identification—such as by allowing pictures of identification to be submitted online or deploying state agents to help voters who may not have the necessary documents on hand procure them. While these steps would come with costs, the number of voters at issue is limited, and again, costs cannot control the analysis.

Balancing the three factors makes clear that the cure process is inadequate: A crucial right is at stake, the chances of erroneous denial of that right via the cure process is extremely high, and the burden on the state for a process that would reduce those chances is minimal and in any event warrants relatively little weight in the analysis. The balance thus tips sharply in favor of a due-process violation.

3. *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment prohibits North Carolina from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. Specifically, citizens have "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S.

330, 336 (1972). And "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000) (per curiam).

The selective disenfranchisement that the state courts blessed violates this binding precedent. As explained in the paragraphs that follow, voters that the Protests targeted are "at risk of being disenfranchised while similarly-situated voters are not, simply because of the county in which they reside … or their physical location." *Griffin*, 2025 WL 1021724, at *40 (Hampson, J., dissenting). This punishes voters based on arbitrary distinctions, and thus violates the Equal Protection Clause, as does subjecting only those arbitrarily targeted voters to the cure process the state courts have ordered.

The Protests targeted only voters in certain counties, and only those votes that were cast in his race. His challenge to military and overseas voters who submitted absentee ballots under Article 21A without accompanying photo ID was limited to ballots cast in heavily Democratic Guilford County. *See Griffin*, 2025 WL 1021724, at *40 (Hampson, J., dissenting). (After the protest deadline, as noted, he expanded that challenge to include military and overseas voters in Buncombe, Durham, and Forsyth Counties, also heavily Democratic. *See* Complaint Ex.J.) But there are military and overseas citizens in North Carolina's other counties who also submitted absentee ballots under Article 21A without including a photocopy of a photo ID or ID Exception Form. Indeed, Judge Griffin's post-deadline protests allege precisely that. *See* Complaint Ex.J. Unlike similarly situated voters from Guilford County, the votes of citizens in these other counties will be unaffected, even if they do not provide photo identification within 30 days. Discarding the votes of residents of one county in one race, but not ballots that suffered from the same asserted defects but were cast by voters in a different county or a different race, constitutes "arbitrary and

disparate treatment" that "value[s] one person's voter over that of another." *Bush*, 531 U.S. at 104-105. So does automatically discarding the votes of voters in the first category simply because of where they live.

The 30-day cure process does not solve these equal-protection problems; in fact, it reinforces them. Requiring early and absentee voters and voters from targeted counties to complete additional steps in order to have their votes counted—steps that were not required of any other voters in the 2024 North Carolina Supreme Court election or in any other race—itself violates the Equal Protection Clause, subjecting similarly-situated voters to drastically different voting rules based on the losing candidate's strategic decision to target (and thus burden) only voters registered in counties more likely to vote for his opponent.

In short, NCDP will likely prevail on its constitutional claims.

### B.    Discarding Ballots Violates The National Voter Registration Act

NCDP will also likely prevail on its claim that the NVRA prohibits North Carolina from discarding votes of overseas voters who did not themselves live in North Carolina, because the statute requires systematic (i.e., non-individualized) challenges to voters' registration status to be brought at least 90 days before the relevant election. Specifically, section 8 of the NVRA provides: "A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. §20507(c)(2)(A).[2]

---

[2] Although NVRA section 8 refers to elections for federal office, it applies here because "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal law. *RNC v. NCSBE*, 120 F.4th at 401-402. Specifically, the NCSBE has acknowledged that it maintains "the same rules for registration for voters in state and federal elections," Complaint Ex.B at 27. Indeed, this dispute concerns votes cast in the November 2024 elections during which voters elected federal as well as state officials.

The NVRA's 90-day bar on removals applies to *every* systematic removal program, regardless of the facts on which removal is based. The bar's purpose is to prohibit the systematic removal of voters "when the risk of disfranchising eligible voters is the greatest," and targeted voters cannot "correct the State's errors in time to vote." *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Hence, a judge in this district held in one case that county boards of elections in North Carolina violated the NVRA when they systematically removed voters from the voting rolls within 90 days of a federal election, even though the efforts to remove the voters were motivated by evidence that the voters no longer lived at their address. *See North Carolina State Conference of NAACP v. Bipartisan Board of Elections and Ethics Enforcement*, 2018 WL 3748172, at *5-10 (M.D.N.C. Aug. 7, 2018). The judge enjoined state officials both from continuing to remove the voters "without individualized inquiry as to the circumstances of each voter in the 90 days preceding a federal election" and from "holding hearings or taking any other action(s) to process challenges" designed to facilitate systematic removal. *Id.* at *12. Likewise here, to retroactively declare those voters improperly registered—and to discard their votes on that basis—would violate the NVRA's 90-day ban. And it is no answer to say that these votes can be *discarded* without formally *removing* the voters from the rolls; the discarding of registered voters' ballots is tantamount to removal, and Congress could not have intended to permit such an end-run around the NVRA's protections.

## II.    THE REMAINING FACTORS FAVOR AN INJUNCTION

### A.    NCDP Will Suffer Irreparable Harm Absent Relief

NCDP is a membership organization with the purpose of electing Democrats to public office in North Carolina, which it does by supporting Democratic candidates and ensuring that all voters can cast ballots and have their votes counted. Complaint ¶¶22-23; Lawson Decl. ¶2. The North Carolina Supreme Court has now ordered the NCSBE to discard nearly 300 votes challenged

by the Protests (those in the first category). Lawson Decl. ¶17. Approximately 1,400 additional military and overseas voters will have their votes discarded unless they can provide photo identification within 30 calendar days from the date the mailings are sent out, many of them to far-flung overseas addresses—necessitating a novel cure process that will directly burden both the targeted voters and the NCDP itself. Lawson Decl. ¶14. (And if the Board decides to include the late-challenged ballots, a total of approximately 5,500 votes could be subjected to the cure process and/or discarded. *Id.*) There is no doubt that hundreds, and potentially thousands of voters, including NCDP members, will either have their votes discarded immediately or be subjected to an unlawful cure process targeting military and overseas voters from strategically selected Democratic counties—and that voters who are unable to cure their ballots in time are at risk of disenfranchisement. Lawson Decl. ¶¶22-23, 25-26. Those members, and hence NCDP, will be irreparably harmed as a result. Lawson Decl. ¶¶21-28. That is because denial of a fundamental constitutional right—and certainly denial of what is perhaps the most important and fundamental right of all—"unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). Once ballots targeted by the Protests are removed from the count, the North Carolinians who cast them will be irrevocably disenfranchised, because once an election comes and goes, "there can be no do-over and no redress." *Id.* The injury to NCDP members—and hence to NCDP—is "real and completely irreparable if nothing is done to enjoin" unlawful state action. *Id.* NCDP would further be harmed irreparably if its candidate, Justice Riggs, is denied her seat despite winning the election.

This Court's April 12 Order in *Griffin II* preliminarily enjoining the Board from certifying the election will not prevent the irreparable harm just discussed, as the cure process itself—which, again, is strategically targeted to voters in one or more heavily Democratic counties and thus places unique burdens on the NCDP and voters more likely to support Justice Riggs—will be allowed to proceed absent further preliminary relief.

**B.    The Equities And Public Interest Favor An Injunction**

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These merged factors favor a temporary restraining order and preliminary injunction here.

As explained, granting an injunction would prevent disenfranchisement of voters throughout North Carolina, including military servicemembers and their families, and allow Judge Griffin to choose the voters whose ballots he would like counted well after they were all cast in accordance with the rules in place at the time cast.  The public has a "strong interest in exercising the fundamental political right to vote," *Purcell*, 549 U.S. at 4 (quotation marks omitted)—which, as noted, includes the right to have one's vote counted, *see Reynolds*, 377 U.S. at 554.  That interest is best served by "permitting as many qualified voters to vote as possible" (and, again, to have their votes counted).  *Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).  Indeed, "electoral integrity is enhanced, not diminished, when all eligible voters are allowed to exercise their right to vote free from interference and burden unnecessarily imposed by others."  *North Carolina State Conf. of NAACP v. Cooper*, 430 F.Supp.3d 15, 53 (M.D.N.C. 2019).  Conversely, discarding thousands of votes cast in reliance on state instructions long after an election—and potentially reversing the results of that election—undermines rather than advances the public's interest in election integrity and stability.

That conclusion is borne out by the public alarm that has been expressed over Judge Griffin's and the North Carolina state courts' actions here. Scores of public interest groups, including at least one group representing veterans and overseas American citizen families, have expressed the toll that this retroactive disenfranchisement would impose on North Carolinian overseas voters and on public trust in the state's elections. *E.g.*, Brief of Secure Families Initiative and Certain Members of Count Every Hero, An Unincorporated Association, In Support of Dismissing the "FPCA" Election Protests, *Griffin*, No. 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 3, 2025), https://tinyurl.com/4f8798pd. For example, an investigative news outlet reported that "dozens of voters" "expressed astonishment and anger" at the "ongoing attempts to cancel their ballots." *See* Clark, *They Followed North Carolina Election Rules When They Cast Their Ballots. Now Their Votes Could Be Tossed Anyway*, ProPublica (Jan. 27, 2025), https://perma.cc/AL7J-JCLK. And a bipartisan group of over 200 North Carolina jurists— including former state supreme court justices—and senior state government officials and lawyers issued a letter describing the Protests as "a threat to the public's faith in" state government and urging Judge Griffin to abandon his attempt to thwart the will of the people. *See* Letter to Judge Jefferson Griffin (Mar. 18, 2025), https://tinyurl.com/4xpk7ar7.

Other commentators across the country (and the ideological spectrum) have emphasized that overturning the election result by changing the rules after the fact would embolden other candidates to adopt Judge Griffin's playbook, setting a dangerous precedent and imperiling the peaceful transition of power. *See, e.g.*, Bonner, *A Republican-Led Group Is Running Ads in NC Opposing the GOP Attempt to Throw out Ballots*, NC Newsline (Jan. 24, 2025), https://tinyurl.com/47kkmmfw; Holder, *The Courts Must Stop This Judge From Stealing an Election*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/opinion/north-

carolina-supreme-court.html; Blake, *The Gravity of a GOP Election Challenge in N.C.: 'Invites Incredible Mischief'*, Wash. Post (Jan. 8, 2025), https://www.washingtonpost.com/politics/2025/01/08/gop-election-challenge-north-carolina/; Clark, *A North Carolina Supreme Court Candidate's Bid to Overturn His Loss Is Based on Theory Election Deniers Deemed Extreme*, ProPublica (Dec. 23, 2024), https://www.propublica.org/article/jefferson-griffin-north-carolina-supreme-court-challenge-election-integrity-network.  Preventing such a regime is assuredly in the public interest.

## CONCLUSION

NCDP's motion for a temporary restraining order and preliminary injunction should be granted.

April 14, 2025

Respectfully submitted,

/s/ Shana L. Fulton

Seth P. Waxman[*]
Daniel S. Volchok[*]
Christopher E. Babbitt[*]
Jane E. Kessner[*]
Nitisha Baronia[*]
Ann E. Himes[*]
Wilmer Cutler Pickering
   Hale and Dorr llp
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
annie.himes@wilmerhale.com

Shana L. Fulton
N.C. Bar No. 27836
William A. Robertson
N.C. Bar No. 53589
James W. Whalen
N.C. Bar No. 58477
Brooks, Pierce, McLendon,
   Humphrey & Leonard, LLP
150 Fayetteville Street, Suite 1700
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

[*] Local Rule 83.1(e) special appearance

## CERTIFICATE OF SERVICE

On this 14th day of April, 2025, I electronically filed the foregoing document using the court's CM/ECF system.

/s/ Shana L. Fulton
Shana L. Fulton