# EXHIBIT 11



# GENERAL ASSEMBLY OF NORTH CAROLINA
# SESSION 2005

## JOINT SELECT COMMITTEE ON COUNCIL OF STATE
## CONTESTED ELECTIONS

REPORT AS TO THE LAW AND THE FACTS AND RECOMMENDATIONS TO THE GENERAL ASSEMBLY FOR ITS ACTION

 WHEREAS, Article VI, Section 5 of the Constitution of North Carolina provides that a contested election for a Council of State office shall be determined by joint ballot of both houses of the General Assembly in the manner prescribed by law; and

 WHEREAS, G.S. 163-182.13A provides for the appointment of a select committee to hear such a contest for a Council of State office, to make findings as to the law and the facts, and to make recommendations to the General Assembly for its action; and

 WHEREAS, June S. Atkinson ("Contestant Atkinson"), a candidate for the office of Superintendent of Public Instruction in the November 2, 2004, general election, has initiated a contest under Article VI, Section 5 and G.S. 120-10.3 by filing a Notice of Intent to Contest Election and Bill Fletcher ("Contestee Fletcher"), also a candidate for the office, has filed a Response to that notice under G.S. 120-10.4; and

 WHEREAS, the Speaker of the House of Representatives and the President Pro Tempore of the Senate have appointed members to this Joint Select Committee on Council of State Contested Elections ("Committee"); and

 WHEREAS, Contestant Atkinson and Contestee Fletcher have had full access to the procedures for discovery under G.S. 120-10.6, full opportunity to present depositions, affidavits, briefs and other documents for the consideration of the Committee, and full opportunity to present testimony and argument at a hearing before the Committee and to request the presence and examination of other witnesses at a hearing; and

 WHEREAS, the Committee conducted a hearing on July 14, 2005, at which it heard the testimony of Contestant Atkinson and Contestee Fletcher and the arguments of their counsel and questioned both the parties and their counsel for more than six hours; and

 WHEREAS, the Committee has considered all documents presented to it by the parties, all testimony and argument at the hearing, and all information requested by members of the Committee, and has duly deliberated on the matter;

 Now, therefore, the Committee adopts this Report as to the Law and the Facts and Recommendations to the General Assembly for its Action.

## History

At issue in this election contest is the counting of several thousand out-of-precinct provisional ballots.

## Legislation Leading to the Use of Out-of-Precinct Provisional Ballots

1. Effective for 2002, the General Assembly adopted G.S. § 163-166.7(c)(6) ("Voters not clearly eligible to vote in the precinct but who seek to vote there are given proper assistance in voting a provisional official ballot or guidance to another voting place where they are eligible to vote.") and G.S. § 182.2 (a) (4) ("Provisional official ballots shall be counted by the county board of elections before the canvass. If the county board finds that an individual voting a provisional official ballot is not eligible to vote in one or more ballot items on the official ballot, the board shall not count the official ballot in those ballot items, but shall count the official ballot in any ballot items for which the individual is eligible to vote.").

2. In 2002, Congress adopted the Help America Vote Act of 2002 ("HAVA") which codified the use of provisional ballots in federal elections beginning on January 1, 2004. Among the requirements of HAVA was the requirement that if an individual appears at a polling place and is not on the official list of eligible voters for the polling place, the individual is to be informed that he or she may cast a provisional ballot upon providing written affirmation stating that the individual is "a registered voter in the jurisdiction in which the individual desires to vote; and eligible to vote in that election." Then, if the "appropriate State or local elections official . . . determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law." 42 U.S.C.S. § 15482 (a). The General Assembly codified similar language in G.S. § 163-166.11 and specifically provided that "[t]he county board of elections shall count the individual's provisional official ballot for all ballot items on which it determines that the individual was eligible under State or federal law to vote." G.S. § 163-166.11(5).

3. The State Board instructed the county boards of elections that the critical inquiry in determining an individual's eligibility to vote is whether there is documentation to show that the individual is a registered voter in the county. This instruction was based on its understanding that (1) HAVA left the question of a voter's eligibility to State law for both federal and State offices, (2) G.S. 163-82.1 provides that the jurisdiction in North Carolina in which a voter is registered is the county, and (3) the use of the word "jurisdiction" in G.S. 163-166.11, when read in the context of the NVRA and G.S. 163-82.1, meant the "county." These instructions were given through statewide training sessions (in May and December of 2003 and in March, May, and September of 2004), memoranda, directives, and a HAVA Policies and Procedures manual. (Bartlett affidavit, p. 5; Hearing Transcript at pp. 197-198)

## Out-of-Precinct Provisional Ballots in the 2004 Elections

4. At the primary elections and the general election of 2004, in all counties of the state, qualified, registered voters who presented themselves to vote in their county of residence but not in their precinct of residence were permitted to vote provisional ballots. Such individuals may be termed "out-of-precinct provisional voters." (Bartlett affidavit, p. 6)

5. In the general election, at least 11,310 out-of-precinct provisional voters cast ballots in North Carolina. (*James v. Bartlett*, 39 N.C. 260, 263 fn. 3). The exact number has not been established. (Hearing Transcript at pp. 16-17)

## Challenge to Out-of-Precinct Provisional Ballots

7. Contestee Fletcher challenged the constitutionality of out-of-precinct provisional ballots (under the North Carolina Constitution) in an election contest and in a declaratory judgment action, both initiated after the 2004 general election. The State Board of Elections unanimously denied his contest and the Superior Court upheld that denial. The Superior Court also granted summary judgment against Contestee Fletcher on the declaratory judgment action. Contestee Fletcher appealed both rulings to the North Carolina Supreme Court.

8. At the same time, a county commissioner candidate in Guilford County, Trudy Wade, contested her election on the same constitutional grounds. The State Board of Elections denied her contest and the Superior Court upheld that denial. Ms. Wade appealed to the North Carolina Supreme Court.

## The Supreme Court ruling in *James v. Bartlett*

9. The Supreme Court consolidated Contestee Fletcher's two appeals and Ms. Wade's appeal and in February 2005 issued an opinion, *James v. Bartlett*, 359 N.C. 260 (2005).

10. In that opinion the Supreme Court held (1) that it had subject matter jurisdiction despite the provisions of Article VI, Section 5 of the Constitution, (2) that the actions of Contestee Fletcher and Ms. Wade were timely despite their not having challenged the use of out-of-precinct provisional ballots before the general election, and (3) that the use of out-of-precinct provisional ballots was "statutorily unauthorized" and that the State Board, through its interpretation of the statutes and its instructions to county elections officials had "instruct[ed] voters to cast provisional ballots in a manner not authorized by State law." 359 N.C. at 269-270.

11. The Supreme Court then remanded Contestee Fletcher's election contest and declaratory judgment action, and Ms. Wade's election contest, to the Superior Court "for further proceedings consistent with this opinion." 359 N.C. at 271.

## 2005 Legislation in Response to *James v. Bartlett*

12. Subsequently, and in response to the decision in *James v. Bartlett*, the General Assembly enacted SL 2005-2. In that statute the General Assembly declared that "[t]he State Board of Elections and all county boards of elections were following the intent of the General Assembly when they administered G.S.163-166.11 and the earlier enacted statutes in G.S.163-182.2(a)(4) and G.S.163-166.7(c)(6) to count in whole or in part ballots cast by registered voters in the county who voted outside their resident precincts in the July 20, 2004, Primary, the August 17, 2004, Second Primary, and the November 2, 2004, General Election."

13. Also subsequently and in response to the decision in *James v. Bartlett*, the General Assembly enacted SL 2005-3, in which it set out the procedures for the General Assembly to determine contested legislative and Council of State elections and abated all pending judicial proceedings.

### Superior Court Rulings on Remand

14. The Superior Court, having received Contestee Fletcher's election contest on remand from the Supreme Court, held that that matter abated as required by SL 2005-3. Contestee Fletcher has appealed that holding to the North Carolina Court of Appeals, which has issued no ruling. The Superior Court entered no ruling on Contestee Fletcher's declaratory judgment action.

15. The Superior Court, having received Ms. Wade's election contest on remand, further remanded the matter to the Guilford County Board of Elections to retabulate returns excluding out-of-precinct ballots. That order was entered in March, 2005. The retabulation has not been completed, despite the conduct of hearings on six days and the expenditure of approximately $38,000. (Bartlett affidavit, p. 12) The State Board has for the time being reasserted control over the proceedings in an effort to expedite resolution of the matter. (Hearing Transcript at p. 133)

16. Among matters at issue in the Guilford recount is the precise scope of meaning of the term "out-of-precinct provisional ballots." Neither the Supreme Court's February, 2005 decision nor any other judicial ruling defines that term and Ms. Wade and her opponent are still at odds on it. (Hearing Transcript at pp. 128-134, 305)

## Committee Findings

The Committee makes the following Findings.

### Exclusive Power to Determine Contested Elections

1. The North Carolina Constitution charges the General Assembly with the responsibility to decide contested Council of State elections. That charge is a unique delegation of power and obligation. It is not found in the Constitution's Article II provisions, which set out the general legislative powers, but is instead found in the Constitution's Article VI provisions, which governs elections. Article VI, Section 5 is entitled "Elections by people and General Assembly." It provides that

> A contested election for any office established by Article III of this Constitution shall be determined by joint ballot of both houses of the General Assembly in the manner prescribed by law.

2. The Constitution has settled this responsibility to determine contested Council of State elections on the General Assembly continuously from the initiation of elections for Governor in 1835 and for Council of State in 1868. Before 1835 the Governor was directly elected by the General Assembly. When the Constitution in 1835 first provided for popular election of the Governor, it also settled the responsibility for determining contested Gubernatorial elections on the General Assembly. Similarly, before 1868, Council of State officers were directly elected by the General Assembly. When the Constitution in 1868 first provided for popular election of Council of State offices, it also settled the responsibility for determining those contested elections on the General Assembly.

3. This Constitutional responsibility has never resided with any other body.

4. Just as the General Assembly had exclusive control over the election of the Governor before 1835 and exclusive control over the election of the Council of State officers before 1868, it now has exclusive control over the determination of certain contested popular elections. The power in Article VI, Section 5 is what remains of an original grant of constitutional authority for the General Assembly to itself elect the persons to hold office under Article III. The General Assembly, in determining a contested election such as this one, functions not as a legislature making laws nor as a court rendering decisions, but instead acts as part of the electorate itself.

5. Article II, Section 20 provides similar authority under the legislative power to judge the qualifications and elections of the members of each house of the General Assembly. The NC Supreme Court has ruled that this power is exclusive to the legislature because the Constitution "[withdrew] inquiry from the consideration of the courts." State ex rel. Alexander v. Pharr, 197 N.C. 699 (1920).

6. The General Assembly's constitutional responsibility is to determine the will of the people in the election. The Constitution settles this responsibility on the legislature as the body closest to the people and most directly accountable to the people for actions on their behalf. In exercising the power established by Article VI, Section 5 in a case where there is disagreement about what the electorate has decided, the General Assembly acts constitutionally as the direct representative of the electorate itself.

7. For these reasons, the General Assembly has enacted G.S. 163-182.13A to provide by law the manner for determining contested Council of State elections and has provided in that statute that its decision may not be reviewed by the General Court of Justice, pursuant to its exclusive jurisdiction.

8. Article VI, Section 5 in a unique, intentional, and explicit manner sets out the method by which contested elections are to be resolved. The General Assembly is mandated to "determine" the contest and it is to do so "by joint ballot in the manner provided by law."

9. The procedures of SL 2005-3 apply to this proceeding and govern the General Assembly's determination of this contested election.

10. The fact that no guiding statute was in place at the time that Contestee Fletcher appealed to the courts does not deprive the General Assembly of authority. Jurisdiction which is conferred directly by the Constitution may not be lost by inaction, disuse, or inadvertence.

11. Contestant Atkinson invoked the General Assembly's jurisdiction by a petition filed on January 14, 2005, three weeks before the decision in *James v. Bartlett*. Upon the filing of Contestant Atkinson's petition, the General Assembly's constitutional jurisdiction attached to the matter and no subsequent action by the courts, by the State Board, or by the parties could divest it of that jurisdiction.

## The Outcome and Conduct of the Election

12. In the November 2, 2004, general election for Superintendent of Public Instruction, Contestant Atkinson received 1,655,719 votes and Contestee Fletcher received 1,647,184. In its December 13, 2004, Order, the State Board unanimously certified these results and the parties so stipulated. (Stipulation of the Parties) These vote totals include the out-of-precinct provisional ballots cast and counted. Contestant Atkinson received the most votes in the 2004 Superintendent of Public Instruction race.

13. There is no evidence that Contestee Fletcher received more votes than Contestant Atkinson. (Hearing Transcript p. 306)

14. As the evidence presented by the parties shows, the General Assembly could reach a different conclusion only by ordering elections officials to disregard the votes of

many thousands of qualified North Carolina voters who cast their ballots in conformity with instructions of duly-installed elections officials.

15. No principle of law compels the General Assembly to disenfranchise innocent voters. To the contrary, long-established principles prohibit it.

16. In interpreting the statutes regarding out-of-precinct provisional ballots, instructing the county boards of elections, and conducting the elections, the State Board acted in good faith. In following the instructions of the State Board, the county boards of elections acted in good faith. (Hearing Transcript at 202)

17. Voters whose out-of-precinct provisional votes were counted in the Superintendent of Public Instruction race were otherwise qualified voters. (Superior Court Finding of Fact No. 6, on remand from Supreme Court)

18. Voters who voted out-of-precinct provisional ballots were acting in good faith in accordance with instructions of duly-appointed elections officials.

19. There have been no allegations of fraud in the use of out-of-precinct provisional ballots in the 2004 elections. (Bartlett affidavit, p. 9; Hearing Transcript at 134)

20. County boards of elections acted according to instructions from the State Board to (a) evaluate the out-of-precinct provisional ballots cast in their counties and make good-faith judgments regarding the qualifications of voters, and (b) count votes from out-of-precinct provisional ballots for all races in which the voter would have been entitled to vote if he had cast his vote in his precinct of residence. In all cases, votes cast by qualified out-of-precinct provisional voters were counted in the Superintendent of Public Instruction race, since it was a statewide race in which voters of all precincts were entitled to vote. (Bartlett affidavit, p.6)

## Substantive Holding in *James v. Bartlett* Does Not Compel Recount or New Election

21. For the reasons set out in the following paragraphs, the holding of the North Carolina Supreme Court in *James v. Bartlett*,[1] even if accepted as fully controlling law, does not compel the General Assembly to order a recount of ballots or a new election.

22. Courts typically consider all the circumstances in deciding whether, in the case of a post-election determination of illegality, the remedy should be applied only in a prospective way and should not upset the results of the completed election. The leading Fourth Circuit decision to this effect is *Hendon v. North Carolina State Board of Elections*, 710 F.2d 177 (4th Cir. 1983), in which the court refers to "the general rule that denies relief with respect to past elections."

---

[1] The Supreme Court held that the use of out-of-precinct provisional ballots was "statutorily unauthorized" and that the State Board, through its interpretation of the statutes and its instructions to county elections officials had "instruct[ed] voters to cast provisional ballots in a manner not authorized by State law."

-7-

Case 5:24-cv-00699-M-KS    Document 37-12    Filed 04/14/25    Page 8 of 13

23. It is common practice to apply an after-election finding of illegality in a prospective manner only, and not in a retrospective manner. The North Carolina Supreme Court, in *Owens v. Chapin*, 228 N.C. 705, rehearing denied, 229 N.C. 797 (1948), quoting *People v. Wood*, 148 N.Y. 142, 42 N.E. 536, 537 (1895), in refusing to remove from the vote totals certain absentee ballots arguably cast in violation of the law, said:

> "We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake, or even the willful misconduct, of election officials in performing the duty cast upon them. The object of elections is to ascertain the popular will, and not to thwart it. The object of election laws is to secure the rights of duly-qualified electors, and not to defeat them." 228 N.C. at 711.

24. Similarly, in *State ex re. Quinn v. Lattimore*, 120 N.C. 426 (1897), violations that were discovered after the election were not applied retrospectively in ways that would have disenfranchised innocent voters. The court, in deciding not to apply the after-election finding retrospectively, said:

> "[A] qualified elector cannot be deprived of his right to vote, and the theory of our government that the majority shall govern, be destroyed by either the wilful or negligent acts of the registrar, a sworn officer of the law. This would be self-destruction, governmental suicide." 120 N.C. at 430.

25. Applying the after-election Supreme Court ruling on illegality to the already-completed election could itself amount to a violation of the constitutional principle of substantive due process. A federal appeals court recently said that the retroactive application of such an after-election decision would amount to a violation of substantive due process "if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998), cert. denied 525 U.S. 1103 (1999) Exactly those two elements are present in the current matter.

26. There is substantial authority for the proposition that a post-election court finding of a violation of law in the conduct of an election does not compel the retroactive application of the new interpretation to the past election. The determination of whether to apply the post-election court decision retroactively is to be made in light of all the circumstances, including

> (a) the nature and severity of the violation, [*Putter v. Montpelier Public School System*, 697 A.2d 354 (Sup. Ct. Vt. 1997)]
> (b) the presence or absence of culpable intent, (*Putter*)

(c) the harm to the organic processes of the election, (*Putter*)
(d) "disruptive effect of election invalidation and the havoc it wreaks upon local political continuity," [*Soules v. Kauaians for Nukolii Campaign Committee*, 140 F.3d 1218 (9th Cir. 1988)]
(e) the "likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election," [*Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998), cert. denied 525 U.S. 1103 (1999)] and
(f) any "significant disenfranchisement that results from a change in the election procedures." (*Bennett*)

These factors apply to the present case in the following manner:

*The nature and severity of the violation.* The violation as found by the Supreme Court in *James v. Bartlett* is one of statutory interpretation. The State Board interpreted the statute to permit out-of-precinct provisional ballots and the General Assembly has subsequently confirmed that that interpretation correctly reflected the legislative intent. The error found by the Court did not enable unregistered or unqualified voters to cast ballots for Superintendent of Public Instruction; it merely permitted otherwise qualified voters to cast ballots at a voting place other than the one to which they were assigned.

*The presence or absence of culpable intent.* There is no suggestion anywhere in the record of any culpable intent on the part of the State Board of Elections or the county boards in their interpretation of the statute or the administration of the election. See Findings 16 through 20.

*The harm to the organic processes of the election.* Contestee Fletcher asserts that there is harm is permitting votes to count in the 2004 election in light of the 2005 Supreme Court decision, in that the votes of voters who did not vote out-of-precinct provisional ballots will be diluted by unlawful votes. Contestant Atkinson asserts that there is harm in not preserving the count of the 2004 out-of-precinct provisional ballots despite the Supreme Court decision in that (a) many thousands of out-of-precinct provisional voters will be disenfranchised and (b) those thousands of voters will be unfairly punished for having followed the good-faith directives of elections officials. Candidate Atkinson identifies the greater harm.

*The disruptive effect of election invalidation and the havoc it wreaks upon local political continuity.* This challenge to the use of out-of-precinct provisional ballots came after those ballots had already been used in the primaries and general election in 2004 in every election in the state.[2] The Supreme Court held that the plaintiffs' failure to bring

---

[2] Contestee Fletcher made no challenge to the use of out-of-precinct provisional ballots before the 2004 primary election, 2004 second primary election, or 2004 general election. No candidate or voter made any challenge to the use of out-of-precinct provisional ballots before either of those elections.

The State Board prepared a large (3-foot by 4-foot) poster, containing provisional ballot information, for every polling place in the state, distributed those posters to the county boards of elections, and required that they be posted for the primary election. It also mailed to North Carolina households 3.9 million copies of

the lawsuit before the election did not divest them of the opportunity to pursue a ruling, but it is perfectly appropriate to consider that failure in fashioning a remedy. The 2004 elections were conducted fairly and in good faith in accordance with rules established before the elections. To revisit the elections now would be disruptive.[3]

*The likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election.* Out-of-precinct provisional ballots were used in both the primary and the second primary and then in the general election before they were challenged. It is clear that many thousands of voters relied directly on official pronouncements about the possibility of out-of-precinct provisional voting. They would have had no other way to know to do it.

*Any significant disenfranchisement that results from a change in the election procedures.* To apply the Supreme Court ruling on the legality of out-of-precinct provisional ballots retroactively would disenfranchise at least 11,000 qualified voters.

27. In *James v. Bartlett*, the North Carolina Supreme Court made an after-election determination that part of the elections administration procedure was unlawful. It remanded the matter to the Superior Court "for further proceedings consistent with this opinion." It is fully consistent with the *James* opinion to apply its holding in a prospective manner only, and not retroactively to the 2004 elections. The retroactive application would result in the disenfranchisement of at least 11,310 innocent voters who exercised their franchise in accordance with the good-faith instructions of elections officials.

28. The General Assembly, in exercising its Article VI, Section 5 power in an electoral capacity as an extension of the electorate, can be no less concerned than the courts with ascertaining the will of the voters, and must be at least as concerned about making a retroactive application of a post-election judicial decision that would upset that will.

---

the "Guide to Voting and Judicial Elections in North Carolina," also containing provisional ballot information.

Contestee Fletcher's fellow plaintiff in *James v. Bartlett*, William James, in an October 24, 2005, letter to the State Board indicated his understanding that out-of-precinct provisional ballots would be used in the upcoming November election.

[3] A statewide recount undertaken to remove from the vote totals the counted out-of-precinct provisional ballots would be extremely difficult, time-consuming, and expensive. The recount in the Guilford County commissioner race, limited to that one county, has consumed six days of hearings and $38,000 of expense and is still unresolved. That pattern would be repeated throughout the state.

Even if such a statewide recount were untaken, it is unclear precisely which votes should be removed from the originally-certified total. Counsel for Contestee Fletcher acknowledge that further judicial action is necessary to make that determination.

A recount ordered now would engage the county boards of elections at just the time that they are preparing to conduct the 2005 municipal elections across the state.

A new election would be conducted in accordance with SL 2005-2. That is, it would be conducted with the use of out-of-precinct provisional ballots, precisely the kinds of ballots at issue in this challenge to the 2004 election.

29. For these reasons, the decision in *James v. Bartlett*, even if applied by the General Assembly, does not compel the ordering of a recount or a new election. Its ruling should be given prospective-only effect.[4]

**Substantive Holding in *James v. Bartlett* Cannot be Implemented under the Voting Rights Act**

30. The statutes under which the 2004 elections were conducted were properly precleared under Section 5 of the Voting Rights Act of 1965, as were SL 2005-2 and SL 2005-3, adopted in response to the *James v. Bartlett* decision. The *James v. Bartlett* decision itself, because it would change the manner of counting votes, requires preclearance. *LULAC of Texas v. Texas*, 995 F. Supp. 719 (W.D.Tex. 1998): "[I]n determining whether a change has occurred in a state's election law, however, this court must compare the challenged law with the state's election procedures that were in fact in force or effect before the alleged change, irrespective of what those procedures should

---

[4] As the discussion in Paragraphs 22 through 30 demonstrates, the substantive holding in *James v. Bartlett*, does not compel a recount or a new election. Moreover, even if the holding should be read as compelling a recount or a new election, it has been overridden by the adoption of SL 2005-2.

The *James* substantive holding, that out-of-precinct provisional voting was not "statutorily authorized," was based on the Supreme Court's determination that it found nothing to indicate that "our state legislature's intent in passing N.C.G.S. § 163-166.11[] was to enable voters to cast valid ballots outside their precincts of residence." 359 N.C. at 268. That determination is set aside by the passage of SL 2005-2, which reconfirms that the General Assembly did in fact have just such an intent in the enactment of G.S. 163-166.11. SL 2005-2 further reconfirms that the manner in which the State Board and county elections boards conducted the 2004 elections was consistent with the legislative intent.

SL 2005-2 is a clarifying statute. Its application to this matter would simply restore matters to the position which the General Assembly intended that they occupy all along. Its application would not upset any right vested in Contestee Fletcher by the decision in *James v. Bartlett* for the simple reason that there has been no final judgment in that case. The matter was remanded to the Superior Court for further action. The action was abated and therefore no final judgment can ever be issued; on the other hand, the current appeal of that abatement to the Court of Appeals demonstrates that there has been no final judgment. Even if the opinion of the Supreme Court in *James v. Bartlett* could be characterized as some sort of final judgment, it vested no right in Contestee Fletcher. There is no property right to elective office in this state. Contestee Fletcher has pointed to no actions taken by him in reliance on the *James v. Bartlett* decision. Indeed, a retroactive application of the *James v. Bartlett* decision would disrupt the reliance placed by voters on the instructions given to them by elections officials. Voters who followed those instructions have a far more significant vested right to have their votes count than any right gained by Contestee Fletcher as a result of post-election litigation.

The application of SL 2005-2 to this matter would not violate the legal principles of law of the case, equitable estoppel, or res judicata. These legal doctrines apply only to judicial proceedings and govern the relationship among the courts and among successive proceedings in courts. In this matter, the General Assembly is not sitting as a court and is not exercising a judicial function. It is sitting in an elective capacity as a representative of the people. The doctrines of law of the case, equitable estopple, or res judicata do not apply.

In applying SL 2005-2 the General Assembly would not be acting in derogation of the powers of the judicial branch or in violation of the doctrine of separation of powers—it would simply be exercising the specific authority granted to it by express provision of the Constitution. That grant of authority is to the General Assembly not in its legislative capacity or in its limited judicial capacity, but in its elective capacity.

-11-

have been under a 'correct' interpretation of state law." The *James* decision was never submitted for preclearance and has not been precleared.

31. In the absence of preclearance, the *James v. Bartlett* decision cannot be applied retroactively to the 2004 election.

### Recommendation of the Committee

For the reasons stated above, this Committee recommends that the General Assembly determine that Contestant Atkinson be declared elected.

THIS REPORT has been adopted by the Committee on this day, August 9, 2005.

_____
Representative Deborah K. Ross
Co-chair

_____
Senator Daniel G. Clodfelter
Co-Chair