# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

JUDGE JEFFERSON GRIFFIN,

Plaintiff,

v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,

Defendant.

and

ALLISON RIGGS, et al.,

Intervenor-Defendants

Case No. 5:24-CV-00731-M

---

NORTH CAROLINA
DEMOCRATIC PARTY,

Plaintiff,

v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS, et al.,

Defendants.

Case No. 5:24-CV-00699-M

---

CARRIE CONLEY, et al.

Plaintiffs,

v.

ALAN HIRSCH, et al.

Defendants.

Case No. 5:25-CV-00193-M

1

## I. Introduction

Six months ago, millions of North Carolinians exercised their right to vote. In one race, for Seat 6 on the Supreme Court of North Carolina, the results were close. At the end of the canvassing period (and after two recounts), the incumbent Justice Allison Riggs led Judge Jefferson Griffin (a judge on the North Carolina Court of Appeals) by 734 votes: 2,770,412 (50.01%) to 2,769,678 (49.99%). In the aftermath of the election, Judge Griffin filed hundreds of election protests across North Carolina's 100 counties.

But before getting to those protests, it's important to understand who cast ballots in the election, and under what rules. For example, thousands of North Carolina voters cast absentee ballots from overseas. Many of these folks serve in the military, or are in the family of someone who does. Others may be missionaries. Still more are temporarily working or pursuing an education abroad.

Relevant to those voters, North Carolina's General Assembly enacted a voter identification ("ID") law in 2018, and after years of litigation, that law took effect in 2023. But the law has never been applied to overseas military and civilian voters who cast absentee ballots. The North Carolina Board of Elections (the "State Board"), on a bipartisan and unanimous basis, exempted those voters from the voter ID law; on April 1, 2024, the State Board, pursuant to its rulemaking authority under state law, promulgated a final rule which provided that overseas military and civilian voters were not required to submit a copy of their photo ID with their absentee ballot. An identical temporary administrative rule had already been in effect for eight months before promulgation of the final rule.

The final rule was then on the books for over seven months prior to the election, and it went unchallenged. In the months leading up to the election, the State Board also publicized

guidance to overseas voters which informed them that they were exempt from the voter ID law. Thousands of overseas voters then, on election day, relied on the State Board's rule and its guidance. In fact, they had to. Overseas voters submit their ballots through an online portal that lacked any mechanism for a voter to attach a copy of their photo ID.

Judge Griffin challenged the votes from overseas voters who cast absentee ballots without providing a copy of their photo ID. But he targeted only a select few of North Carolina's 100 counties. And, months after the election, North Carolina's Court of Appeals and Supreme Court agreed with him on the merits of his state law argument: overseas voters who cast absentee ballots (in those select counties) were required to submit a copy of their photo ID with their ballot. Unless these affected voters cure their ballots by submitting a copy of their photo ID, their votes will be discarded from the final tally for Seat 6.

Judge Griffin also challenged the votes from a separate group of voters: children of overseas North Carolinians who, when casting an absentee ballot in 2024, checked a box indicating that they have never lived in the United States ("Never Residents"). For over a decade prior to the 2024 election, a state law granted Never Residents the right to vote, and they had voted under that statute in over 40 consecutive elections. But North Carolina's Constitution includes a bona fide residency requirement for voters.

The North Carolina Court of Appeals and Supreme Court subsequently determined that the law granting Never Residents the right to vote conflicted with the bona fide residency provision in the state Constitution and was void. Everyone who self-identified as a Never Resident in the November 2024 election (several hundred individuals) will have their votes in the Seat 6 race discarded. There was no cure process offered to any individual who may have inadvertently

3

checked the box indicating that they have never lived in the United States and who had, in fact, previously resided in North Carolina.

The question presented here is whether those decisions from the North Carolina Court of Appeals and Supreme Court, which rested on state law grounds, can be implemented in an election (that has come and gone) in a manner consistent with federal law.

The right to vote is "of the most fundamental significance under our constitutional structure."[1] "No right is more precious in a free country than that of having a voice."[2] Voting is essential to "a free and democratic society,"[3] because it is "preservative of all rights."[4] These principles are "beyond cavil."[5]

At the same time, our "Constitution was also intended to preserve to the States the power that even the Colonies had to establish and maintain their own separate and independent governments."[6] States must "retain the power to regulate their own elections."[7] And "not every" state "election irregularity gives rise to a" federal "constitutional claim."[8] To conclude otherwise would be to "authorize federal courts to" act as roving "state election monitors."[9]

With those fundamental principles in mind, the court wishes to make clear that this case is *not* about the prerogative of North Carolina courts to interpret North Carolina law. Without question, those courts "are the principal expositors of state law."[10] This case is also *not* about North Carolina's primacy to establish rules for *future* state elections; it may do so. Rather, this

---

[1] *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).
[2] *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).
[3] *Reynolds v. Sims*, 377 U.S. 533, 562(1964).
[4] *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).
[5] *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).
[6] *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970).
[7] *Burdick*, 504 U.S. at 433.
[8] *Hendon v. N. Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983).
[9] *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980).
[10] *Moore v. Sims*, 442 U.S. 415, 429 (1979).

4

case concerns whether the federal Constitution permits a state to alter the rules of an election *after the fact* and apply those changes retroactively to only a select group of voters, and in so doing treat those voters differently than other similarly situated individuals. This case is also about whether a state may redefine its class of eligible voters but offer no process to those who may have been misclassified as ineligible.

To this court, the answer to each of those questions is "no." For that reason, and those that follow, the court finds that effectuation of the North Carolina Court of Appeals and Supreme Court's orders would violate the equal protection and substantive due process rights of overseas military and civilian voters. The court further finds that discarding the votes of Never Residents without any process for those who may have been misclassified as ineligible violates procedural due process and represents an unconstitutional burden on the right to vote. Accordingly, the State Board must not proceed with implementation of the North Carolina Court of Appeals and Supreme Court's orders, and instead must certify the results of the election for Seat 6 based on the tally at the completion of the canvassing period.

## II.    Case History

To pick up where the court left off in its introduction, in the aftermath of the election, Judge Griffin filed hundreds of election protests across North Carolina's 100 counties. Three categories of protests are relevant to this consolidated action.

First Judge Griffin challenged the votes of approximately 60,000 "voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number." DE 1-4 at 12.[11] Second, Judge Griffin contested the votes of 1,409

---

[11] Unless otherwise specified, "DE" will refer to Docket Entries in Case No. 5:24-CV-731-M, the lead case in this consolidated action consisting of three independent civil actions.

5

overseas voters[12] who cast absentee ballots in Guilford County. *Id.* Third, Judge Griffin challenged 266 ballots that were "cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States," i.e., Never Residents. *Id.*

In late November 2024, the State Board assumed jurisdiction over these three categories of protests and consolidated them. *Id.* at 10, 13. Approximately two weeks later, the State Board held a public meeting to consider the protests. *Id.* at 10.

By written decision dated December 13, 2024, the State Board denied each of Judge Griffin's three protests. *Id.* at 15. The State Board first concluded that Judge Griffin had failed to serve potentially affected voters with copies of his protests. *Id.* at 15-20. The State Board also rejected each of his challenges based on their state law merits. *Id.* at 23-32, 34-46.

Most pertinent here, the State Board additionally determined that discarding the votes of these three groups of voters would violate their procedural and substantive due process rights, and contravene federal statutory law. *Id.* at 32-36, 41, 46-48.

After the denial of his protests, Judge Griffin filed an original action in the North Carolina Supreme Court, through which he sought a writ of prohibition preventing the State Board from certifying the results of the election. *Jefferson Griffin v. North Carolina State Board of Elections*, 5:24-CV-724-M, (E.D.N.C. 2024), DE 1 at 1-2 ("*Griffin I*"). The State Board removed that action to federal court. *See id.*

Judge Griffin also filed three separate petitions for judicial review in the Wake County Superior Court. DE 1 at 2 ("*Griffin II*"). Each petition addressed one of his three protests. *Id.*

---

[12] A dispute remains over whether this second category of protests includes only 1,409 overseas voters who cast absentee ballots in Guilford County, or whether it also includes several thousand overseas voters from five additional counties. *E.g.* DE 117 at 2-3. But this dispute of fact is not material to the issues of federal law present here.

6

The State Board removed those three petitions to federal court as one consolidated civil action. *See id.* Both *Griffin I* and *Griffin II* were assigned to the undersigned.

Shortly after removal of the actions to federal court, Judge Griffin filed a motion for preliminary injunction in *Griffin I*. *Griffin I*, DE 31; DE 32. After granting intervention to several parties, including Justice Riggs, the court ordered expedited briefing on the preliminary injunction motion. *Griffin I*, Text Order dated December 26, 2024. All the parties complied with that briefing schedule, and several other parties filed amicus briefs. *Griffin I*, DE 37; DE 39; DE 40; DE 41; DE 42; DE 47. At the same time Judge Griffin filed his reply in support of his motion for preliminary injunction, he also filed a motion to remand *Griffin I* to the North Carolina Supreme Court. *Griffin I*, DE 48; DE 49.

Three days after briefing concluded on the motion for preliminary injunction, the court issued an order remanding *Griffin I* to the North Carolina Supreme Court. *Griffin I*, DE 50. The court concluded that it possessed subject-matter jurisdiction under 28 U.S.C. § 1443(2), but that abstention was warranted under *Burford v. Sun Oil Co.*, 1 319 U.S. 315, 332 (1943). *Griffin I*, DE 50 at 1-2, 20, 25-27.

Because Judge Griffin had filed motions for injunctive relief in *Griffin II* as well, the court sua sponte remanded *Griffin II* to the Wake County Superior Court because "the factual and legal subject matter" there was "substantially identical to that in" *Griffin I*. DE 24 at 1. The day after the court remanded *Griffin I* and *Griffin II* to state court, the North Carolina Supreme Court entered a stay in *Griffin I* which prohibited the State Board from certifying the results of the election until Judge Griffin's protests could be resolved on their merits. *Griffin v. N. Carolina Bd. of Elections*, No. 320P24, 2025 WL 40353, at *1 (N.C. Jan. 7, 2025).

7

The State Board and Justice Riggs separately appealed the court's remand of *Griffin I* and *Griffin II* to the Fourth Circuit Court of Appeals. *E.g.*, DE 26. The Fourth Circuit then consolidated *Griffin I* and *Griffin II* on appeal. DE 29. While those appeals were pending before the Fourth Circuit, the North Carolina Supreme Court dismissed *Griffin I* (the petition for a writ of prohibition), but left in place its order staying certification of the election. DE 30 at 8; *see also Griffin v. N. Carolina Bd. of Elections*, 910 S.E.2d 348, 349 (N.C. 2025). Accordingly, the Fourth Circuit dismissed the appeal of the court's remand of *Griffin I* as moot. *Id.* at 9.

As to *Griffin II*, the Fourth Circuit affirmed this court's conclusion that it possessed subject-matter jurisdiction "under § 1443(2)." *Id.* The Fourth Circuit then "affirm[ed] but modif[ied]" the court's decision to abstain and remand. *Id.* The Court agreed that abstention was warranted, but held that "*Pullman* abstention [wa]s a more appropriate theory for abstaining from federal jurisdiction." *Id.* at 9-10; *see also Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).

The difference between *Burford* and *Pullman* abstention is that, under *Pullman*, the federal court retains jurisdiction of the federal issues to resolve them, if necessary, after the state court passes upon the state law issues. *See id.* As a result, the Fourth Circuit directed this court "to modify its [remand] order to expressly retain jurisdiction of the federal issues identified in the [State] Board's notice of removal should those issues remain after the resolution of the state court proceedings, including any appeals." *Id.* at 11. This court did so. DE 35 at 1-2.

The state law issues in *Griffin II* then proceeded in state court. Back in state court, the State Board and Justice Riggs filed *England* reservations, through which they reserved their right to litigate the federal law issues in federal court. *See* DE 83 at 6; DE 84 at 9; *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411 (1964).[13] On February 7, 2025, "the Wake County

---

[13] Judge Griffin has not challenged those reservations. *E.g.*, DE 81; DE 104; DE 106.

Superior Court held a hearing" on Judge Griffin's three protests and subsequently "entered three separate one-page orders affirming the [State] Board's dismissal decisions." *Griffin v. N. Carolina State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *3 (N.C. Ct. App. Apr. 4, 2025) ("*Griffin COA*").

A few days later, Judge Griffin appealed the rulings of the Wake County Superior Court to North Carolina's Court of Appeals. *Id.* The Court of Appeals held oral argument on March 21, 2025, and issued a written opinion two weeks later. *Id.*

In that opinion, the Court of Appeals ruled in favor of Judge Griffin on each of his three challenges. As to Judge Griffin's first challenge, the Court of Appeals determined that "a person must be legally registered to vote in order to cast a lawful vote in an election." *Id.* at *8. Therefore, because North Carolina law has since 2004 obligated the State Board to "request" an applicant's driver's license number or the last four digits of their social security number in connection with their voter registration, N.C.G.S. § 163-82.4(a)(11), the Court of Appeals held that "any voter who registered" after 2004 "but who failed to provide their drivers license number or their social security number's last four digits . . . is not lawfully registered to vote in North Carolina elections." *Id.* at *10.

Without being lawfully registered to vote, that group of voters' roughly 60,000 votes in the 2024 election for Seat 6 were not "lawful." *Id.* at *8. The Court of Appeals ordered a 15-day remedial period[14] where affected voters could "provide this required information to cure their ballots," in which case their ballots would "be counted" in the 2024 election. *Id.*

---

[14] In this order, the court may refer interchangeably to the "remedial procedure," "remedial process," or "cure process." All those terms are intended to describe the same thing: the order of the North Carolina Court of Appeals, as modified by the North Carolina Supreme Court.

9

Second, the Court of Appeals held that North Carolina law "requires [all] eligible and registered absentee voters," including overseas military and civilian voters, "to provide photographic identification with their absentee ballots." *Id.* at *11. At the time of the 2024 election, the State Board had enacted an administrative rule which provided that overseas military and civilian voters were "not required to submit a photocopy of acceptable photo identification" when casting an absentee ballot. 8 N.C. Admin. Code 17.0109(d). But the Court of Appeals determined that that provision of the administrative code ran "counter to the General Assembly's express purpose in enacting the photo ID requirement," and that "all voters voting absentee in a non-federal election in North Carolina [must] comply with the photo ID requirement." *Griffin COA*, 2025 WL 1021724, at *12. The Court of Appeals ordered the same 15-day cure process for overseas voters. *See id.*

Finally, the Court of Appeals concluded that the self-identified Never Residents "are ineligible to vote in non-federal North Carolina elections." *Id.* at *13. North Carolina law had, since 2011, granted the right to vote to this group of individuals. N.C.G.S. § 163-258.2(1)(e). But the Court of Appeals held that the statute conflicted with the North Carolina Constitution and was void. *Griffin COA*, 2025 WL 1021724, at *13. The Court of Appeals' order did not provide any cure process for any individual whom Judge Griffin identified as belonging to this class of voters. *See id.* at *15.

The Court of Appeals ordered its mandate to take effect on April 7. *See id.* On April 6, the State Board and Justice Riggs "filed motions for temporary stay, petitions for writs of supersedeas, and petitions for discretionary review with" the North Carolina Supreme Court. *Griffin v. N. Carolina State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *1 (N.C. Apr.

11, 2025) ("*Griffin SC*"). The North Carolina Supreme Court stayed the Court of Appeals' mandate on April 7. *Id.*

Four days later, the North Carolina Supreme Court issued a decision on the merits. As to Judge Griffin's first challenge, the Supreme Court "allow[ed] the petitions for discretionary review for the limited purpose of reversing the decision of the Court of Appeals," concluding that "mistakes made by negligent election officials in registering citizens who are otherwise eligible to vote" was no basis to render their votes void after they had been cast. *Id.* at *1-2. The votes of those approximately 60,000 voters will be counted in the 2024 election for Seat 6 and are no longer at issue in this litigation.

"For the second category—military or overseas ballots cast" by voters without providing a copy of their photo ID, the North Carolina Supreme Court affirmed the decision of the Court of Appeals, but "expand[ed] the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice." *Id.* at *3. For the final category of voters, those "who have never been domiciled or resided in North Carolina," the North Carolina Supreme Court "den[ied] review," leaving in place the decision of the Court of Appeals. *Id.* In addition, the North Carolina Supreme Court "dissolved" the stay of the election certification that it had issued in January, and "remanded to the Court of Appeals" for implementation of the cure process. *Id.*

The decision from the North Carolina Supreme Court in *Griffin II* issued on Friday, April 11 at 4:14 p.m. *See* DE 40 at 3. Later that evening, Justice Riggs returned to federal court and filed an emergency motion requesting that this court "prohibit[] the parties from taking any action to enforce or effectuate the North Carolina Court of Appeals' opinion . . . as modified by the North Carolina Supreme Court in its April 11 Order." DE 37 at 1. The next day, this court entered a

11

Text Order in which it declined to interfere with commencement of the cure process as outlined by North Carolina's Court of Appeals and Supreme Court, but ordered the State Board to refrain from "certify[ing] the results of the election, pending further order of this court." Text Order dated April 12, 2025. The Court also established an expedited briefing schedule for the parties to address the "remaining federal issues," and further ordered the State Board to provide notice to the court the following week of the scope of the State Board's remedial efforts. *Id.*; *see also* Second Text Order dated April 12, 2025.

On the morning of Monday, April 14, the North Carolina Democratic Party ("NCDP") filed a complaint in federal court, naming the State Board and its officers as Defendants, and alleging that implementation of the North Carolina Court of Appeals and Supreme Court's order would (1) violate its members' constitutional rights under the First and Fourteenth Amendments to the United States Constitution and (2) contravene federal statutory law. *See generally North Carolina Democratic Party v. North Carolina State Board of Elections, et al.*, 5:24-CV-699-M (E.D.N.C. 2024), DE 35 ("*NCDP*"). The NCDP contemporaneously sought a temporary restraining order enjoining the commencement of the cure process. *NCDP*, DE 36 at 1.

Also that morning, a putative class of similarly-situated North Carolina voters filed a class action complaint, naming the State Board's officers as Defendants. *Conley et al. v. Hirsch et al.*, 5:25-CV-50-M (E.D.N.C. 2025) ("*Conley*"). That filing likewise contends that implementation of the North Carolina Court of Appeals and Supreme Court's order would violate the Plaintiffs' constitutional rights under the First and Fourteenth Amendments to the United States Constitution. *See generally Conley*, DE 1. The *Conley* Plaintiffs sought an identical temporary restraining order to that sought by the NCDP. *Conley*, DE 11.

12

By separate Text Orders on the afternoon of April 14, this court denied the NCDP's and the *Conley* Plaintiffs' requests for temporary restraining orders. *See NCDP*, Text Order dated April 14, 2025; *Conley*, Text Order dated April 14, 2025. Because the federal issues raised by those Plaintiffs parallel those raised by the State Board in *Griffin II*, this court consolidated all three cases "to promote judicial economy." *See NCDP*, Second Text Order dated April 14, 2025; *Conley*, Second Text Order dated April 14, 2025. *Griffin II* was designated as the lead case, and the court ordered all the parties to participate in the briefing schedule that it outlined in its April 12 Text Order in *Griffin II*. *See NCDP*, Second Text Order dated April 14, 2025; *Conley*, Second Text Order dated April 14, 2025.

Later that afternoon, Justice Riggs, the VoteVets Action Fund Parties (Intervenor-Defendants in *Griffin II*), the NCDP, and the *Conley* Plaintiffs filed interlocutory appeals of the court's orders denying their requests for emergency injunctive relief and/or temporary restraining orders. DE 44; DE 45; DE 49; DE 51. The same parties also requested that the court "stay" its order while their interlocutory appeals were pending. DE 47; DE 48; DE 50; DE 52; DE 54; DE 55. The next day, April 15, this court denied the stay requests as procedurally "improper" because they were appealing the court's inaction, not its action. DE 60 at 2. The court further found that "initiation of [the] cure process" would not, "on its own," cause any party "irreparable harm." *Id.* at 3.

The Fourth Circuit consolidated two of the four interlocutory appeals and issued largely identical orders in all the appeals on April 22. *See, e.g.*, DE 92; DE 93; DE 94. In those orders, a split panel concluded that it possessed subject-matter jurisdiction to adjudicate Justice Riggs' appeal. *E.g.*, DE 92 at 3-4. The Fourth Circuit further held that, because this court "has not yet had the opportunity to exercise its jurisdiction," it would "enjoin the North Carolina State Board

13

of Elections from mailing any notice to any potentially affected voter" until this court had the opportunity to resolve Justice "Riggs' motion for a preliminary injunction." *Id.* at 4. As things stand now, the cure process ordered by the North Carolina Court of Appeals and Supreme Court has been halted.

Multiple parties, including amici,[15] participated in the court's expedited briefing schedule. Opening briefs were filed April 21. DE 78; DE 81; DE 82; DE 83; DE 84; DE 85; DE 86; DE 87. Response briefs were filed April 25. DE 99; DE 100; DE 101; DE 102; DE 103; DE 104. And the parties filed replies on April 28. DE 106; DE 107; DE 108; DE 109; DE 110; DE 111. The court is now fully apprised, and greatly appreciates the thoughtful and comprehensive arguments all the parties provided. The parties' thoroughness has significantly aided the court's decisional process.

### III.    Procedural Posture

As noted, this is a consolidated action that consists of three separate actions. In *Griffin II*, the court previously abstained from resolving the merits of Judge Griffin's three motions for preliminary injunctive relief. *See* DE 24 at 1-2. The motion addressing the 60,000 voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number is now moot after the decision of the North Carolina Supreme Court. DE 1-9; *Griffin SC*, 2025 WL 1090903, at *2. But his other two motions remain pending. DE 1-5; DE 1-13. As do his petitions for judicial review. DE 1-4; DE 1-12.

In addition, per the Fourth Circuit's order on Justice Riggs' interlocutory appeal, her request in *Griffin II* for emergency injunctive relief remains pending. *See* DE 92 at 4. The VoteVets Action Fund Parties, who intervened as Defendants in *Griffin II*, seek summary

---

[15] The court grants the State Democracy Defenders Fund and Secure Families Initiative's respective motions for leave to file an amicus brief, DE 85; DE 98, and has considered those briefs, DE 85-1; DE 98-1.

judgment. DE 86. And the State Board requests denial of Judge Griffin's petitions and a permanent injunction. DE 83 at 19.

In *NCDP* and *Conley*, the Plaintiffs have filed Complaints. *NCDP*, DE 35; *Conley*, DE 1. Through briefing, the NCDP seeks declaratory relief and a permanent injunction. DE 78 at 8-9. The *Conley* Plaintiffs request a preliminary injunction or, in the alternative, a permanent injunction. DE 82 at 14. Those actions are ostensibly complicated by the fact that the State Board and its officers are named as Defendants, but the State Board agrees with the *NCDP* and *Conley* Plaintiffs on the merits of their constitutional claims. *E.g.*, DE 1-12; DE 83; DE 99; DE 109. With that said, Judge Griffin has briefed the issues the *NCDP* and *Conley* Plaintiffs raise, so the court has considered his arguments as opposition to their respective requests for injunctive relief.

By the court's count, then, in these three cases there are seven pending requests for injunctive relief and one pending motion for summary judgment. Given the exceptional circumstances and exigencies of this case, and considering the significant public interest in the finality of elections, the court sees only one "just" and "speedy" way to efficiently resolve this consolidated action. Fed. R. Civ. P. 1.

The court relies on Rule 56(f) of the Federal Rules of Civil Procedure. That rule permits a court to enter summary judgment on its own initiative "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (explaining that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence") (italics in original); *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989) (noting that this inherent "power is contingent on giving the losing party notice

that it must come forward and defend its claim"); *Amzura Enters., Inc. v. Ratcher*, 18 F. App'x 95, 104–05 (4th Cir. 2001).

Consistent with that procedure, the court issued an order to the parties at the conclusion of the briefing schedule in which it informed them that it intended to grant summary judgment to one or more parties. DE 113. That order directed the parties to identify any material factual matters that remained in dispute, or to inform the court whether they needed more time beyond the end of the briefing period to come forward with their evidence. *See id.* at 2. Thus, the parties have been afforded "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f).

In response, the NCDP and *Conley* Plaintiffs agreed that there were no material facts in dispute and approved of the court's plan to treat their briefing as motions for summary judgment. DE 116 at 2; DE 120 at 2. Judge Griffin also did not object, though his response identified several "contentions" raised by other parties in briefing that he argued did not amount to "issues of material fact." DE 118 at 2. The issues Judge Griffin identifies are either legal in nature, or immaterial factual issues. *See id.* at 2-3.

The State Board, Justice Riggs, and the VoteVets Parties likewise agreed that there are no genuine issues of material fact. DE 117 at 2; DE 119 at 2; DE 121 at 2. But those parties pointed out that there remains an ongoing dispute about the scope of the cure process, and specifically (1) whether Judge Griffin's challenge to overseas military and civilian voters is limited to Guilford County, or whether it also includes several other counties, and (2) whether the State Board is permitted to offer any cure process to Never Residents. *See generally id.* The court finds that the first dispute does not constitute an issue of material fact for purposes of the federal claims raised in this action. And, as for the second issue, it is undisputed that the order from the North Carolina Court of Appeals explicitly lays out a cure process for overseas military and civilian voters but

contains no similar process for Never Residents, instead directing the State Board to "remove" those ballots "from the final count of the 2024 election for Supreme Court Seat 6." *Griffin COA*, 2025 WL 1021724, at \*15. The question for this court is whether the terms of that order comport with federal law.[16]

Under the circumstances, summary judgment is the most appropriate procedural vehicle to resolve this consolidated action. Throughout this imperfect record, there are few disputes of fact, and none that are material. The court therefore "need only decide relevant legal questions." *Chudik v. Iancu*, No. 1:19-CV-01163, 2020 WL 9460468, at \*3 (E.D. Va. Mar. 25, 2020), *aff'd sub nom. Chudik v. Hirshfeld*, 987 F.3d 1033 (Fed. Cir. 2021); *see also Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (noting that legal questions are "always capable of decision at the summary judgment stage"); *Danville Reg'l Med. Ctr., LLC v. Am. Guarantee & Liab. Ins. Co.*, No. 4:21-CV-00012, 2022 WL 16914516, at \*2 (W.D. Va. Nov. 14, 2022) ("Purely legal questions are particularly appropriate for summary judgment.").

In treating the parties' briefing as cross-motions for summary judgment, the court considers each brief "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014). To the extent that consideration involves factual disputes, "the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). But the parties' unanimous agreement that the court treat their briefing as cross-motions

---

[16] The court notes further that the State Board has been ordered not to "mail[] any notice to any potentially affected voter." DE 92 at 4. Accordingly, there was a chance that subsequent factual development could have altered the court's analysis as to the Never Residents, giving due respect to dual federalism. But that process has been halted, and this court is constrained to rule on the issues as they stand now, and not how they might have unfolded.

17

for summary judgment is at least "'probative of the non-existence of a [material] factual dispute.'" *Syncrude Canada Ltd. v. Highland Consulting Grp., Inc.*, 916 F. Supp. 2d 620, 624 (D. Md. 2013) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir.1983)).

## IV. Analysis

The court's analysis proceeds in seven parts. First, the court must assure itself of jurisdiction. Second, the court considers whether it should abstain under *Younger*. Third, the court assesses whether the North Carolina Court of Appeals and Supreme Court's remedial procedure comports with equal protection principles. Fourth, the court evaluates whether a retroactive change to voting procedures violates overseas military and civilian voters' substantive due process rights. Fifth, the court analyzes whether stripping the right to vote from Never Residents violates their due process rights (substantive, then procedural) or imposes an unconstitutional burden on the right to vote under *Anderson-Burdick*. Sixth, the court addresses some remaining issues identified by the parties. And last, the court considers the remedy.

### a. Jurisdiction

Federal courts "must resolve jurisdictional issues before considering the merits of a claim." *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022). The court has already concluded that it possesses subject-matter jurisdiction in *Griffin II*. *See Griffin I*, DE 50 at 20; *see also* DE 24. That conclusion has been affirmed on appeal, DE 30 at 9, and does not to be revisited. As to *NCDP* and *Conley*, the court finds that it has federal question subject-matter jurisdiction because the claims in those actions "aris[e] under the Constitution" and "laws . . . of the United States." 28 U.S.C. § 1331.

In addition, the court finds that the Plaintiffs in *NCDP* and *Conley* possess standing. *See Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) ("To invoke federal jurisdiction, a plaintiff

bears the burden of establishing . . . Article III standing"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining burden of standing at summary judgment). On that front, the court finds that the NCDP has representational standing because it has "demonstrate[d] that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)); *see also* DE 78-1 at 6-7. The court further finds that Carrie Conley has demonstrated Article III standing, which is sufficient for the *Conley* Plaintiffs. *See* DE 82-2 at 2-5; *see also Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (holding that there must be a demonstration "of harm to the named plaintiff in particular"); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977).

Because this court has "assure[d]" itself "of subject matter jurisdiction," it may now consider "the merits." *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).

  b. *Younger* Abstention

Judge Griffin argues that the court should abstain under *Younger v. Harris*. DE 81 at 5-9. That doctrine of abstention evolved from the "longstanding public policy against federal court interference with state court proceedings." *Younger v. Harris*, 401 U.S. 37, 43 (1971). But "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013); *see also Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821).

As a threshold matter, *Younger* abstention is limited to three classes of state proceedings: (1) "criminal prosecutions," (2) "civil enforcement proceedings," and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," such as "civil contempt" proceedings. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*"); *see also Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022) (explaining that first step for court is to "determine whether the proceeding [] falls under the three types of proceedings that warrant *Younger* abstention"). If the state proceeding "does not fall within any of the three exceptional categories described in *NOPSI*," it "does not trigger *Younger* abstention." *Sprint*, 571 U.S. at 79; *see also Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 329 (4th Cir. 2022) (emphasizing that "*Sprint* [] recast the earlier cases" involving *Younger* abstention).

If the state court proceeding qualifies as one of those identified in *NOPSI* and *Sprint*, then the court proceeds to consider three additional factors: (1) whether the "state judicial proceeding" is "ongoing," (2) whether "the proceedings implicate important state interests," and (3) whether "there an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *see also Sprint* 571 U.S. at 81 (clarifying that "[t]he three *Middlesex* conditions" are "not dispositive," but rather "*additional* factors" to be considered "before invoking *Younger*") (emphasis in original); *Air Evac EMS*, 37 F.4th at 96 (explaining that court considers *NOPSI* categories first, and then *Middlesex* factors).

"But even when both steps are satisfied, *Younger* identifies three exceptions to the court's duty to abstain." *Air Evac EMS*, 37 F.4th at 96. Those include (1) "where there is a showing of bad faith or harassment by state officials responsible for the prosecution," (2) "where the state law

to be applied in the criminal proceeding is flagrantly and patently violative of express constitutional prohibitions," or (3) "where there exist other extraordinary circumstances." *Kugler v. Helfant*, 421 U.S. 117, 124 (1975) (internal quotation marks omitted); *see also Nivens v. Gilchrist*, 444 F.3d 237, 241 (4th Cir. 2006) (listing same three exceptions); *Erie Ins. Exch. v. Maryland Ins. Admin.*, 105 F.4th 145, 152 (4th Cir. 2024) ("Under [Fourth Circuit] precedent, there are 'three exceptions to the court's duty to abstain'" under *Younger*) (emphasis omitted) (quoting *Air Evac EMS*, 37 F.4th at 96). In sum, abstention under *Younger* requires satisfaction of a three-step process; otherwise, the court must adhere to its "virtually unflagging obligation" to exercise jurisdiction. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

Judge Griffin's *Younger* "argument stumbles right out of the gate." *Erie Insurance*, 105 F.4th at 150. He develops no argument that his post-election protests are akin to a state criminal prosecution, civil enforcement proceeding, or proceeding "involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," such as "civil contempt" proceedings. *NOPSI*, 491 U.S. at 368. And for good reason: they are not. This proceeding is a far cry from "a typical state criminal trial." *Nivens*, 444 F.3d at 241. It is not a "noncriminal proceeding[ that] bear[s] a close relationship to proceedings criminal in nature." *Middlesex*, 457 U.S. at 432. Nor is it "in aid of and closely related to" state "criminal statutes." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). And it was surely not "initiated to sanction the federal *plaintiff*, *i.e.*, the party challenging the state action, for some wrongful act." *Sprint*, 571 U.S. at 79 (emphasis added). It was Judge Griffin who sought judicial review of the State Board's decisions in the Wake County Superior Court, not "the State" or one of its instrumentalities in a "sovereign capacity." *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977). Because the election

protests "do[] not fall within any of the three exceptional categories described in *NOPSI*," they "do[] not trigger *Younger* abstention." *Sprint*, 571 U.S. at 79.

Judge Griffin contends that this proceeding is sufficiently state-centric to satisfy *Younger* because "important state interests are involved." DE 81 at 8. Without a doubt the state interests here are significant. But if that were enough, that "would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Sprint*, 571 U.S. at 81. In other words, crediting Judge Griffin's contention would lead to the exception (*Younger*) swallowing the rule (federal courts must exercise jurisdiction when they have it).[17]

In addition, this action separately fails the *Younger* test because it does not involve parallel actions, where separate "proceedings were *already pending* in a state court." *Juidice*, 430 U.S. at 335 (emphasis added). This is all one proceeding. Judge Griffin filed three petitions for judicial review in state court, the State Board removed those petitions to this court as one consolidated federal action, and this court subsequently remanded the state law *issues* to the state courts but retained jurisdiction of the federal issues. DE 1; DE 24; DE 35. Thus, the proceedings continuing now in federal court are not "designed to annul the results of a state" proceeding. *Huffman*, 420 U.S. at 604. They are part and parcel of the same proceeding. Concluding otherwise would nullify *Pullman*, where the state court *always* addresses the state law issues before the federal court passes upon the federal issues.

---

[17] In his reply brief, Judge Griffin asserts that this case fits the third *Sprint* category. DE 106 at 12-13. But the state court orders at issue here are not like contempt orders, which seek to "vindicate[] the regular operation of [the state's] judicial system," *Juidice v. Vail*, 430 U.S. 327, 335 (1977), and neither does this case involve "challenges to the *processes* by which the State compels compliance with the judgments of its courts," *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13–14 (1987) (emphasis added).

Case 5:24-cv-00699-M-KS    Document 41    Filed 05/05/25    Page 22 of 68

Finally, even if *Younger* applied, this is one of those "unusual situations" where "federal intervention" is nonetheless obligatory. *Younger*, 401 U.S. at 54. "Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)). This precept "serves two key interests, those of hierarchy and finality." *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007). Specifically, the "mandate rule" requires "district courts to 'implement both the letter *and spirit*'" of an appellate court's mandate after the appellate court "decide[s] a case on appeal." *R.A. v. McClenahan*, 122 F.4th 143, 146 (4th Cir. 2024) (emphasis added) (quoting *Bell*, 5 F.3d at 66).

Here, the Fourth Circuit affirmed but modified this court's remand order, and expressly directed this court to "retain jurisdiction of the federal issues." DE 30 at 11. This court heeded that mandate. DE 35 at 1-2. If the court were to superficially "retain" the federal issues, only to abstain (again) from reaching those issues, that could hardly be said to meet its duty of implementing the Fourth Circuit's mandate in this case. *See R.A.*, 122 F.4th at 146.

In short, *Younger* does not apply. Even if it did, the mandate rule requires the court to reach the federal issues on their merits. The court turns to those issues now.

### c. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Although "[t]he Equal Protection Clause does not forbid classifications," it does prohibit "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Applying this principle to the voting context, the Supreme Court announced over a half-century ago that "a citizen has a constitutionally

23

protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969) (holding that courts must closely scrutinize state action that "grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others").

As the statement from *Dunn* suggests, "[t]he right to vote is protected in more than the initial allocation of the franchise." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). "[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966). Line-drawing is inconsistent with the Equal Protection Clause when a state, "by later arbitrary and disparate treatment, value[s] one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

In *Bush v. Gore*, the United States Supreme Court concluded that a recount procedure ordered by Florida's Supreme Court violated the federal Equal Protection Clause. *Id.* at 103. In that case, the day following the 2000 Presidential election the "Florida Division of Elections reported that" then-Governor George W. Bush led then-Vice President Albert Gore, Jr. by less than 2000 votes, a margin of approximately 0.033%. *Id.* at 101-02. "Vice President Gore then sought manual recounts in" only a handful of Florida's largest counties, including "Palm Beach, Broward, and Miami–Dade Counties." *Id.* at 101.

The Florida Supreme Court approved a manual recount across those counties for thousands of ballots that were considered potential "undervotes," i.e. votes on a "punchcard" ballot where the ballot was not "perforated with sufficient precision for a machine to register the perforations."

*Id.* at 105. "In some cases a piece of the card," referred to as "a chad," was "hanging . . . by two corners." *Id.* "In other cases there [wa]s no separation at all, just an indentation." *Id.*

The Florida Supreme Court's order provided that a not-fully perforated ballot would be considered a legal vote and counted if the individual reviewing the ballot could ascertain "the intent" of the voter. *Id.* at 105-06. In other words, if an election official determined that an indentation on a ballot was significant enough to evince a voter's intent to vote for a Presidential candidate, the ballot would count.

But "each of the counties used varying standards" to assess ballots. *Id.* at 107. "Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties." *Id.* And Palm Beach County canvassers "began the process with a 1990 guideline which precluded counting completely attached chads, switched to a rule that considered a vote to be legal if any light could be seen through a chad, changed back to the 1990 rule, and then abandoned any pretense of a *per se* rule, only to have a court order that the county consider dimpled chads legal." *Id.* at 106-07.

The United States Supreme Court concluded that this incongruent post-election procedure contravened principles of equal protection. *Id.* at 104-05. The Court explained that, when a state "accord[s] arbitrary and disparate treatment to voters in its different counties," i.e., when "counties use[] varying standards to determine what [qualifies as] a legal vote," such "uneven treatment" amounts to a "constitutional violation." *Id.* at 107; *see also Moore v. Ogilvie*, 394 U.S. 814, 817 (1969) (holding that state may not "make[] classifications of voters which favor residents of some counties over residents of other counties"); *Gray v. Sanders*, 372 U.S. 368, 379 (1963) (concluding that state violated Equal Protection Clause by treating votes from "some small rural counties"

25

differently "than other larger rural counties"). Therefore, the defect in the post-election procedure authorized by the Florida Supreme Court was that it was not "designed to ensure uniform treatment . . . from county to county." *Id.* at 106.

Those principles map onto this case. North Carolina has 100 counties. DE 1-12 at 2. Judge Griffin challenged the absentee ballots cast by overseas military and civilian voters in no more than 6 of those 100 counties. *Id.* at 12 & n.2. Per the court order from North Carolina's Court of Appeals and Supreme Court, those targeted voters must, in short order, provide a copy of their driver's licenses or a completed declaration of reasonable impediment to the State Board or their votes will be discarded. *See Griffin SC*, 2025 WL 1090903, at *3.

As a consequence, overseas military and civilian voters who cast a ballot in Guilford County are required to undertake additional efforts in order to have their votes counted. *See id.* Their neighbors in Randolph, Alamance, and Rockingham Counties need not. That disparate treatment between similarly situated voters, based solely on their casting of ballots in "different counties," amounts to "a constitutional violation" of the Equal Protection Clause. *Bush*, 531 U.S. at 107. "Everyone's ballot" must be "worth the same." *Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020) (en banc).

Compare the retroactive requirement of providing photo ID in this case with variant treatment of "chads" in *Bush v. Gore*. Like a hanging chad that would qualify as a legal vote in Broward but not Palm Beach County, here absentee ballots cast in Randolph County by overseas voters who did not attach a copy of their photo ID to the ballot are *valid* in the 2024 election. But absentee ballots cast in Guilford County by overseas voters who did not attach a copy of their photo ID to the ballot are *invalid* in the 2024 election. Those two groups of voters are "are in all relevant respects alike," *Nordlinger*, 505 U.S. at 10, but they are subject to "unequal evaluation of

26

[their] ballots," *Bush*, 531 U.S. at 106. Thus, as a result of the North Carolina Court of Appeals and Supreme Court's order, overseas military and civilian voters casting ballots in Guilford County are deprived from "participat[ing] in [the 2024] election[] on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336; *see also Kramer*, 395 U.S. at 627.

The only possible justification for this "later . . . disparate treatment," *Bush*, 531 U.S. at 104, is that the scope of the cure process was tailored to the scope of Judge Griffin's protest, *see* DE 1-12 at 12. But that is "arbitrary." *Bush*, 531 U.S. at 104. Judge Griffin is an interested litigant seeking to obtain a personal advantage (not unlike then-Vice President Gore). *See Bush*, 531 U.S. at 145-46 (Breyer, J., dissenting) (rejecting remedy but conceding that "the use of different standards" across counties "could favor one or the other of the candidates" which implicates "basic principles of fairness"); *Griffin COA*, 2025 WL 1021724, at *41 n.23 (Hampson, J., dissenting) (observing that Judge Griffin's challenge to overseas voters was limited to select few "counties [where] he lost by significant margins").

Matching the scope of the judicial remedy to the scope of the challenge, in this instance, does not satisfy "the rudimentary requirements of equal treatment and fundamental fairness" because it results in state action that treats similarly situated voters differently. *Bush*, 531 U.S. at 109. Because here North Carolina has granted "the franchise . . . to the electorate," the state may not later permit "lines [to] be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper*, 383 U.S. at 665. By letting an interested litigant hold the pen for that line-drawing exercise, the North Carolina Court of Appeals and Supreme Court "ratified [] uneven treatment." *Bush*, 531 U.S. at 107.

To the extent the forgoing analysis articulates a rule, it is surely not that a litigant raising a post-election protest must challenge everyone in the state, or no one at all. Some challenges may

address an irregularity that is unique to one geographic area or segment of the population. But others may concern generally applicable rules.

The court's conclusion here is solely that, when the underlying basis for a protest is a rule that applies statewide, a geographically selective protest raises equal protection concerns and the specter of post-election mischief. But those concerns only come to fruition and manifest as an equal protection violation when a state adopts the litigant's selectivity and retroactively applies newly announced rules to a discrete subset of citizens, and not all similarly situated voters.[18] That is the arbitrary and disparate treatment that the Supreme Court cautioned against in *Bush v. Gore*, and that guidance operates with full force here.

On that point, the court acknowledges that the Supreme Court in *Bush v. Gore* took pains to "limit[]" its holding "to the present circumstances." *Id.* But those "circumstances" consisted of a post-election procedure implemented by a state supreme court that possessed "the power to assure uniformity" and instead "ratified [] uneven treatment" across counties. *Id.* at 107 & 109. The "issues" there are "indistinguishable from those" here. *Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 46 (S.D.N.Y. 2020) (relying on *Bush v. Gore* and granting preliminary injunction based on finding of likely equal protection violation where election officials treated ballots differently "in Brooklyn as compared to the other boroughs"); *see also Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 387 (W.D. Pa. 2020) ("Indeed, *Bush's* core proposition—that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial.").

---

[18] Nothing in this order should be construed as a constraint against *prospective* application of the North Carolina Court's interpretation of state law, because that prospective application applies to all overseas military and civilian voters equally.

After all, "[i]t is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases." *Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) (opinion of Gorsuch, J.) (italics in original). Courts always decide cases on the basis of the unique record before them. No two cases are carbon copies of one another, but that does not limit the reach of judicial reasoning. *See Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021) ("If necessary to the outcome, a precedent's reasoning must be followed."). "Distinctions" in future cases "require meaningful differences to matter." *City of Martinsville, Virginia v. Express Scripts, Inc.*, 128 F.4th 265, 271 (4th Cir. 2025).

True to those principles, federal courts have routinely relied on *Bush v. Gore* to identify equal protection problems in pre- and post-election procedures. For example, in *Northeast Ohio Coalition for the Homeless v. Husted*, the Sixth Circuit affirmed the lower court's preliminary injunction on the basis that a consent decree "likely violates equal protection" because it permitted voters to cure their ballot if they used the last four digits of their social security number to cast a provisional ballot but offered no cure for voters "using any other form of identification (e.g., current photo identification, copy of current utility bill, paycheck." *Northeast Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012). In *Ford v. Tennessee Senate*, the district court entered a declaratory judgment and directed the Tennessee Senate to "apply uniform, non-arbitrary, objective standards for determining and defining a legal vote . . . across each of Tennessee's ninety-five (95) counties." *Ford v. Tennessee Senate*, No. 06-CV-2031, 2006 WL 8435145, at *14 (W.D. Tenn. Feb. 1, 2006). In *Pierce v. Allegheny County Board of Elections*, the district court granted a preliminary injunction and concluded that varying practices both within and across counties regarding the acceptance of absentee ballots hand-delivered by third parties "raise a serious equal protection claim under a theory similar to that espoused by the United States

Supreme Court in *Bush v. Gore*." *Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003). And in *Black v. McGuffage*, the district court held that a state's delegation of authority to counties to select voting systems, when those systems had statistically significant variances in rate of accuracy, meant that "people in different counties" would have significantly different probabilities of having their votes counted," which "cannot be constitutional." *Black v. McGuffage*, 209 F. Supp. 2d 889, 898–99 (N.D. Ill. 2002). In short, federal courts have not hesitated to "apply *Bush v. Gore*" when its reasoning "is relevant." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025).

Judge Griffin offers several arguments against the application of *Bush v. Gore* and its progeny, but the court does not find any of them persuasive. First, he contends that "the *Anderson-Burdick* test, not *Bush v. Gore*, applies to equal-protection challenges to state law." DE 81 at 23. This argument calls to mind Justice Gorsuch's thoughtful observation that too often litigation over the correct standard of review "take[s] on a life of its own and do[es] more to obscure than to clarify the ultimate constitutional questions." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 74 (2025) (Gorsuch, J., concurring).

But, even taking the argument on its face, Judge Griffin's position may have been accurate in the Ninth Circuit fifteen years ago, *see Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011), but no longer, *see Mi Familia Vota*, 129 F.4th at 730 ("We apply *Bush v. Gore*, because [] it is relevant precedent."). And Judge Griffin's contention does not reflect the law in the Fourth Circuit, *see Wise*, 978 F.3d at 100 (applying *Bush v. Gore* to equal protection challenge to state's change to state election law), or the Second, Third, Sixth, and Seventh Circuits, *see Gallagher*, 477 F. Supp. 3d at 46; *Pierce*, 324 F. Supp. 2d at 705; *Northeast Ohio*, 696 F.3d at 598; *Black*, 209 F. Supp. 2d at 898–99.

30

Second, Judge Griffin asserts that *Bush v. Gore* "'is of limited precedential value.'" DE 81 at 23 (quoting *Wise*, 978 F.3d at 100 n.7). The court agrees that the principles of that case should be applied no further than factually analogous circumstances (as with any case), but the "issues" in *Bush v. Gore* are "indistinguishable from those" here. *Gallagher*, 477 F. Supp. 3d at 46. In any event, the factual "differences" between the two cases are not "meaningful." *City of Martinsville*, 128 F.4th at 271.

Next, and relatedly, Judge Griffin argues that *Bush v. Gore* is limited to "a statewide recount" where the "recount provided election officials with no standards," whereas here "the ID" requirement is "sufficiently uniform." DE 81 at 24. The court does not discern a material distinction between a statewide recount where there is disparate treatment between counties and a statewide cure process where there is disparate treatment between counties. *See City of Martinsville*, 128 F.4th at 271. Both post-election processes are intended to culminate with the accurate tabulation of ballots in an election. And the ID requirement imposed by the North Carolina Court of Appeals and Supreme Court is only sufficiently uniform in its *prospective* application; it's retroactive application "accord[s] arbitrary and disparate treatment to voters in its different counties," leading to similarly situated voters being subject to "unequal evaluation of [their] ballots." *Bush*, 531 U.S. at 106-07.

Fourth, Judge Griffin contends that, because *Bush v. Gore* sanctions the use of different "systems" across counties, finding an equal protection violation here would require future election protestors "to file in every county across the State" or otherwise run into a remedial equal protection problem. DE 81 at 24-25. Not so. As the court previously noted, not every election protest involves challenges to generally applicable rules. And even in those cases, a challenger can raise a discrete challenge, so long as the remedy operates prospectively to all similarly situated

voters, and not retroactively in a manner that treats differently voters who "participate[d] in [an] election[] on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336.

Last, Judge Griffin suggests that the cure process here represents a mere "'jot and tittle of state election law'" and that the process actually "makes it easier to vote and have one's vote counted—not harder." DE 81 at 25 (quoting *Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377, 388 (3d Cir. 2020)). That cannot be right. Had the state courts here not imposed a retroactive remedy, the affected overseas military and civilian voters would have to do *nothing* to have their ballots counted in the 2024 election. And the prospect that thousands of North Carolinians could have their votes discarded if they fail to comply with a retroactive cure process strikes this court as more than mere jot and tittle.

At bottom, the court finds that the cure process offends equal protection principles because it treats overseas military and civilian voters casting ballots in certain counties differently than others who are identically situated. Because that process is "inconsistent with the Equal Protection Clause of the Fourteenth Amendment," *Harper*, 383 U.S. at 665, it may not proceed.

### d. Substantive Due Process

Due process "is the foundation of our constitutional order." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025). "The principle and true meaning of" due process has "never been more tersely or accurately stated than by" Justice Johnson in *Bank of Columbia v. Okely. Hurtado v. People of State of Cal.*, 110 U.S. 516, 527 (1884). More than 200 years ago, Justice Johnson wrote that due process is "intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." *Bank of Columbia v. Okely*, 17 U.S. 235, 244 (1819). As this formulation makes apparent, the phrase *due process* embodies "a concept less rigid and more

32

fluid than those envisaged in other specific and particular provisions of the Bill of Rights." *Betts v. Brady*, 316 U.S. 455, 462 (1942). But since our Nation's founding, "[t]he touchstone of due process" has been "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

The United States Supreme Court has not announced a standard by which to assess substantive due process claims in the context of state election activities. But it is a "significant duty of federal courts to preserve" due process "rights in the electoral process." *Hutchinson v. Miller*, 797 F.2d 1279, 1283 (4th Cir. 1986). In furtherance of that duty, "courts in th[e Fourth C]ircuit and elsewhere have" evaluated election-related due process claims by distinguishing between (1) "broad-gauged, patent and fundamental unfairness that erode[s] the democratic process" (which contravenes due process), and (2) "garden variety election irregularities" (which "do not give rise to a due process claim"). *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 915 (E.D. Va. 2018) (internal quotation marks omitted). Articulated more succinctly, state action may render "the electoral process so deficient as to violate the Due Process Clause of the Fourteenth Amendment" when that action implicates "the very integrity of the electoral process." *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985).

Distinguishing between garden variety irregularities and broad-gauged unfairness is rarely straightforward in "this chiaroscuro corner of the law." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001). But after reviewing cases across circuits and decades, the court observes a unifying principle: retroactive changes to election procedures raise serious due process concerns, *particularly* where those changes result in invalidating the votes of individuals who cast ballots in reliance on previously established rules.

*Griffin v. Burns* is the most significant case addressing post-election changes to voting procedures. That case concerned "the use of absentee and shut-in ballots in a special Democratic primary election held in the Tenth Ward of Providence, Rhode Island." *Griffin v. Burns*, 570 F.2d 1065, 1066 (1st Cir. 1978). At the time, Rhode Island law "expressly permitted absentee and shut-in voting" in all "elections" but was silent on whether absentee and shut-in voting was likewise authorized for party primaries. *Id.* at 1067. "The Secretary [of State] and the other election officials, believing the issuance of such ballots in party primaries to be authorized, and acting in accordance with a practice that had existed in Rhode Island for about seven years in the case of primaries, advertised and issued various such ballots for use in this primary." *Id.*

In the primary, the plaintiff's competitor received more in-person votes on election day, but the plaintiff won substantially more absentee and shut-in votes and received 15 more votes in total. *Id.* His competitor then challenged the use of absentee ballots for party primaries, and the Rhode Island Supreme Court ultimately concluded that "there is no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election." *Id.* at 1068. The state Supreme Court "ordered that the 123 such ballots be invalidated," which resulted in the plaintiff's competitor receiving more votes. *Id.* So, the plaintiff sued in federal court.

The First Circuit concluded that Rhode Island could not, consistent with principles of due process, retroactively invalidate the votes of absentee and shut-in voters for several reasons: (1) the competitor did not challenge "the absentee or shut-in ballot procedures prior to the primary," (2) "the issuance" of absentee and shut-in "ballots followed long-standing practice," and (3) "in utilizing such ballots voters were doing no more than following the instructions of the officials charged with running the election." *Id.* at 1075. The fundamental point underlying the First Circuit's reasoning is that voters are entitled to rely on guidance from election officials: "[w]hen

34

a group of voters are handed ballots by election officials that, unsuspected by all, are invalid, state law may forbid counting the ballots, but the election itself becomes a flawed process," *id.* at 1076, and "reaches the point of patent and fundamental unfairness," *id.* at 1077. In other words, "due process is implicated," and a federal court must step in, "where the entire election process including as part thereof the state's administrative and judicial corrective process fails on its face to afford fundamental fairness." *Id.* at 1078.

*Bennett v. Yoshina* is a useful comparison case to *Griffin*. That case involved Hawaii's interpretation of blank ballots submitted in connection with a ballot provision requesting a constitutional convention. *Bennett v. Yoshina*, 140 F.3d 1218, 1222 (9th Cir. 1998). For years prior to the 1996 election, the practice in Hawaii had been that "machine-counted ballots that left the convention question blank were simply ignored in computing whether the convention question had passed. 'Yes' votes were counted against 'no' votes, and the majority ruled." *Id.* In addition, immediately prior to the election, the state office of elections published a fact sheet "that said that a majority on the convention question would be determined without considering blank ballots." *Id.* In the 1996 election, the "yes" votes on the convention question exceeded the "no" votes by a slim margin, but a significant number of voters left the ballot blank. *Id.*

Shortly after the election, a group of "no" voters filed an original action in the Hawaii Supreme Court and sought a declaratory judgment that blank ballots should be combined with "no" votes in determining whether the "convention question had failed." *Id.* The Hawaii Supreme Court agreed with the plaintiffs, in effect retroactively counting more ballots in connection with the convention question. *Id.* at 1222-23. As a result, the *Bennett* plaintiffs ("yes" voters) filed suit in federal court "on the ground that the Hawaii Supreme Court's interpretation of blank ballots

was so unforeseeable that the voters' substantive due process . . . rights were violated." *Id.* at 1221-22.

The Ninth Circuit concluded that there was no due process violation. After reviewing decades of precedent including *Griffin*, the *Bennett* Court summarized "[a] general pattern" in the case law: that "a court will strike down an election on substantive due process grounds" where there is "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Id.* at 1226-27.

The Ninth Circuit found that neither element was met in that case. First, there was no voter reliance because it was "beyond belief to suggest that thousands of voters who left the convention question blank were secretly relying on the hope that their votes would not be counted, and that they would have voted 'yes' had they foreseen the decision" of Hawaii's Supreme Court. *Id.* at 1227. Second, and more importantly here, "there was no disenfranchisement or meaningful vote dilution" because "[e]very ballot submitted was counted." *Id.* Put another way, the Hawaii Supreme Court's "*ex post* clarification of the state's election laws" did not violate the *Bennett* plaintiffs' due process rights because "counting *more* votes than had previously been permitted did not *dis*enfranchise anyone." *Id.* at 1226-27 (emphasis in original). *Griffin* and *Bennett* can therefore be interpreted as reaching different outcomes based on extent of voter reliance, and the presence or absence of ballot invalidation.

*Hoblock v. Albany County Board of Elections* also involved an after-the-fact challenge to election procedures. There, prior litigation over districting in Albany County prevented the county from holding elections in the fall of 2003 and instead led to a court-ordered special primary and general election in the spring of 2004. *Hoblock v. Albany Cnty. Bd. of Elections*, 341 F. Supp. 2d

36

169, 171 (N.D.N.Y. 2004). The court order providing for those special elections directed the county board of elections "to send absentee ballots for the special *primary* election to any voter who had filed an application for an absentee ballot for either the 2003 primary or general election," but "stated that the process for obtaining and counting absentee ballots for the special *general* election would be in accordance with Article 8 of the New York Election Law," which required "a voter to file an application requesting an absentee ballot to qualify to cast an absentee vote." *Id.* (emphasis in original). In short, the issue was whether the county board of elections could send an absentee ballot to a voter for the special general election if the voter had requested an absentee ballot in the fall of 2003 but had not renewed that request in the spring of 2004.

"In a bipartisan decision," the county board of elections "interpreted the [court] order to allow it to issue absentee ballots for the special *general* election to all voters who had filed an application for an absentee ballot for the cancelled November 4, 2003 election," and "[t]here was no objection to this decision until *after* the special general election on April 27, 2004." *Id.* at 171–72 (emphasis in original). At least 27 voters cast their vote for the general election on the absentee ballots they received from the county board of elections. *Id.* at 172.

The election was close; "without tallying" the 27 absentee ballots, "fewer than 5 votes separated the candidates." *Id.* The candidates then filed a state court action concerning the absentee ballots, and a state trial court "ruled that the [county board of elections'] actions resulted from a misinterpretation of the [court] order, and therefore the absentee ballots at issue were not in compliance and should not be tallied." *Id.* That decision was affirmed on appeal to New York's Court of Appeals, and the affected voters subsequently instituted a federal action in which they argued that the county board's failure to count their ballots violated their "Fourteenth Amendment rights of Due Process and Equal Protection." *Id.*

On the plaintiffs' motion for preliminary injunction, the District Court found that the plaintiffs were likely to succeed on the merits of their due process claim: "by providing absentee ballots that voters rely upon in good faith to cast their vote, and then invalidating them, the [county board of elections] has effectively taken away their guaranteed right to vote in the election." *Id.* at 176. The *Hoblock* Court noted further that "[i]t would be absurd to make it the responsibility of the voters to reject the ballot sent by the [county board of elections] because of the [county board of elections'] error in interpreting the [court's] order." *Id.* at 177. The District Court also acknowledged a state's authority to interpret state law, but explained that such authority cannot overcome federal constitutional constraints: although "it is necessary for states to have regulations surrounding the issuance of absentee ballots to avoid election fraud, adherence to those regulations cannot trump the fundamental right to vote and to have one's vote counted as guaranteed by the United States Constitution." *Id.* at 177-78.

On appeal, the Second Circuit affirmed the District Court's entry of a preliminary injunction on the voters' due process claim, recognizing that "when election officials refuse to tally absentee ballots that they have deliberately (even if mistakenly) sent to voters, such a refusal may violate the voters' constitutional rights." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005). The Second Circuit left the preliminary injunction in place to permit the District Court to decide the ultimate merits of the voters' constitutional claims. *See id.*

The District Court subsequently entered summary judgment in favor of the voters who cast absentee ballots. *Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 93 (N.D.N.Y. 2006). The Court reiterated that those voters were entitled to rely in good faith on the guidance of election officials, even if those election officials were "mistaken" in their interpretation of state law. *Id.* at 95. And the state court's "remedy," i.e., the absentee "ballots are not being counted,"

was "unfair and inadequate for the protection of" the voters' federal "constitutional rights, such that [their] only relief is to be found in" federal court. *Id.* at 95-96. The *Hoblock* Court thus ordered the county board of elections to "count the disputed [absentee] ballots, and certify winners." *Id.* at 98.

Other cases embody similar principles. For example, *Roe v. Mobile County Appointing Board* also concerned a state's treatment of absentee ballots. *Roe v. Mobile Cnty. Appointing Bd.*, 904 F. Supp. 1315 (S.D. Ala. 1995) (*Roe I*). Alabama law required absentee ballots to be notarized and signed in the presence of two witnesses, and for years the state's consistent practice had been to exclude ballots from the vote count if they were not notarized or lacked witness signatures. *Id.* at 1334. Then, after the 1994 election results for Treasurer and Chief Justice of the state Supreme Court were close, a state court ruled that absentee ballots could not be excluded from the vote count "because of a lack of notarization or a lack of witnesses." *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 578 (11th Cir. 1995) (emphasis omitted).

A group of voters instituted a federal action, and the District Court in *Roe* concluded that a "retroactive[]" change in election procedure constituted a "fundamental deficiency in the fairness of the process" that "amount[ed] to ballot-box stuffing" and violated voters' due process rights. *Roe I*, 904 F. Supp. at 1335. In short, after-the-fact changes to voting procedures that alter the weight of votes that were cast consistently with practice at the time of the election violated voters' due process rights. *See id.*

On appeal, the Eleventh Circuit affirmed the District Court. *Roe v. State of Ala.*, 68 F.3d 404, 405 (11th Cir. 1995) (*Roe II*). Notably, in an earlier stage of the litigation, the Alabama Supreme Court had answered a certified question from the Eleventh Circuit and determined that "Alabama law requires the counting of all absentee ballots cast in the general election of November

8, 1994," even if those ballots were not notarized and lacked witness signatures. *Roe v. Mobile Cnty. Appointment Bd.*, 676 So. 2d 1206, 1226 (Ala. 1995). But the Eleventh Circuit concluded that the Alabama Supreme Court's interpretation of state law had no bearing on the District Court's treatment of the voters' federal due process claims: the state Supreme Court surely had authority to interpret state law, but "was not called upon to decide whether the counting of the contested ballots cast in the November 8, 1994, general election . . . infringed the *Roe* [voters' federal] constitutional rights." *Roe II*, 58 F.3d at 409.[19] *Roe I* and *II* thus stand for the proposition that a judicial interpretation of state law that results in retroactive changes to election procedures implicates the due process rights of voters who cast ballots based on a settled understanding of the state law at the time of the election.

Another decision, relevant by analogy, is *Brown v. O'Brien*. There, the national Democratic Party excluded certain California delegates from its 1972 convention after concluding that California's "winner-take-all provision of the California primary election law" was inconsistent with rules previously developed by the Party. *Brown v. O'Brien*, 469 F.2d 563, 565-66 (D.C. Cir. 1972). California's winner-take-all provision meant that, even though then-Senator George McGovern only won a plurality of votes in the California primary (approximately 43%), "the entire 271 person slate was designated as the California delegation to the national convention." *Id.* at 566. Importantly, the Democratic Party had previously assured California's state Democratic Party that the winner-take-all provision was not inconsistent with Party rules. *See id.* at 568.

---

[19] Earlier in the litigation, when the state defendants appealed the District Court's entry of a preliminary injunction, the Eleventh Circuit affirmed the District Court and discussed the merits of the constitutional claim more fully. The Court, citing the First Circuit in *Griffin*, agreed with the District Court that "a post-election departure from previous practice in Alabama" would "implicate fundamental fairness and the propriety of the two elections at issue." *Roe*, 43 F.3d at 581. Further, considering that the state court's interpretation upended longstanding practice in Alabama, the Eleventh Circuit emphasized that it would have been "unreasonable to expect average voters and candidates to question" guidance from election officials. *Id.*

40

The D.C. Circuit held that the Democratic Party's decision to exclude certain California delegates amounted to a "retroactive[]" and "entirely new and unannounced standard of conduct." *Id.* at 569. Like the manner in which other federal courts analyzed state court treatment of state election law, the D.C. Circuit recognized that "political parties must have wide latitude in interpreting their own rules and regulations," but that "the very integrity of the [election] process rests on the assumption that clear rules will be established" ex ante "and that, once established, they will be enforced fairly, consistently, and without discrimination so long as they remain in force." *Id.* 569-70. Likewise, the Court expressed that state party officials were permitted to act "in justifiable reliance" on the guidance from the national Democratic Party prior to the 1972 primaries. *Id.* at 569. The D.C. Circuit ultimately concluded that retroactive changes to election procedures that excluded delegates from participating in the national convention violated those delegates' substantive due process rights. *Id.* at 570 n.4.[20]

In contrast to *Griffin*, *Hoblock*, *Roe*, and *O'Brien*, federal courts routinely decline to intervene in state election disputes when those disputes concern irregularities, mistakes, or the mere negligence of state actors. *E.g.*, *Hendon*, 710 F.2d at 182 (ballots with formatting and font errors represented "simple negligence" and not "a violation of the due process clause"). But, even in refusing to grant relief in those circumstances, courts consistently emphasize the thrust of the cases the court has summarized: a state cannot, consistent with due process, "change[] the rules half way through the game," by telling "voters one thing before the election and chang[ing] policy thereafter." *Scheer v. City of Miami*, 15 F. Supp. 2d 1338, 1344 (S.D. Fla. 1998); *see also Gold v. Feinberg*, 101 F.3d 796, 801 (2d Cir. 1996) (recognizing that "officially-sponsored election

---

[20] The D.C. Circuit's judgment was later vacated as moot, *O'Brien v. Brown*, 409 U.S. 816 (1972), because the Democratic Party "seated at the Convention the delegation whose right thereto was contested by plaintiffs," *Keane v. Nat'l Democratic Party*, 475 F.2d 1287, 1288 (D.C. Cir. 1973) (disagreeing with Supreme Court that case was moot but nonetheless affirming dismissal on equitable grounds).

41

procedure" that results in "broad-gauged unfairness" requires intervention by federal court); *Hendon*, 710 F.2d at 182 (describing holding of *Griffin* as "settled" law on substantive due process).

For five reasons, this case is like *Griffin, Hoblock*, *Roe*, and *O'Brien*. It is not like *Bennett* or the cases involving garden variety irregularities.

First, as to overseas military and civilian voters, the rules of the road were settled at the time of the 2024 election. The State Board advised this class of voters that they could cast an absentee ballot without providing a copy of their driver's license. *E.g.*, DE 82-8 at 3-5. The State Board even promulgated a rule to that effect, which codified longstanding practice. 08 N.C. Admin. Code. 17.0109(d). That final rule was in effect for months prior to the election, and no one challenged it. *See* DE 1-12 at 46. Thus, as in *Griffin*, election officials here "advertised, issued, and sanctioned" a particular election procedure. *Griffin*, 570 F.2d at 1078. That procedure reflected "statewide practice prior to the general election." *Roe*, 43 F.3d at 578.

Second, and related to the first point, this settled rule could have been challenged before the election. The State Board's administrative rule and guidance were publicized well in advance of the election, and "[t]here was no objection to th[ose] decision[s]" at the time. *Hoblock*, 341 F. Supp. 2d at 172. Rather, it was not until "[a]fter the" election that Judge Griffin "for the first time questioned the authority of the" State Board to exempt overseas military and civilian voters from the photo ID requirement. *Griffin*, 570 F.2d at 1067.

A post-election challenge to a circumstance known prior to the election implicates "the integrity of the vote." *Bennett*, 140 F.3d at 1226. In that regard, the federal courts of appeals uniformly look askance at post-election challenges that contest conditions existing prior to the election. For example, in *Hendon* the Fourth Circuit determined that a North Carolina election

law was unconstitutional but declined to grant retroactive relief after the election had passed, explaining that "[c]ourts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible." *Hendon*, 710 F.2d at 182. Although *Hendon* does not establish "a per se rule" barring post-election challenges to pre-election conditions, it does set forth "the general rule" that "a candidate . . . should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see first whether they will be successful at the polls." *United States v. City of Cambridge, Md.*, 799 F.2d 137, 141 (4th Cir. 1986) (finding *Hendon's* rule did not apply to the United States, which, unlike candidate, had "no interest" in outcome of election); *see also Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988) (summarizing *Hendon* and *City of Cambridge* for proposition that, unless "aggrieved parties" provide "adequate explanation" of why they did "not come forward before the election, they will be barred from the equitable relief of overturning the results of the election").

Likewise in other circuit courts of appeals, "it is the duty of affected parties to bring their grievances forward for prompt pre-election adjudication." *Toney v. White*, 476 F.2d 203, 209 (5th Cir. 1973). To conclude otherwise would "encourage parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate, then, if they lose, cover their bad bet by undoing the ballot results in a court action." *Id.*; *see also Chinese for Affirmative Action v. Leguennec*, 580 F.2d 1006, 1008 (9th Cir. 1978) (affirming principle of *Toney*); *Tucker v. Burford*, 603 F. Supp. 276, 279 (N.D. Miss. 1985) (concluding that courts must not "embrace the hedging posture discouraged in *Toney*").

When an election approaches, parties who believe they have "suffered" or will suffer "a wrong" only "aggravate[] it by their own undue delay." *Smith v. Paris*, 257 F. Supp. 901, 906

43

(M.D. Ala. 1966); *see also Hart v. King*, 470 F. Supp. 1195, 1197 (D. Haw. 1979) (explaining that "[c]ourts have refused to void state elections where parties" with advance knowledge of an election irregularity "failed to seek pre-election relief"); *James v. Humphreys Cnty. Bd. of Election Comm'rs*, 384 F. Supp. 114, 126 (N.D. Miss. 1974) (denying post-election relief where it was "obvious that prior to the election, plaintiffs could have feasibly invoked judicial relief to avoid or correct [the] practices they now complain of"). "It takes no special genius" to predict what an alternative rule would produce: "confusion and turmoil [] that threatens to undermine public confidence in the federal courts, state agencies, and the elections themselves." *Wise*, 978 F.3d at 105 (Wilkinson, J., dissenting).

Third, overseas military and civilian voters cast ballots in reliance on the State Board's rule and guidance. In fact, they had to. Over 90% of overseas military and civilian voters cast their ballot through an online portal that lacked any mechanism for attaching a copy of their photo ID. *See, e.g.*, DE 61 at 3 n.3; DE 82-7 at 7. Without question, then, there has been "reliance by voters on an established election procedure" and the State Board's "official pronouncements about what the procedure [would] be in the [2024] election." *Bennett*, 140 F.3d at 1226–27.

Voters are entitled to rely on their election officials, and it would constitute a "fiction" to contend "that the voters had a duty, at their peril, somehow to foresee the ruling of the [North Carolina Court of Appeals and] Supreme Court invalidating their ballots." *Griffin*, 570 F.2d at 1076. In other words, "[i]t would be absurd to make it the responsibility of the voters to reject the ballot sent by the [State] Board" because the State Board failed to anticipate that the North Carolina Court of Appeals and Supreme Court would later disagree with its interpretation of state law. *Hoblock*, 341 F. Supp. 2d at 177; *see also Roe*, 43 F.3d at 581 (emphasizing that it is "unreasonable to expect average voters and candidates to question" guidance from election officials"); *Williams*

44

*v. Sclafani*, 444 F. Supp. 906, 912 (S.D.N.Y. 1978) (concluding that, where board of elections'

"advice was erroneous," but reflected "a custom or practice, which induced justifiable reliance,"

the practice "could not be departed from without giving prior notice"), *aff'd sub nom. Williams v.*

*Velez*, 580 F.2d 1046 (2d Cir. 1978).

Fourth, the rulings from the North Carolina Court of Appeals and Supreme Court

"constitute a retroactive change in the election laws." *Roe*, 43 F.3d at 581. Those rulings cannot

fairly be described as mere "*ex post* clarification of the state's election laws." *Bennett*, 140 F.3d

at 1227. The State Board's rule was the prevailing law on the date of the election. 08 N.C. Admin.

Code. 17.0109(d). That rule finalized a preexisting temporary rule that had been in effect the year

prior, and the State Board had exempted overseas military and civilian voters from the voter ID

law since its passage in 2019. *See* DE 82-8 at 8-9.

Put another way, it is undisputed (as a matter of historical fact) that overseas military and

civilian voters have *never* previously been required to comply with the voter ID law, and yet the

new rule announced by the North Carolina Court of Appeals and Supreme Court "applie[s]

retroactively." *Roe I*, 904 F. Supp. at 1335. "[T]he very integrity of the [election] process rests

on the assumption that clear rules will be established" before an election, and not after when

individuals have already conformed their conduct to preexisting rules. *O'Brien*, 469 F.2d at 569-

70.

And fifth, this retroactive change to the rules will result in disenfranchisement because over

1,400 ballots from overseas military and civilian voters have been declared invalid, "a potentially

controlling number of the votes cast." *Griffin*, 570 F.2d at 1080. By establishing procedures "that

voters rely upon in good faith to cast their vote, and then invalidating them," the state action here

"effectively take[s] away" overseas military and civilian voters' "guaranteed right to vote in the

45

election." *Hoblock*, 341 F. Supp. 2d at 176. A "post-election change of practice" that results in the discarding of votes "is abominable under the Constitution of the United States." *Roe I*, 904 F. Supp. at 1335. "This is especially true where, as here, fundamental, constitutionally protected liberties are adversely affected, and those interested," i.e. voters, "require certain knowledge of what is expected of them by the state." *Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970) (concluding that last-minute change to election procedure violated due process).

Even those federal courts that decline to intervene in a state election dispute recognize the fundamental concept that a state cannot, consistent with due process, "change[] the rules" after "the game," by telling "voters one thing before the election and chang[ing] policy thereafter." *Scheer*, 15 F. Supp. 2d at 1344. And "it would make for an empty constitutional right if one's franchise extended only so far as placing one's ballot in the ballot box." *Hoblock*, 487 F. Supp. 2d at 98. That is why, for over a century, the Supreme Court has described as "unquestionable" the principle that the "right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box." *United States v. Mosley*, 238 U.S. 383, 386 (1915). Overseas military and civilian voters followed the rules as they existed at the time of the election, but the retroactive change in voting procedure at issue here deprives them of their fundamental right to have their votes counted.

In light of the foregoing, this court wishes (again) to make clear that its order does not implicate North Carolina's authority to interpret state law or implement state election procedures prospectively. Likewise, this order does not question the North Carolina Court of Appeals and Supreme Court's interpretation of North Carolina election law, and is in no way "a backhanded critique of the merits of" those decisions. *Bennett*, 140 F.3d at 1225. But those Courts only resolved questions of state law; they were "not called upon to decide whether" retroactive

46

invalidation of ballots would implicate overseas military and civilian voters' federal "constitutional rights." *Roe II*, 58 F.3d at 409. Thus, they "did not confront the" federal "questions that retroactive application" of their state-law "ruling would create." *Griffin*, 570 F.2d at 1079.

Judge Griffin maintains that there is no substantive due process violation here. He argues that the substantive due process right at issue in this case has "never [been] recognized by the Supreme Court." DE 81 at 11. But the Fourth Circuit has said that the principles espoused by the First Circuit in *Griffin* are "settled." *Hendon*, 710 F.2d at 182. And it is equally settled that "decisions of the circuit courts of appeals bind the district courts," *Doe*, 511 F.3d at 465, so *Hendon* "is binding on this court," *Fisher-Borne v. Smith*, 14 F. Supp. 3d 695, 697 (M.D.N.C. 2014).

Judge Griffin also contends that the remedial process here distinguishes this case from *Griffin* and other cases like it, where votes were invalidated without the opportunity for voters to cure their ballots. DE 81 at 12-13. That is a factual distinction, but the court does not find it to be a "meaningful" one. *City of Martinsville*, 128 F.4th at 271. Here, as in *Griffin*, certain ballots have been subject to "retroactive invalidation." *Griffin*, 570 F.2d at 1070. The act of "invalidati[ng] absentee ballots" based on retroactive application of newly announced election rules is the state action that triggers due process concerns. *Hoblock*, 341 F. Supp. 2d at 173. Like in *Griffin*, *Hoblock*, *Roe*, and *O'Brien*, the complained-of decisions in this case "attach[] new legal consequences to events" long ago "completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994). What's more, the court has already concluded that the cure process violates the Equal Protection Clause. A state cannot fix one constitutional violation (a retroactive change to election procedure) by committing another (the disparate treatment of similarly situated voters).

In addition, Judge Griffin asserts that this case involves a "garden variety" issue, and not the sort of "massive" disenfranchisement necessary to sustain a due process claim. DE 81 at 14-

47

19. The court disagrees on both fronts. When courts speak of garden variety issues in election cases, they are referring to errors or negligence, not intentional state conduct. *E.g.*, *Hendon*, 710 F.2d at 182; *Gamza*, 619 F.2d at 453–54. The State Board's promulgation of an administrative rule, and the North Carolina Courts' thoughtful consideration of difficult state law issues, bear no resemblance to a formatting error on a ballot, *Hendon*, 710 F.2d at 182, mistakenly including extra candidates on a run-off ballot, *Gamza*, 619 F.2d at 451, or a "[v]oting device malfunction." *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975); *see also Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) (collecting cases and cataloguing various "garden variety" issues). Guidance from state election officials that is later invalidated by judicial decree is of a different order of magnitude; "this is not" like those other "situation[s]." *Griffin*, 570 F.2d at 1075; *see also Hoblock*, 487 F. Supp. 2d at 96 (holding that "[t]he intentional issuance of the absentee ballots was an action under color of state law which itself directly led to the deprivation of Plaintiffs' constitutionally protected franchise"); *Roe I*, 904 F. Supp. at 1335 (concluding that judicial order retroactively changing voting procedure represents a "fundamental deficiency in the fairness of the process").

And although the *Bennett* Court referred to the "massive *ex post* disenfranchisement" in *Griffin* as a basis for federal court intervention, *Bennett*, 140 F.3d at 1226, the *Griffin* Court rejected the notion that identifying a substantive due process violation "requir[es] mathematical certainty," *Griffin*, 570 F.2d at 1080. That case only involved "131 votes [that] were cast by absentee or shut-in ballots." *Id.* 1067. Some cases involve more ballots. *Roe II*, 43 F.3d at 578 (addressing "[b]etween 1000 and 2000 absentee voters"). Others involve fewer. *Hoblock*, 341 F. Supp. 2d at 177 ("27 voters"). But when the results of an election are close, and the challenged votes are potentially outcome-determinative, "a post-election departure from previous practice" reaches the "point of patent and fundamental unfairness." *Roe*, 43 F.3d at 581 (first quote); *Griffin*,

48

570 F.2d at 1077 (second quote); *see also Bonas*, 265 F.3d at 74 (agreeing that due process is violated where state action "changed the rules at the end of the game, resulting in the annulment of an entire class of ballots that likely would have been outcome-determinative").

At bottom, the court agrees with the First Circuit in *Griffin*: "[w]hen a group of voters are" advised (and in fact required) "by election officials" to follow a voting procedure "that, unsuspected by all, [is] invalid, state law may forbid counting the ballots, but the election itself becomes a flawed process." *Griffin*, 570 F.2d at 1076. "The unfairness to" overseas military and civilian "voters is unmistakably clear, and just as troublesome as that in *Griffin*." *Hoblock*, 341 F. Supp. 2d at 177. Consequently, "it is incumbent upon a federal court to step in to protect the rights guaranteed to each citizen of this nation" and "[t]his [c]ourt will not shirk its duty." *Roe I*, 904 F. Supp. at 1335. The court finds that retroactive invalidation of overseas military and civilian voters' ballots violates their substantive due process rights.[21]

e. Never Residents

The court turns now to the Never Residents who, when requesting a ballot for the 2024 election, indicated that they have never lived in the United States. *See* DE 84 at 6. Judge Griffin identified several hundred of these individuals in his protest. DE 1-12 at 12. The North Carolina Court of Appeals and Supreme Court determined that the state statute granting this group of individuals the right to vote conflicted with an express provision of North Carolina Constitution. *Griffin COA*, 2025 WL 1021724, at *13; *Griffin SC*, 2025 WL 1090903, at *3. Those orders did not offer any opportunity for voters to contest their designation as Never Residents. *See id.*[22]

---

[21] Because the court has found that retroactive invalidation of overseas military and civilian voters' ballots violates their due process rights, and that the cure process contravenes principles of equal protection, it will not separately consider (as to that group of voters), whether the cure process imposes an unconstitutional burden on the right to vote.

[22] As detailed previously, the court recognizes that certain parties dispute whether the State Board can provide any sort of cure process for Never Residents. *E.g.* DE 121 at 2. That dispute is apparently unsettled in state court. *See* DE 76. For purposes of this order, the court finds that there is no genuine dispute that the order from the North Carolina Court of Appeals expressly sets forth a remedial procedure for overseas military and civilian voters, but

Accordingly, the court must consider first whether this retroactive change violates the Never Residents' substantive due process rights, and second whether the lack of a cure process violates their procedural due process rights or amounts to an unconstitutional burden on the right to vote.

### i. Substantive Due Process

As to the first question, the court does not discern a substantive due process violation. Since its creation in 1776, North Carolina's Constitution has provided that "only lawful residents of North Carolina . . . are entitled to vote in [] state and non-federal elections." *Griffin COA*, 2025 WL 1021724, at *13; *see also* N.C. CONST. art. VI, § 2. A North Carolina statute enacted in 2011 expanded the right to vote to certain non-residents, N.C.G.S. § 163-258.2(1)(e), but the North Carolina Court of Appeals and Supreme Court subsequently determined that the statute conflicted with the state Constitution and was void, *Griffin COA*, 2025 WL 1021724, at *13.

Therefore, in contrast to overseas military and civilian voters, the decisions from the North Carolina Court of Appeals and Supreme Court pertaining to Never Residents did not retroactively change an election procedure for *eligible* voters. Those decisions determined that a class of individuals who have historically been regarded as *ineligible* voters are in fact ineligible voters. *Griffin*, *Hoblock*, *Roe*, and like cases all addressed retroactive changes to voting procedures for eligible voters, not determination of who is eligible to vote in the first instance.

Because those cases are inapt, the question for this court is whether it should recognize a new substantive due process right: the right of non-residents of a state to have their votes counted in a particular state's election when a statute of the state granted them the right to vote but the constitution of the state forbade it. Courts must be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this" uncharted "area are scarce

---

provides no cure process for Never Residents, instead directing the State Board to "remove" those ballots "from the final count of the 2024 election for Supreme Court Seat 6." *Griffin COA*, 2025 WL 1021724, at *15.

and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). "By extending constitutional protection" to a new "asserted right or liberty interest," a court largely "place[s] the matter outside the arena of public debate and legislative action." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see also District Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 73 (2009) (recognizing that "[e]stablishing a freestanding right" of substantive due process "force[s]" courts "to act as policymakers"). Doing so represents an inherently "treacherous" exercise, because "the only limits to such judicial intervention become the predilections" of the court. *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 502 (1977) (plurality op.). Accordingly, at a minimum a court tasked with defining a new substantive due process right must determine that the right is consistent with our Nation's history and tradition. *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (right must be "deeply rooted in this Nation's history and tradition"); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 (2010) (right must be "fundamental to our scheme of ordered liberty and system of justice") (emphasis omitted).

The right of a non-resident to vote in a state's elections is not deeply rooted in our Nation's history and tradition. Quite the opposite: "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50 (1959). And more specifically, North Carolina "has unquestioned power to impose reasonable residence restrictions on the availability of the ballot." *Carrington v. Rash*, 380 U.S. 89, 91 (1965).[23]

A reasonable residence restriction includes the requirement that "voters [] be bona fide residents." *Dunn*, 405 U.S. at 337 n.7. Bona fide residency requirements are "necessary to

---

[23] *Cf. Minor v. Happersett*, 88 U.S. 162, 177 (1874) (summarizing practice of several states that had not made "*citizenship* . . . a condition precedent to the enjoyment of the right of suffrage") (emphasis added).

preserve the basic conception of a political community." *Id.* at 344. Put another way, one "who lives in Virginia has no constitutional right to cross the Potomac and vote in Maryland; and an Alaskan has no constitutional right to vote in Louisiana." *Fontham v. McKeithen*, 336 F. Supp. 153, 168 (E.D. La. 1971) (three-judge panel) (Wisdom, J., dissenting). "That is hardly a startling proposition." *Id.*

Never Residents may have voted in reliance on a state statute, but the North Carolina Supreme Court determined that the statute conflicted with the North Carolina Constitution and was void. *Griffin SC*, 2025 WL 1090903, at *3. Therefore, the North Carolina Supreme Court concluded that Never Residents had no state law right to have their votes counted in a state election. *See id.* That Court is the "principal expositor[]" of North Carolina law, and this court has no authority to second-guess that Court's interpretation of state law. *Moore*, 442 U.S. at 429.

This court's task, then, is only to determine whether Never Residents possess a substantive due process right that is coextensive with the state statute that North Carolina's Supreme Court invalidated. They do not; states retain "unquestioned power to impose reasonable residence restrictions on the availability of the ballot," *Carrington*, 380 U.S. at 91, including the requirement of "bona fide residen[cy]," *Dunn*, 405 U.S. at 337 n.7. And North Carolina's "long practice of regulating" voting by non-residents (by prohibiting the practice) "precludes [the] claim that the denial of" the right to vote for Never Residents "has deprived [them] of a fundamental liberty interest." *Kerry v. Din*, 576 U.S. 86, 95 (2015); N.C. CONST. art. VI, § 2. As a result, the court finds that the orders of the North Carolina Court of Appeals and Supreme Court do not violate the substantive due process rights of Never Residents.

ii. *Procedural Due Process/Undue Burden*

The parties disagree about the correct standard of review for assessing the effect of the North Carolina Court of Appeals and Supreme Court's orders on Never Residents: traditional procedural due process analysis under *Matthews v. Eldridge* or *Anderson-Burdick* scrutiny. *Compare* DE 78 at 18-19, *with* DE 81 at 19. The case law is also mixed. *Compare Democratic Party of Virginia v. Brink*, 599 F. Supp. 3d 346, 361 (E.D. Va. 2022), *with Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020). Because, in the court's view, application of either test leads to the same outcome (as to the Never Residents), the court will apply each in the alternative. *See League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 77 (D.S.C. 2020) (considering both tests); *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (observing that tests are "conceptually duplicative"). [24]

For the traditional due process claim, the Fourth Circuit has explained that "[d]ue process contains both substantive and procedural components." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014). The "substantive component," discussed previously, "bars certain arbitrary, wrongful government actions." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). On the other hand, "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). The first step in evaluating a procedural

---

[24] Although the court will apply each test, it considers the traditional *Matthews v. Eldridge* test more appropriate in the post-election context. *Anderson-Burdick* scrutiny typically involves pre-election challenges to state election laws. Because this action does not involve such a challenge, there is no state party present to articulate or defend the state's interest in the state action, which is the second step of *Anderson-Burdick* scrutiny. In fact, the only state entity here, the State Board, is arguing against application of the state courts' orders. *See* DE 83. And evaluating the state's interest here is particularly perplexing because North Carolina's General Assembly *unanimously* passed the statute that the Court of Appeals and Supreme Court later invalidated. *See* DE 84 at 7. The court has only identified one case where *Anderson-Burdick* was applied to assess the "burden on voting rights imposed by post-election actions," but that case is so factually anomalous as to be of no help. *Monserrate v. New York State Senate*, 599 F.3d 148, 156 (2d Cir. 2010) (addressing burden on voters when state senator was convicted of assault and then expelled from senate, which resulted in his district lacking representation for six weeks until special election was held).

due process claim is identifying "the private interest that will be affected by the official action." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Where a private interest is implicated by state action, an individual enjoys the procedural right of notice and an opportunity to be heard. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).

True Never Residents have no substantive right, under either state law or the federal Constitution, to have their votes counted in the 2024 election for Seat 6. *See, e.g.*, *Griffin COA*, 2025 WL 1021724, at *13; *Griffin SC*, 2025 WL 1090903, at *3; *Dunn*, 405 U.S. at 337 n.7; *Carrington*, 380 U.S. at 91. Therefore, that group of voters possesses no attendant procedural due process rights. *Rockville Cars, LLC v. City of Rockville, Maryland*, 891 F.3d 141, 145 (4th Cir. 2018) ("Procedural due process applies only to the deprivation of liberty and property interests that the Fourteenth Amendment encompasses."); *Elhady v. Kable*, 993 F.3d 208, 219 (4th Cir. 2021) (explaining that, without "substantial infringement of liberty or property," "[n]o process is due").[25] But what of individuals erroneously designated as Never Residents?

The available record contains sufficient evidence that multiple individuals have been misclassified as Never Residents: perhaps more than 10% of the individuals named in Judge Griffin's protest. *See* DE 78-1 at 8-10; DE 61 at 4 n.6. Judge Griffin makes no attempt to counter that evidence. *See* DE 81; DE 104; DE 106. Those individuals are *not* ineligible to vote in North Carolina's elections on the basis articulated by the North Carolina Court of Appeals and Supreme Court, but the orders from those Courts direct the State Board to "remove" their votes "from the final count of the 2024 election for Supreme Court Seat 6." *Griffin COA*, 2025 WL 1021724, at *15. As to this latter group of voters, the court must (1) identify the "private interest that will be

---

[25] The court recognizes that a property interest to which procedural due process rights attach may "stem from an independent source such as state law." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). But here, the state law granting Never Residents the right to vote in North Carolina elections was declared unconstitutional, and this court may not review the merits of that state law decision. *See Moore*, 442 U.S. at 429.

affected by the official action," (2) assess "the risk of an erroneous deprivation of such interest," and (3) consider "the Government's interest." *Mathews*, 424 U.S. at 335.

First, the private interest is significant; for eligible voters, the right to vote, and have one's vote counted, is fundamental. *Wesberry*, 376 U.S. at 17; *Mosley*, 238 U.S. at 386.

Second, the risk of erroneous deprivation is substantial. Multiple individuals have been misclassified as Never Residents, *see* DE 78-1 at 8-10; DE 61 at 4 n.6, but the orders from the North Carolina Court of Appeals and Supreme Court do not mandate any "notice and an opportunity to be heard" for those voters. *Mora v. The City Of Gaithersburg, MD*, 519 F.3d 216, 230 (4th Cir. 2008).

The only "notice" those individuals received is a bulk-mailed postcard from the North Carolina Republican Party (not Judge Griffin or the State Board) which equivocally informed them that their vote "may be affected" by a post-election protest, and which contained a QR code that the voter could scan to view a list of hundreds of post-election protests instituted by multiple candidates. *See* DE 1-12 at 17-18. The postcard did not identify which protest, if any, was applicable to the voter. *See id.*

If the voter owned a device capable of scanning the QR code, the voter would then have to sift through non-alphabetized spreadsheets (some containing hundreds or thousands of names) to try to locate their name on a protest filing. Although "the use of mail" may satisfy "the notice element of due process," *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014), the court finds that the notice provided to these voters was not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane*, 339 U.S. at 314; *see also Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479, 488–89 (4th Cir. 2024) (holding

that notice was inadequate where recipient had to read fine print on back of form to identify pertinent warning).

And third, the court is unable to detect any state interest in depriving an eligible voter of the right to vote without notice and an opportunity to be heard. To the contrary, the North Carolina Court of Appeals expressly highlighted the public interest in protecting the right to vote for eligible voters. *See Griffin COA*, 2025 WL 1021724, at *4. Judge Griffin agrees with that sentiment. *See* DE 81 at 22-23. But that interest requires giving voters who have been improperly designated as Never Residents an opportunity to contest that designation. *See, e.g.*, *Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1053 (D.N.D. 2020) (finding that absence of cure process for signature mismatch likely violated voters' procedural due process rights and that "allowing voters to verify the validity of their ballots demonstrably advances—rather than hinders" the state's interest in "upholding the integrity of elections"); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2018) (same, and emphasizing that "permitting an absentee voter to resolve an alleged [] discrepancy [] has the very tangible benefit of avoiding disenfranchisement"); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 220 (D.N.H. 2018) ("additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised"); *cf. Hudler v. Austin*, 419 F. Supp. 1002, 1014 (E.D. Mich. 1976) (three-judge panel) (concluding that new ballot access law passed shortly before general election imposed a "constitutionally unreasonable obstacle to compliance" and "[d]epriv[ed] plaintiffs of adequate time and notice"), *aff'd sub nom. Allen v. Austin.*, 430 U.S. 924 (1977). The orders from the North Carolina Court of Appeals and Supreme Court do not require the State Board to offer any "notice" or "an opportunity to be heard" for Never Residents. *Mora*, 519 F.3d at 230. As applied to Never

Residents who have been erroneously classified as such, the lack of a cure process violates their right to procedural due process.

### iii. *Anderson-Burdick*

The outcome would be no different if the court instead analyzed this issue as a burden on the right to vote under the *Anderson-Burdick* framework. That framework acknowledges that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). And states retain "control over the election process for state offices." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986). But such control "does not extinguish the State's responsibility to" avoid "the abridgment of fundamental rights." *Id.* As a result, federal courts assess "the constitutionality of a challenged election law by applying" the sliding scale of "the *Anderson-Burdick* test." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019).

Under this approach, when an election law imposes "reasonable, nondiscriminatory restrictions" on an individual's right to vote, "the state's important regulatory interests are generally sufficient to justify" the law. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). On the other hand, if an individual's "First and Fourteenth Amendment rights . . . are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "*Anderson–Burdick* balancing operates on a sliding scale: the greater the burden imposed, the more important a state's justification must be." *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 664 (M.D.N.C. 2024).

As for the relevant burden, the court finds that post-election ballot disqualification for individuals erroneously designated as Never Residents constitutes a substantial burden on the right to vote. *E.g.*, *Northeast Ohio Coalition*, 696 F.3d at 593 (invalidation of ballots was "substantial burden"); *Voto Latino*, 712 F. Supp. 3d at 670 (state law that removed "votes of a cast ballot from the count" without any "notice and opportunity to be heard" represented "substantial burden" on right to vote); *Poindexter v. Strach*, 324 F. Supp. 3d 625, 631–32 (E.D.N.C. 2018) (holding that "retroactive application" of state law that prevented plaintiff from appearing on ballot "imposes a severe burden"). It's hard to envision a more "severe restriction" than retroactive invalidation of one's vote. *Norman*, 502 U.S. at 289. To satisfy scrutiny, this restriction must "be narrowly drawn to advance a state interest of compelling importance." *Id.*

The court acknowledges that North Carolina has a compelling interest in limiting the right to vote to bona fide residents, which is "necessary to preserve the basic conception of a political community." *Dunn*, 405 U.S. at 344; *see also Carrington*, 380 U.S. at 91. But by declining to offer any process through which voters may contest their designation as Never Residents, the orders from North Carolina Court of Appeals and Supreme Court are not "narrowly drawn to advance" that interest. *Norman*, 502 U.S. at 289. "[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Kusper v. Pontikes*, 414 U.S. 51, 58–59 (1973). Put another way, "States" must "adopt the least drastic means to achieve their ends." *Socialist Workers Party*, 440 U.S. at 185.

The means at issue here are not the least drastic available. They are "overinclusive." *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015). Multiple individuals have been incorrectly designated as Never Residents. *See* DE 78-1 at 8-10; DE 61 at 4 n.6. But the orders from the

North Carolina Court of Appeals and Supreme Court direct the removal of their "votes . . . from the count" without any "notice and opportunity to be heard." *Voto Latino*, 712 F. Supp. 3d at 670.

A "less restrictive alternative" (providing notice and an opportunity to be heard) "would serve" North Carolina's interest in limiting the right to vote to bona fide residents. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). By not employing that alternative, the state action here is not "narrowly drawn" to advance "a state interest of compelling importance." *Norman*, 502 U.S. at 289. Although North Carolina has a compelling "interest in ensuring orderly, fair, and efficient procedures for the election of public officials," retroactively discarding the votes of eligible voters undermines, rather than advances, that interest. *South Carolina Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 759 (4th Cir. 2010). The court thus finds that the invalidation of ballots from misclassified Never Residents without notice or an opportunity to be heard represents an unconstitutional burden on the right to vote under *Anderson-Burdick*.

### f. Other Issues

Certain parties have raised other bases for relief, but the court does not find that any of them warrant entry of judgment as a matter of law.

#### i. *National Voters Registration Act*

Several parties contend that discarding the votes of Never Residents amounts to a systematic removal of voters that violates the Notional Voter Registration Act ("NVRA"). DE 78 at 25-26; DE 83 at 17-18; DE 84 at 29; DE 87 at 21-23. The court does not agree.

The NVRA provides that a "a State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). The court has previously held that the NVRA governs federal elections,

59

not state elections. *See Griffin I*, DE 50 at 7-8; *Young v. Fordice*, 520 U.S. 273, 275 (1997). Moreover, the potential discarding of votes from Never Residents does not involve "remov[ing] the[ir] names . . . from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). If it did, that would implicate the NVRA because "North Carolina has a unified registration system for both state and federal elections." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024). But the orders from the North Carolina Court of Appeals and Supreme Court do not direct the removal of Never Residents from voter rolls, and exclusively address the right of Never Residents "to vote in *non-federal* North Carolina elections." *Griffin COA*, 2025 WL 1021724, at *13 (emphasis added). The NVRA does not call into question those orders.

### ii. *Voting Rights Act*

Justice Riggs and the State Board assert that the cure process and discarding of votes from Never Residents are barred by the Voting Rights Act, which prohibits state officials from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the vote of someone who "is otherwise qualified to vote." 52 U.S.C. § 10307(a); *see also* DE 83 at 18; DE 84 at 30. Neither party meaningfully develops this argument, and the court does not find it persuasive.

For one, the North Carolina Court of Appeals and Supreme Court determined that Never Residents are not "qualified to vote" in North Carolina Elections. *Id.* In addition, Justice Riggs and the State Board's proffered interpretation of the Voting Rights Act is constitutionally dubious because it lacks a limiting principle and would appear to preclude states from enforcing any procedural rule associated with voting in state elections if the rule did not concern a voter's qualification to vote. *But see Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 715 (4th Cir. 2016) (observing that "the Constitution has continued to preserve for state legislatures the

60

presumptive authority to regulate both the larger and smaller aspects of . . . state elections occurring within that state's boundaries"). The court "find[s] it implausible that" the Voting Rights Act "bars a State from enforcing vote-casting rules that it has deemed necessary to administer its elections." *Pennsylvania State Conf. of NAACP Branches v. Sec'y Commonwealth of Pennsylvania*, 97 F.4th 120, 135 (3d Cir. 2024); *cf. Powell v. Power*, 436 F.2d 84, 87 (2d Cir. 1970) (emphasizing that goal of Voting Rights Act is "abolition of racial discrimination in the election process").

### iii.  *Civil Rights Act*

The VoteVets Action Fund Parties argue that discarding the votes of Never Residents violates the materiality provision of the Civil Rights Act, which provides that a state official may not "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B); *see also* DE 87 at 23-27. As this argument goes, if an individual mistakenly self-identifies as a Never Resident, then that ballot error "is not material in determining whether" the individual is "qualified . . . to vote." *Id.*

For two reasons, the VoteVets Action Fund Parties are not entitled to judgment as a matter of law on this issue. First, without belaboring the point, the court finds persuasive the Eleventh Circuit's discussion of materiality in *Florida State Conference of N.A.A.C.P. v. Browning* and agrees that the argument presented here conflates "the nature of the error" with "the nature of the underlying information requested." *Florida State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 11-7475 (11th Cir. 2008). Second, although the Ninth Circuit in *Mi Familia Vota* concluded that an error on a form's checkbox related to a voter's citizenship status was not material, the Court

61

there only reached that conclusion for voters who had previously provided *documentary proof* of citizenship to state election officials. *Mi Familia Vota*, 129 F.4th at 720–21. In other words, the record in that case reflected that election officials had "already verified the applicant's citizenship" with "hard proof." *Id.* at 761 (Bumatay, J., dissenting in part but affirming conclusion that checkbox error was not material). Here, the State Board has stated that some Never Residents have been improperly designated as such. DE 61 at 4 n.6. And the NCDP has provided evidence substantiating that statement. DE 78-1 at 8-10. But the State Board is yet to verify that its own records contain "hard proof" demonstrating that certain Never Residents inadvertently checked a box indicating that they have never resided in the United States. *Mi Familia Vota*, 129 F.4th at 761. Thus, the factual record in this case is distinguishable from that in *Mi Familia Vota*.

### iv. Uniformed and Overseas Citizens Absentee Voting Act

Last, Justice Riggs contends that the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") exempts overseas military and civilian voters "from state requirements that they provide a copy of a photo ID or other documentation of their name and address when voting by mail." DE 84 at 30. But "UOCAVA's requirements apply only to absentee ballots used to elect candidates for federal office." *Doe v. Walker*, 746 F. Supp. 2d 667, 671 (D. Md. 2010); *see also* 52 U.S.C. § 20302(a); *Somers v. S.C. State Election Comm'n*, 871 F. Supp. 2d 490, 494 n.6 (D.S.C. 2012). And the orders from the North Carolina Court of Appeals and Supreme Court only apply state law to require "voters voting absentee in a non-federal election in North Carolina to comply with the photo ID requirement." *Griffin COA*, 2025 WL 1021724, at *12. The court finds that those orders do not implicate UOCAVA.

g. Remedy

The court concludes that the retroactive invalidation of absentee ballots cast by overseas military and civilian voters violates their substantive due process rights, and that the cure process violates their equal protection rights. The court further concludes that the lack of any cure process for individuals erroneously designated as Never Residents violates their procedural due process rights and represents an unconstitutional burden on the right to vote. Based on those conclusions, the State Board may not implement the stated cure process or "remove" the votes of all Never Residents "from the final count of the 2024 election for Supreme Court Seat 6." *Griffin COA*, 2025 WL 1021724, at \*15.

At least in theory, the court could attempt to revise the remedial orders of the North Carolina Court of Appeals and Supreme Court to ameliorate the constitutional issues it has identified. But, this late in the game, the *Purcell* doctrine bars the court from doing so.

*Purcell* explains that "[c]ourt orders affecting elections, especially conflicting orders, can [] result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). Therefore, the Supreme Court "has repeatedly emphasized that federal courts ordinarily should not alter state election rules in the period close to an election." *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring in grant of application for stay). That means counting votes even if those votes were cast in violation of state law. *See id.* at 9–10 (staying district court's order exempting absentee ballots from South Carolina's witness requirement "except to the extent that any ballots cast before this stay issues and received within two days of this order may not be rejected for failing to comply with the witness requirement"). The *Purcell* doctrine thus reflects the commonsense principle that "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81

63

(2022) (Kavanaugh, J., concurring in grant of applications for stays); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) ("lower federal courts should ordinarily not alter the election rules on the eve of an election"); *cf. Riley v. Kennedy*, 553 U.S. 406, 426 (2008) ("practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges").

If *Purcell* counsels against "judicial tinkering" when "an election is close at hand," *Milligan*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring), it surely forbids retroactive tinkering, *see Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 227 (4th Cir. 2024) (applying *Purcell* because election "is happening right now"). Put another way, if this court had not abstained and remanded the state law issues in *Griffin II*, *Purcell* would have precluded the court from offering Judge Griffin any relief. *Purcell* is no less relevant now, and perhaps more so, months after the election has come and gone.

Thus, the only remedial option available to this court is to (1) permanently enjoin the State Board from implementing the cure process or removing votes from the count, and (2) order the State Board to certify the results of the election for Seat 6 based on the tally at the completion of the canvassing period. To obtain a permanent injunction, a party must first demonstrate "actual success" on the merits. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987). The party then "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

First, the court finds (as detailed throughout this order), that the State Board, Justice Riggs, the VoteVets Action Fund Parties, the NCDP, and the *Conley* Plaintiffs have collectively demonstrated actual success on the merits of their claims that (1) retroactive invalidation of ballots of overseas military and civilian voters violates those voters' substantive due process rights, (2) the cure process violates those same voters' equal protection rights, and that (3) the lack of any cure process for individuals to contest their designation as Never Residents violates those voters' procedural due process rights and represents an unconstitutional burden on the right to vote.

Second, the court finds that the challenged voters would suffer an irreparable injury in the absence of injunctive relief. Where "there is a [demonstrated] constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021); *see also Air Evac EMS*, 37 F.4th at 103; *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992) (the "prospect of" unconstitutional state action "supplies the necessary irreparable injury"). "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Third, monetary damages are inadequate to compensate the challenged voters for the loss of their fundamental right to vote. *See Legend Night Club*, 637 F.3d at 302. And, in any event, voters could not recover damages from the State Board. *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 223 (4th Cir. 2001); *Doe v. Bd. of Visitors of Virginia Mil. Inst.*, 494 F. Supp. 3d 363, 379 (W.D. Va. 2020) ("State entities and state officials are immune from damages suits in their official capacities.").

Fourth, the balance of hardships and public interest support entry of a permanent injunction. *See, e.g.*, *Kravitz v. United States Dep't of Com.*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (granting permanent injunction and explaining that "[b]ecause the government is a party, and 'the government's interest is the public interest,' the last two factors merge") (quoting *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)); *Nken v. Holder*, 129 S. Ct. 1749, 1753 (2009) ("The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party."); *United States v. Klamath Drainage Dist.*, No. 23-3404, 2025 WL 262346, at *2 (9th Cir. Jan. 22, 2025). Depriving voters of a fundamental right would result in significant hardship. Preventing the State Board from implementing a process violative of constitutional rights would impose no hardship. Dispossessing Justice Riggs of a seat on the North Carolina Supreme Court that she won would constitute a substantial hardship. Giving effect to the will of the voters would result in no corresponding hardship for Judge Griffin. And there is a tremendous public interest in safeguarding "the integrity of our electoral processes," which "is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4.

Permanent injunctive relief is warranted in this case.

## V.  Conclusion

"The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring). That principle will be familiar to anyone who has played a sport or board game. You establish the rules before the game. You don't change them after the game is done.

This consolidated action concerns an attempt to change the rules of the game after it had been played. The court cannot countenance that strategy, *see Hendon*, 710 F.2d at 182; *Toney*, 476 F.2d at 209, which implicates the very integrity of the election and offends "the law's basic interest in finality." *United States v. Fugit*, 703 F.3d 248, 253 (4th Cir. 2012). Permitting parties to "upend the set rules" of an election after the election has taken place can only produce "confusion and turmoil [which] threatens to undermine public confidence in the federal courts, state agencies, and the elections themselves." *Wise*, 978 F.3d at 105 (Wilkinson, J., dissenting). Accordingly, the court FINDS as follows:

1. Retroactive invalidation of absentee ballots cast by overseas military and civilian voters violates those voters' substantive due process rights;

2. The cure process violates the equal protection rights of overseas military and civilian voters; and

3. The lack of any notice or opportunity for eligible voters to contest their mistaken designation as Never Residents violates procedural due process and represents an unconstitutional burden on the right to vote.

Therefore, the court ORDERS that:

A. The State Board SHALL NOT take any action in furtherance of the North Carolina Court of Appeals and Supreme Court's orders in *Griffin v. N. Carolina State Bd. of Elections*, No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) and *Griffin v. N. Carolina State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025);

B. The State Board SHALL certify the results of the election for Seat 6 based on the tally at the completion of the canvassing period on December 10, 2024;

C. Judge Griffin's petitions for judicial review [DE 1-4; DE 1-12] are DENIED;

67

D. Judge Griffin's motions for injunctive relief [DE 1-5; DE 1-13] are DENIED;

E. Justice Riggs' motion for injunctive relief [DE 37] is GRANTED;

F. The VoteVets Action Fund Parties' motion for summary judgment [DE 86] is GRANTED[26];

G. The NCDP's request for injunctive relief [DE 78] is GRANTED;

H. The *Conley* Plaintiffs' request for a permanent injunction [DE 82] is GRANTED;

I. Final judgment[27] is ENTERED:

    i.    In *Griffin II*, judgment is ENTERED in favor of the State Board, Justice Riggs, and the VoteVets Action Fund Parties as to the issues identified in Findings 1, 2, and 3;

    ii.    In *NCDP*, judgment is ENTERED in favor of the NCDP as to the issues identified in Findings 1, 2, and 3; and

    iii.    In *Conley*, judgment is ENTERED in favor of the *Conley* Plaintiffs as to the issues identified in Findings 1 and 2.[28]

The court's order is STAYED for 7 days, so that Judge Griffin may pursue an appeal if he so chooses.

SO ORDERED this 5th day of May, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

---

[26] In light of this disposition, the VoteVets Parties' motion to amend [DE 114] is denied as moot.

[27] Given the unique circumstances of this case, and the nature of the relief ordered, the court finds there is no "just reason for delay" and enters final judgment. *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980); Fed. R. Civ. P. 54(b).

[28] Given this resolution, the court will not direct the *Conley* Plaintiffs to move for class certification. *See* DE 120 at 2.

68